# EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 7, 2016

**By Email**

Barry H. Berke, Esq.
Kramer Levin Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036
Phone: 212-715-9100
Email: bberke@kramerlevin.com

Re: *United States* v. *William Walters*, S1 16 Cr. 338 (PKC)

Dear Mr. Berke:

    We write in response to your letters of May 31, 2016 requesting, respectively, a bill of particulars and discovery. First, with respect to a bill of particulars, we direct your attention to the detailed Indictment and the anticipated discovery in this case. In light of those materials, we do not believe a bill of particulars is warranted in this case, and we do not intend to produce one.

    Second, with respect to your request for discovery, the Government is aware of its disclosure obligations and will comply with them. We began our production on June 3, 2016, after the Court entered the Protective Order in this case on June 2, 2016. As we indicated at the June 1, 2016 conference in front of Judge Castel, we intend to complete production by the end of June. If you have additional questions or concerns after receiving our discovery production, please do not hesitate to contact us.

                    Very truly yours,

                    PREET BHARARA
                    United States Attorney

        by:   /s/Brooke E. Cucinella
              Brooke E. Cucinella
              Daniel S. Goldman
              Assistant United States Attorneys
              (212) 637-2477/2289

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
     :
UNITED STATES OF AMERICA     :
     :
   - v -     :     S1 11 Cr. 907 (JSR)
     :
RAJAT K. GUPTA,     :     **April 9, 2012 Bill of Particulars**
     :
     Defendant.     :
     :
-------------------------------------------------------X

     Pursuant to the Court's order, the Government supplements particulars set forth in the

Superseding Indictment by the Grand Jury in the above-captioned case with additional particulars

set forth in paragraphs 1 through 21 below concerning: (a) the identity of additional known co-

conspirators in the charged conspiracy; (b) tips from Gupta to Rajaratnam during and in

furtherance of the charged conspiracy; (c) additional benefits, direct and/or indirect, to Gupta

from the insider trading scheme; and (d) further specificity regarding the trades charged in

substantive Counts Two through Six of the Superseding Indictment.

     The below information is based on the current state of the evidence and the Government's

review and analysis of that evidence to date.  Certain answers are based, in part, on inferences

that we have drawn from documents and other evidence.  As the Government continues to

collect, review, and analyze the evidence, the Government reserves the right to draw other

reasonable inferences from the evidence.  To the extent any modifications and/or additions are

necessary based on the Government's continuing investigation, the Government will submit a

supplemental Bill of Particulars no later than three weeks prior to the start of trial.

<u>Known Co-Conspirators</u>

1.      The known co-conspirators of Rajat Gupta and Raj Rajaratnam in the conspiracy charged in Count One are: (1)                    ; (2) Michael Cardillo; (3) Ian Horowitz; (4)              ; (5)            ; (6)            ; (7)              ; and (8)

<u>Gupta's Tips To Rajaratnam In Furtherance Of The Charged Conspiracy</u>

In addition to the allegations in the Superseding Indictment, the following tips from Gupta to Rajaratnam, and their known and unknown co-conspirators, were during and in furtherance of the charged conspiracy:

2.      Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, material, nonpublic information relating to the quarterly earnings of Goldman Sachs for the first quarter of fiscal year 2007 (which ended February 23, 2007), prior to Goldman Sachs' public announcement of the quarterly earnings on or about March 13, 2007.

3.      Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, material, nonpublic information relating to the quarterly earnings of Goldman Sachs for the third quarter of fiscal year 2007 (which ended August 31, 2007), prior to Goldman Sachs' public announcement of the quarterly earnings on or about September 20, 2007.

4.      Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, material, nonpublic information relating to the quarterly earnings of Goldman Sachs for the second quarter of fiscal year 2008 (which ended May 30, 2008), prior to Goldman Sachs' public announcement of the quarterly earnings on or about June 17, 2008.

2

5.      Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, material, nonpublic information concerning P&G's sale of its Folgers business to Smucker's, prior to the public announcement of the transaction on or about June 4, 2008.

6.      On July 29, 2008, Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, nonpublic information relating to Goldman Sachs's strategic plans and board discussions (as reflected in the July 29, 2008 wiretap call between Rajaratnam and Gupta).

7.      In or about September 2008 and prior to the afternoon of September 23, 2008, Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, material, nonpublic information relating to discussions by the Goldman Sachs Board of raising capital and the status of the business.

8.      In the afternoon of September 23, 2008, Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, material, nonpublic information relating to Warren Buffett's/Berkshire Hathaway's $5 billion investment in Goldman Sachs, prior to the public announcement of that investment after the close of the market on September 23, 2008.

9       On October 23, 2008, Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, material, nonpublic information relating to interim quarterly earnings of Goldman Sachs (including revenue and other information reflected in the October 24, 2008 wiretap call between Rajaratnam and Lau) for the fourth quarter of fiscal year 2008 (which later ended November 28, 2008) prior to Goldman Sachs' public announcement of the quarterly earnings on or about December 16, 2008.

3

10.    Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, material, nonpublic information relating to P&G's organic sales growth forecast for the October-December quarter prior to P&G's public announcement on or about December 11, 2008.

11.    Gupta disclosed to Rajaratnam, and their known and unknown co-conspirators, material, nonpublic information relating to P&G's organic sales growth forecast for the fiscal year prior to P&G's public announcement on or about January 30, 2009.

12.    Although the Government believes that there is evidence of additional tips from Gupta to Rajaratnam in furtherance of the charged conspiracy, the Government does not intend at this time to offer evidence of such tips in its case-in-chief; if the Government intends to offer additional tips in its case-in-chief, the Government will supplement its Bill of Particulars by no later than three weeks prior to the start of trial.  Nevertheless, the Government reserves the right to respond to any claims by Gupta during the trial regarding the non-existence of such tips.  For example, should Gupta argue that there is no evidence of an illegal tip on a particular date in 2007 that the Government has not identified in the Superseding Indictment or Bill of Particulars, the Government reserves the right to respond that there is evidence that there was an illegal tip on that particular date.

Additional Benefits To Gupta

In addition to the particulars set forth in the Superseding Indictment:

13.    The benefits, direct and indirect, to Gupta of tipping Rajaratnam (and their known and unknown co-conspirators) included that Gupta furthered his friendship with Rajaratnam during much of the period of the charged conspiracy.

4

14.     The benefits, direct and indirect, to Gupta of tipping Rajaratnam (and their known and unknown co-conspirators) included that Gupta made a gift of material, nonpublic information to Rajaratnam.

15.     The benefits, direct and indirect, to Gupta of tipping Rajaratnam (and their known and unknown co-conspirators) included that Gupta cultivated and attempted to cultivate a personal and business relationship with Rajaratnam.  Gupta perceived Rajaratnam to be a billionaire and the head of a multi-billion dollar, highly successful hedge fund with significant connections around the world.  As a result, Gupta anticipated that a strong personal and business relationship with Rajaratnam would benefit Gupta in tangible and intangible ways.

16.     The benefits, direct and indirect, to Gupta of tipping Rajaratnam (and their known and unknown co-conspirators) included that, after Gupta's joint investment with Rajaratnam in Voyager (an entity described in the Superseding Indictment) declined in value, Gupta hoped that Rajaratnam would help Gupta recoup some and/or all of his losses from Gupta's investment in Voyager.

Further Specifics Regarding The Trades In The Substantive Counts

17.     With respect to Count Two of the Superseding Indictment, based in whole or in part on material, nonpublic information that Gupta disclosed to Rajaratnam (and their known and unknown co-conspirators) in violation of Gupta's fiduciary and other duties of confidentiality, Rajaratnam executed and/or caused to be executed the purchase of approximately 350,000 shares of Goldman Sachs stock in the portfolio manager codes of TAM and DIV on March 12, 2007.  In addition, based in whole or in part on material, nonpublic information that Gupta disclosed to Rajaratnam (and their known and unknown co-conspirators) in violation of Gupta's fiduciary and

5

other duties of confidentiality, Rajaratnam executed and/or caused to be executed the purchase of approximately 100,000 shares of Goldman Sachs stock in the portfolio manager code of EMO on March 12, 2007.

18.    With respect to Count Three of the Superseding Indictment, based in whole or in part on material, nonpublic information that Gupta disclosed to Rajaratnam (and their known and unknown co-conspirators) in violation of Gupta's fiduciary and other duties of confidentiality, Rajaratnam executed and/or caused to be executed the purchase of approximately 150,000 shares of Goldman Sachs stock in the portfolio manager code of TAM on September 23, 2008.

19.    With respect to Count Four of the Superseding Indictment, based in whole or in part on material, nonpublic information that Gupta disclosed to Rajaratnam (and their known and unknown co-conspirators) in violation of Gupta's fiduciary and other duties of confidentiality, Rajaratnam executed and/or caused to be executed the purchase of approximately 67,200 shares of Goldman Sachs stock in the portfolio manager code of TAM on September 23, 2008.

20.    With respect to Count Five of the Superseding Indictment, based in whole or in part on material, nonpublic information that Gupta disclosed to Rajaratnam (and their known and unknown co-conspirators) in violation of Gupta's fiduciary and other duties of confidentiality, Rajaratnam executed and/or caused to be executed the sale of approximately 150,000 shares of Goldman Sachs stock in the portfolio manager code of TAM on October 24, 2008.

21.    With respect to Count Six of the Superseding Indictment, based in whole or in part on material, nonpublic information that Gupta disclosed to Rajaratnam (and their known and unknown co-conspirators) in violation of Gupta's fiduciary and other duties of confidentiality, '

Rajaratnam executed and/or caused to be executed the short sale of approximately 180,000

shares of P&G stock in the portfolio manager codes of DIV, ADM, and ADS on January 29,

2009.

Dated: New York, New York
      April 9, 2012

                                   PREET BHARARA
                                   United States Attorney

By:                                         
                                   Reed Brodsky/Richard C. Tarlowe
                                   Assistant United States Attorneys
                                   Tel. (212) 637-2492/2330

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

        - v. -

TODD NEWMAN,
ANTHONY CHIASSON, and
JON HORVATH,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

S2 12 Cr. 121 (RJS)

**Bill of Particulars**

         Pursuant to the Court's Order filed June 29, 2012, the Government supplements the particulars set forth in the Superseding Indictment with additional particulars set forth below concerning: (a) the identity of known coconspirators; (b) the identity of certain stocks with respect to which one or more of the defendants and/or coconspirators provided, obtained, or received material, nonpublic information, or attempted to do so; (c) the nature of the confidential information obtained or passed by one or more of the defendants and/or coconspirators; (d) the sources of that information, if known; (e) the nature of the benefit received by the tippers of the information; (f) the approximate periods of time during which one or more of the defendants and/or coconspirators obtained or attempted to obtain the information; and (g) certain trading activity that was in furtherance of the conspiracy charged in Count One of the Superseding Indictment.

         The information set forth below is based on the current state of the evidence and the Government's review and analysis of the evidence to date. Certain answers are based, in part, on

inferences that we have drawn from documents and other evidence in the case.  As the

Government continues to review and analyze the evidence, the Government reserves the right to

draw other reasonable inferences from the evidence.

Additionally, the Government anticipates that further particularity as to the Government's

charges will be apparent from the Government's exhibits, which will be provided to the

defendants on September 21, 2012, in accordance with the Court's June 29, 2012 Order, as well

as materials that will be provided to the defendants in advance of trial pursuant to 18 U.S.C.

§ 3500.

Finally, in accordance with the Court's May 15, 2012 Order, the names of uncharged

third parties have been redacted from the publicly filed version of this Bill of Particulars.

<u>Known Coconspirators</u>

| | |
|---|---|
| *Analyst Coconspirators*: | Jesse Tortora, Spyridon Adondakis, a/k/a "Sam Adondakis," Danny Kuo, Jon Horvath, ███████████████. |
| *Portfolio Manager Coconspirators*: | Todd Newman, Anthony Chiasson, ██████████, ███████████. |
| *Other Coconspirators*: | Sandeep Goyal, ████████████████████ ████████████████. |

Stocks With Respect to Which the Defendants and/or Coconspirators
<u>Obtained or Attempted to Obtain Inside Information</u>

Dell, Inc. ("Dell"), NVIDIA Corporation ("Nvidia"), Sun Microsystems ("Sun"),

Advanced Micro Devices ("AMD"), Taiwan Semiconductor Manufacturing Company

("TSMC"), Altera Corporation ("Altera"), Intel Corporation ("Intel"), Texas Instruments,

2

Western Digital Corporation ("Western Digital"), Volterra Semiconductor Corporation ("Volterra"), PMC Sierra Inc. ("PMCS"), Ingram Micro, Inc. ("Ingram Micro"), and TE Connectivity Ltd.

<u>The Nature of the Confidential Information Passed or Obtained</u>

The nature of the confidential information passed or obtained includes the following:

| <u>Company</u> | <u>Information</u> |
|---|---|
| Dell | • Earnings information, including revenue and gross margin information (from ███████). <br><br> • Actual and forecast unit sales numbers for desktop and/or notebook computers, and pricing and market share information relating to hard drives from Dell's suppliers, including Western Digital and Seagate Technology PLC (from Dan DeVore). <br><br> • Financial information pertaining to Dell's commercial business (from ███████). |
| Nvidia | Earnings information, including revenue and gross margin information. |
| Sun | Earnings information, including actual and forecast sales information. |
| AMD | Actual and forecast unit sales numbers and average sales prices for different product lines; total revenue and gross margin information. |
| TSMC | Actual and forecast bookings information for wafers, by customer, for substantially all of TSMC's North America business. |
| Altera | Earnings information, including revenues. |
| Intel | Actual and forecast unit sales numbers for various Intel products, including microprocessors for notebooks, desktops, and servers; information pertaining to Intel's average selling prices for certain products; and information relating to Intel's fab utilization rates. |
| Texas Instruments | Earnings information, including actual and forecast sales numbers. |
| Western Digital | Actual unit shipment/sales numbers for Western Digital products. |
| Volterra | Earnings information, including revenues. |

3

| PMCS | Earnings information (from ███████); revenue information for PMCS's enterprise business (from unknown source). |
| Ingram Micro | Earnings information pertaining to Ingram Micro's European business. |

<u>The Source of the Information, If Known</u>

| Company | Source |
| --- | --- |
| Dell | ███████, Daniel DeVore, ███████ |
| Nvidia | ███████ |
| Sun | ███████ |
| AMD | Mark Anthony Longoria |
| TSMC/SMIC (wafer information) | Manosha Karunatilaka, Sam Wang |
| Altera | ███████ |
| Intel | ███████ |
| Texas Instruments | ███████ |
| Western Digital | ███████ |

███████ passed information pertaining to Volterra and PMCS to Tortora.

With respect to Intel, as the Government has previously indicated, the Intel information provided by ███████ and ██ was provided to ███████ and then passed to Tortora and Adondakis through ███████ and/or ███████. As is apparent from emails provided in discovery in this case, and as will be further supported by the Government's exhibits and Section 3500 materials that will be provided to defendants, Tortora and Adondakis also received confidential financial information regarding Intel from a number of other sources.

<u>Nature of the Benefit Received By the Tipper</u>

| **Individual** | **Benefit** |
|---|---|
| ███████ | Goyal provided ███ career advice and actual assistance – as well as promises of future assistance – with opportunities to work in the securities industry; ███ also provided the information to maintain a personal friendship. |
| ███████ | To maintain a personal friendship; assistance with possible employment opportunities. |
| ███████ | ███ provided the information to maintain a personal friendship with ███; ███ told ███ that he was seeking the Inside Information for purposes of trading in his own account. |
| ███████ | ███ and ███████ provided information to maintain a personal friendship; ███ and ███████ were also taken out to lunch by ███, who paid for the lunches; ███████ also provided career advice and assistance to ███. |
| ███████ | ███ provided the information to maintain a personal friendship with Goyal. |

Manosha Karunatilaka, Daniel DeVore, Mark Anthony Longoria, ████████, ████████, ████, and ████████ were consultants for PGR. PGR Payment records that have been provided in discovery set forth the payments PGR made to these individuals for their consultations with investment firm employees, including Tortora and Adondakis.

<u>Approximate Periods of Time During Which Information Was Passed or Obtained</u>

As relevant to the conspiracy charged in the Superseding Indictment, the approximate periods of time during which the information described above was passed or obtained, are as follows:

████████ provided confidential information pertaining to Dell from in or about late 2007 through in or about August 2009.

████████ provided confidential information pertaining to Dell's commercial

5

business from in or about late 2007 through in or about 2009.

██████████ provided confidential information pertaining to Altera from in or about late 207 through in or about the first half of 2008.

██████████ provided confidential information pertaining to Nvidia from in or about late 2008 through in or about 2009.

██████████ provided confidential information pertaining to Volterra and PMCS from in or about 2008 through in or about 2009.

██████████ provided confidential information regarding Intel to ██████ for a period of approximately 6 to 8 months in or about 2006 to 2007.  ██████ provided confidential information regarding Intel to ██████ from in or about the second half of 2007 through in or about 2009.

Horvath provided confidential information regarding Ingram Micro from in or about 2008 through in or about 2009.

In addition, to the extent the information was provided by the various PGR consultants identified above, the approximate time periods during which information was passed can be ascertained from the billing records provided by PGR that have been produced in discovery, and the emails sent by Tortora, Adondakis and others memorializing the conversations with those consultants.

Trading Activity In Furtherance of the Conspiracy

a.   *Dell*:

Diamondback:

- On or about February 28, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- From at least on or about May 16, 2008 to on or about May 29, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about July 3, 2008 and on or about August 28, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about August 15, 2008 and on or about August 26, 2008, Diamondback executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Diamondback executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, Diamondback executed transactions in Dell securities based in whole or in part on Inside Information.

█████████:

- From at least on or about May 13, 2008 to on or about May 28, 2008, ██████████ executed transactions in Dell stock based in whole or in part on Inside Information.

- On or about May 12, 2008, ██████████ executed transactions in Dell call option contracts based in whole or in part on Inside Information.

- Between on or about July 8, 2008 and on or about August 28, 2008, ████ ████ executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about August 11, 2008 and on or about August 26, 2008, ▮▮▮▮▮▮▮▮ executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, ▮▮▮▮▮ ▮▮▮▮ executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, ▮▮▮▮ ▮▮▮▮ executed transactions in Dell securities based in whole or in part on Inside Information.

▮▮▮▮▮▮▮▮:

- Between on or about May 13, 2008 and on or about May 29, 2008, ▮▮▮▮ ▮▮▮▮ executed securities transactions in Dell call option contracts based in whole or in part on Inside Information.

- Between on or about August 18, 2008 and on or about August 28, 2008, ▮▮▮▮▮▮▮ executed securities transactions in Dell stock based in whole or in part on Inside Information.

- Between August 19, 2008 and August 27, 2008, ▮▮▮▮▮▮ executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, ▮▮▮▮▮ ▮▮▮▮ executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, ▮▮▮▮ ▮▮▮▮ executed transactions in Dell securities based in whole or in part on Inside Information.

▮▮▮▮▮▮▮▮▮:

- Between on or about July 8, 2008 and on or about August 28, 2008, ▮▮▮▮▮▮▮▮ executed securities transactions in Dell stock based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, ▮▮▮▮▮ ▮▮▮▮▮ executed transactions in Dell securities based in whole or in part on Inside Information.

b.    *Nvidia*:

<u>Diamondback:</u>

- Between on or about April 27, 2009 and on or about May 7, 2009, Diamondback executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

  ███████████:

- Between on or about April 27, 2009 and on or about May 7, 2009, ███ ███ executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

  ██████████████:

- Between on or about April 15, 2009 and on or about May 7, 2009, ███████████████executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

  ██████████:

- Between on or about May 5, 2009 and May 7, 2009, ███████████ executed transactions in Nvidia securities based in whole or in part on Inside Information.

   c.    *Other Stocks*

     Diamondback, ███████, and/or ████████ executed transactions in one or more of the securities identified herein in addition to Dell and Nvidia during the period in which they received confidential information from the sources set forth above. The Government presently intends to limit proof of specific securities transactions, if any, to trading in the following stocks: Sun, Intel, Texas Instruments, and TSMC.

Dated: New York, New York
      August 29, 2012

                 Respectfully submitted,

                 PREET BHARARA
                 United States Attorney

        By: *Antonia Apps*
                 Antonia M. Apps
                 Richard C. Tarlowe
                 John T. Zach
                 Assistant United States Attorneys
                 (212) 637-2198/2330/2410

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

     - v. -                    :    S4 12 Cr. 121 (RJS)

MICHAEL STEINBERG,                    :    **Final Bill of Particulars**

        Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     The Government hereby supplements the particulars set forth in the Superseding

Indictment in the above-captioned case with additional particulars set forth below concerning: (a)

the identity of known coconspirators; (b) the identity of certain stocks with respect to which one

or more of the defendant and/or coconspirators provided, obtained, or received material,

nonpublic information, or attempted to do so; (c) the nature of the confidential information

obtained or passed by one or more of the defendant and/or coconspirators; (d) the sources of that

information, if known; (e) the nature of the benefit received by the tippers of the information;

(f) the approximate periods of time during which one or more of the defendant and/or

coconspirators obtained or attempted to obtain the information; and (g) certain trading activity

that was in furtherance of the conspiracy charged in Count One of the Superseding Indictment.

     The information set forth below is based on the current state of the evidence and the

Government's review and analysis of the evidence to date.  Certain answers are based, in part, on

inferences drawn from documents and other evidence in the case.  As the Government continues

to review and analyze the evidence, the Government reserves the right to draw other reasonable

inferences from the evidence.

Additionally, the Government anticipates that further particularity as to the Government's charges will be apparent from the Government's exhibits, which will be provided to the defendant on October 15, 2013, as well as materials that will be provided to the defendant pursuant to 18 U.S.C. § 3500.

Known Coconspirators

*Analyst Coconspirators*:       Jesse Tortora, Spyridon Adondakis, a/k/a "Sam Adondakis," Danny Kuo, Jon Horvath, Fayad Abassi, Ron Dennis.

*Portfolio Manager Coconspirators*:   Michael Steinberg, Todd Newman, Anthony Chiasson, Victor Dosti.

*Other Coconspirators*:        Sandeep Goyal, Michael Alessi, Greg Brenner, David Ganek, Lacey Higgins, Mark Lipacis.

Stocks With Respect to Which the Defendant and/or Coconspirators
Obtained or Attempted to Obtain Inside Information

Dell, Inc. ("Dell"), NVIDIA Corporation ("Nvidia"), Sun Microsystems ("Sun"), Advanced Micro Devices ("AMD"), Taiwan Semiconductor Manufacturing Company ("TSMC"), Altera Corporation ("Altera"), Intel Corporation ("Intel"), Texas Instruments, Western Digital Corporation ("Western Digital"), Volterra Semiconductor Corporation ("Volterra"), PMC Sierra Inc. ("PMCS"), Ingram Micro, Inc. ("Ingram Micro"), Seagate Technology PLC ("Seagate"), and Hewlett-Packard .

The Nature of the Confidential Information Passed or Obtained

The nature of the confidential information passed or obtained includes the following:

| Company | Information |
|---------|-------------|
| Dell | • Earnings information, including revenue, gross and operating margin, and operating expense information (from Rob Ray).<br><br>• Actual and forecast unit sales numbers for desktop and/or notebook computers, and pricing and market share information relating to hard drives from Dell's suppliers, including Western Digital and Seagate Technology PLC (from Dan DeVore).<br><br>• Financial information pertaining to Dell's commercial business (from Ruchir Purwar). |
| Nvidia | Earnings information, including revenue and gross margin information. |
| Sun | Earnings information, including sales information. |
| AMD | Actual and forecast unit sales numbers and average sales prices for different product lines; total revenue and gross margin information. |
| TSMC | Actual and forecast bookings information for wafers, by customer, for substantially all of TSMC's North America business. |
| Altera | Earnings information, including revenues. |
| Intel | Actual and forecast unit sales numbers for various Intel products, including microprocessors for notebooks, desktops, and servers; information pertaining to Intel's average selling prices for certain products; and information relating to Intel's fab utilization rates. |
| Texas Instruments | Earnings information, including actual and forecast sales numbers. |
| Western Digital | Actual unit shipment/sales numbers for Western Digital products. |
| Volterra | Earnings information, including revenues. |
| PMCS | Earnings information (from Ron Dennis); revenue information for PMCS's enterprise business (from unknown source). |
| Ingram Micro | Earnings information pertaining to Ingram Micro's European business. |

| Seagate | Earnings information, including Earnings Per Share and gross margin numbers. |

The Source of the Information, If Known

| Company | Source |
| --- | --- |
| Dell | Rob Ray, Daniel DeVore, Ruchir Purwar |
| Nvidia | Chris Choi |
| Sun | Davide Pacchini |
| AMD | Mark Anthony Longoria |
| TSMC/SMIC (wafer information) | Manosha Karunatilaka, Sam Wang |
| Altera | Hyung Lim |
| Intel | ██████████████ |
| Texas Instruments | Tyson King |
| Western Digital | Edward Strong |
| Ingram Micro | ████████████ |

Ron Dennis passed information pertaining to Volterra and PMCS to Tortora. Horvath received earnings information for Seagate from ████████████████████

With respect to Intel, as the Government has previously indicated, the Intel information provided by ████████████ was provided to Higgins and then passed to Tortora and Adondakis through Higgins and/or Lipacis. As is apparent from emails provided in discovery in this case, and as will be further supported by the Government's exhibits and Section 3500 materials that will be provided to defendant, Tortora and Adondakis also received confidential financial information regarding Intel from a number of other sources.

4

Nature of the Benefit Received By the Tipper

| Individual | Benefit |
|---|---|
| Rob Ray | Goyal provided Ray career advice and actual assistance – as well as promises of future assistance – with opportunities to work in the securities industry; Ray also provided the information to maintain a personal friendship. |
| Davide Pacchini | To maintain a personal friendship; assistance with possible employment opportunities. |
| Chris Choi | Choi provided the information to maintain a personal friendship with Lim; Lim told Choi that he was seeking the Inside Information for purposes of trading in his own account. |
| John Lee and Jeff Greenfield | Lee and Greenfield provided information to maintain a personal friendship with Higgins; Higgins also provided career advice and assistance to Lee. |
| Ruchir Purwar | Purwar provided the information to maintain a personal friendship with Goyal. |
| ██████ | To maintain a personal friendship with Horvath. |

Manosha Karunatilaka, Daniel DeVore, Mark Anthony Longoria, Sam Wang, Tyson King, and Edward Strong were consultants for PGR. PGR payment records that have been provided in discovery set forth the payments PGR made to these individuals for their consultations with investment firm employees, including Tortora and Adondakis.[1]

Approximate Periods of Time During Which Information Was Passed or Obtained

As relevant to the conspiracy charged in the Superseding Indictment, the approximate periods of time during which the information described above was passed or obtained, are as

_____

[1] ███████████████████████████████████████████████████████████

follows:

Rob Ray provided confidential information pertaining to Dell from in or about late 2007 through in or about August 2009.

Ruchir Purwar provided confidential information pertaining to Dell's commercial business from in or about late 2007 through in or about 2009.

Hyung Lim provided confidential information pertaining to Altera from in or about late 2007 through in or about the first half of 2008.

Chris Choi provided confidential information pertaining to Nvidia from in or about late 2008 through in or about 2010.

Ron Dennis provided confidential information pertaining to Volterra and PMCS from in or about 2008 through in or about 2009.

███████████ provided confidential information pertaining to Intel to Higgins for a period of approximately 6 to 8 months in or about 2006 to 2007.  ███████ provided confidential information pertaining to Intel to Higgins from in or about the second half of 2007 through in or about 2009.

While Horvath worked at Sigma Capital Management, LLC, ███████████ provided confidential information pertaining to Ingram Micro to Horvath from in or about 2006 through in or about 2009.

Davide Pacchini provided confidential information pertaining to Sun Microsystems from in or about the second half of 2007 through in or about the first half of 2008.

███████████ provided confidential information pertaining to Seagate to Horvath from in or about 2007 through in or about 2010.

6

In addition, to the extent the information was provided by the various PGR consultants identified above, the approximate time periods during which information was passed can be ascertained from the billing records provided by PGR that have been produced in discovery, and the emails sent by Tortora, Adondakis and others memorializing the conversations with those consultants.

<u>Trading Activity in Furtherance of the Conspiracy</u>

a.    *Dell*:

<u>Sigma Capital</u>:

- Between on or about May 13, 2008 and on or about May 29, 2008, Sigma Capital executed securities transactions in Dell call option contracts based in whole or in part on Inside Information.

- Between on or about August 18, 2008 and on or about August 28, 2008, Sigma Capital executed securities transactions in Dell stock based in whole or in part on Inside Information.

- Between August 19, 2008 and August 27, 2008, Sigma Capital executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Sigma Capital executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's February 26, 2009 earnings announcement, Sigma Capital executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, Sigma Capital executed transactions in Dell securities based in whole or in part on Inside Information.

Diamondback:

- On or about February 28, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- From at least on or about May 16, 2008 to on or about May 29, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about July 3, 2008 and on or about August 28, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about August 15, 2008 and on or about August 26, 2008, Diamondback executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Diamondback executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, Diamondback executed transactions in Dell securities based in whole or in part on Inside Information.

Level Global:

- From at least on or about May 13, 2008 to on or about May 28, 2008, Level Global executed transactions in Dell stock based in whole or in part on Inside Information.

- On or about May 12, 2008, Level Global executed transactions in Dell call option contracts based in whole or in part on Inside Information.

- Between on or about July 8, 2008 and on or about August 28, 2008, Level Global executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about August 11, 2008 and on or about August 26, 2008, Level Global executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Level Global executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, Level Global executed transactions in Dell securities based in whole or in part on Inside Information.

Whittier Trust Company:

- Between on or about July 8, 2008 and on or about August 28, 2008, Whittier Trust Company executed securities transactions in Dell stock based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Whittier Trust Company executed transactions in Dell securities based in whole or in part on Inside Information.

b.   *Nvidia*:

Sigma Capital:

- Between on or about May 5, 2009 and May 7, 2009, Sigma Capital executed transactions in Nvidia securities based in whole or in part on Inside Information.

- In advance of NVIDIA's August 6, 2009 earnings announcement, Sigma Capital executed transactions in NVIDIA securities based in whole or in part on Inside Information.

Diamondback:

- Between on or about April 27, 2009 and on or about May 7, 2009, Diamondback executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

Level Global:

- Between on or about April 27, 2009 and on or about May 7, 2009, Level Global executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

9

Whittier Trust Company:

• Between on or about April 15, 2009 and on or about May 7, 2009, Whittier Trust Company executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

c.   *Other Stocks*

Sigma Capital, Diamondback, and/or Level Global executed transactions in one or more of the securities identified herein in addition to Dell and Nvidia during the period in which they received confidential information from the sources set forth above.  The Government presently intends to limit proof of specific securities transactions in these other stocks, if any, to trading by Sigma Capital in Sun Microsystems in advance of one or more of the following quarterly announcements:  November 5, 2007 and/or May 1, 2008.

Dated: New York, New York
       September 18, 2013

                         PREET BHARARA
                         United States Attorney

                   By:  _____
                         Antonia M. Apps
                         Harry A. Chernoff
                         Assistant United States Attorneys
                         (212) 637-2198/2481

# EXHIBIT E

# EXHIBIT E



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 15, 2013

**Via Electronic Mail**
Nathaniel Marmur, Esq.
Stillman & Friedman, P.C.
425 Park Avenue
New York, NY 10022

    Re:    <u>United States v. Martoma, 12 Cr. 793 (PGG)</u>

Dear Mr. Marmur:

    The Government writes in response to your letter of February 22, 2013 (the "February 22 Letter") requesting a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. Without conceding that the defense is entitled to additional particulars, the Government voluntarily provides at this time the following information in response to the February 22 Letter.[1]

### 1. The Inside Information

    Several of the requests in the February 22 Letter seek additional information about the nature of the material non-public information charged in Counts One, Two and Three of the Indictment (the "Inside Information"). The Government provides the defendant with the following summary as to the nature of the Inside Information and its disclosure to the defendant:

    As alleged in the Indictment, the Inside Information at issue in Counts One, Two and Three is confidential and non-public information about the Phase II clinical trial of bapineuzumab jointly conducted by Elan and Wyeth (the "Drug Trial"). The Inside Information was obtained by Dr. Gilman in connection with (1) his chairmanship of the Drug Trial's Safety Monitoring Committee ("SMC") and (2) his role in announcing the results of the Drug Trial to the public on behalf of Elan and Wyeth on July 29, 2008 (the "Public Announcement").

---

[1]    This information is based on the current state of the Government's investigation, which is ongoing, and review of the evidence, including inferences drawn from that evidence. In the event that further collection, review or analysis of evidence causes the Government to amend its position with respect to the factual disclosures in this letter, or to determine that the disclosure of additional particulars is appropriate, the Government will provide notice to the defense at that time.

Page 2

In connection with his chairmanship of the SMC, Dr. Gilman participated in semi-regular meetings of the SMC, including – as alleged in paragraph 23 of the criminal complaint – meetings on or about November 21, 2006, February 8, 2007, October 9, 2007, March 18, 2008 and July 11, 2008. Members of the SMC, including Dr. Gilman, typically received presentations from Elan and Wyeth in advance of these meetings. The matters discussed at the meetings were documented in meeting minutes. The Government has provided all such presentations and meeting minutes in its possession to the defense in discovery. As these presentations and meeting minutes reflect, the SMC was provided with confidential information about the ongoing progress of the Drug Trial, including information about trial design, trial progress and trial safety. The trial safety information disclosed to the SMC included detail about the occurrence and non-occurrence of "serious adverse events" in both drug and placebo populations.

Beginning in late 2006 or early 2007 Dr. Gilman began routinely sharing with Martoma information he learned in connection with his chairmanship of the SMC, including the content of presentations provided to the SMC about the Drug Trial. Martoma and Dr. Gilman arranged for consultations to take place shortly after SMC meetings occurred. As detailed in paragraph 23 of the criminal complaint, Martoma consulted with Dr. Gilman on or about the following occasions after the occurrence of SMC meetings: November 22, 2006, February 9, 2007, October 9, 2007, March 18, 2008, July 13, 2008.

In connection with his role in presenting the full results of the Drug Trial to the public on July 29, 2008, Dr. Gilman obtained Inside Information from Elan and Wyeth about the safety and efficacy results of the Drug Trial, principally during a two-day "unblinding" meeting on July 15, 2007 and July 16, 2007. Dr. Gilman then provided Martoma with Inside Information about the results of the Drug Trial, including by providing Martoma with the contents of a draft PowerPoint presentation announcing the results of the Drug Trial.

## 2.   Nature Of Benefit To Tippee

The February 22 Letter seeks information about the benefits afforded to Dr. Gilman by providing Inside Information to Martoma. The Government alleges that Dr. Gilman directly and indirectly benefited by providing Inside Information to Martoma through (1) financial payments made by the Gerson Lehrman Group to Gilman for consultations with Martoma and (2) the development of a perceived friendship with Martoma.

## 3.   Trades Charged In Substantive Counts

### Elan

With respect to Count Two, the Government intends to prove that the following trades in Elan securities were based in whole or in part on Inside Information:

At the end of the day on Friday, July 18, 2008, CR Intrinsic held approximately 10,560,250 shares of Elan equity securities in portfolios over which Martoma or Steve Cohen had trading authority (the "July 18 Elan Position"). By the time the Drug Trial results were announced after

Page 3

the market closed on July 29, 2008, CR Intrinsic and its affiliates had sold the entirety of the July 18 Elan Position, shorted Elan stock by an additional approximately 4,525,104 shares, and entered into options contracts which would profit if the price of Elan stock decreased following the Public Announcement. The Government alleges that the above trades were undertaken in whole or in part based on Inside Information. Detailed records as to these trades have been produced in discovery at SAC_ELAN00000001 and SAC_ELAN1800712.

Wyeth

With respect to Count Three, the Government intends to prove that the following trades in Wyeth securities were based in whole or in part on Inside Information.

At the end of the day on Friday, July 18, 2008, CR Intrinsic held approximately 7,043,700 shares of Wyeth equity securities in portfolios over which Martoma or Steve Cohen had trading authority (the "July 18 Wyeth Position").[2]  By the time the Drug Trial results were announced after the market closed on July 29, 2008, CR Intrinsic and its affiliates had sold the entirety of the July 18 Wyeth Position and had shorted Wyeth stock by an additional approximately 3,250,000 shares.  The Government alleges that the above trades were undertaken in whole or in part based on Inside Information.  Detailed records as to these trades have been produced in discovery SAC_ELAN00000001 and SAC_ELAN1800712.

Sincerely,

PREET BHARARA
United States Attorney

By:

Arlo Devlin-Brown
Assistant United States Attorney
(212) 637-2506

---

[2]   The term "July 18 Wyeth Position" excludes two positions that, based on the present investigation, do not appear to have been established or controlled by Martoma: (1) a 12 million share derivative contract linked to the performance of Wyeth securities and (2) 400,000 shares of Wyeth held by another portfolio manager.

# EXHIBIT F

**A-37**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA                    :

     - v -                    :                    09 Cr. 1083 (RJS)

JOSEPH CONTORINIS,                    :                    **Bill of Particulars**

           Defendant.                    :

------------------------------------------------------------X

      Pursuant to the Court's order, the Government provides the following particulars in paragraphs 1 through 9 below about the material nonpublic information in connection with the acquisition of Albertson's Corporation ("Albertson's") that Nicos Stephanou provided to Joseph Contorinis. In addition, we have attached certain e-mails (all of which were previously produced) reflecting information that Stephanou learned about the Albertson's acquisition while he was on the Alberton's deal time at UBS. Some of these e-mails reflect the material nonpublic information that Stephanou provided to Contorinis. Further, as you can see from the e-mails, several have attachments, but we have not included them here. As we prepare for trial, we may identify additional e-mails reflecting information that Stephanou learned about the Albertson's transaction. We will promptly direct your attention to any such e-mails.

      1.      On or about September 2, 2005, Stephanou was advised that he was on the Albertson's deal team at UBS Investment Bank ("UBS"). Shortly thereafter, Stephanou told Contorinis that (a) UBS was representing Cerberus Capital Management, L.P. ("Cerberus") in connection with the potential acquisition of Albertson's, (b) Stephanou was on the Albertson's deal team at UBS, and (c) Stephanou would keep Contorinis updated regarding developments in the potential acquisition.

**A-38**

2.      Stephanou routinely updated Contorinis on these developments until the transaction was announced publicly on January 23, 2006.

3.      On or about November 22, 2005, based on his assessment of the likelihood that the Albertson's acquisition would be successfully completed and publicly announced, Stephanou began to purchase Albertson's securities. On or about that date, Stephanou advised Contorinis of these facts.

4.      Late on December 6, 2005, Stephanou learned that Supervalu, Inc. ("Supervalu"), (Cerberus's partner in the Albertson's acquisition) was offering far less than Cerberus had expected. As a result, the Cerberus/Supervalu consortium would not be able to make a sufficiently high bid for the acquisition to take place, and Stephanou was advised that the transaction was on its "death bed." On or about December 7, 2005, Stephanou advised Contorinis of these facts. In addition, on or about December 7, 2005, Stephanou sold his Albertson's stock and sold the stock short.

5.      Between December 7, 2005, and December 9, 2005, Stephanou learned that the problem with Supervalu offer had been resolved, the negotiations were back on track and the consortium's bid for Albertson's was $26.50 per share. Between December 9, 2005, and December 11, 2005, Stephanou advised Contorinis of these facts. On December 9, 2005, Stephanou began purchasing Albertson's stock.

6.      Late on December 21, 2005, Stephanou learned that the Albertson's acquisition negotiations were falling apart, because Albertson's attorneys had raised certain antitrust concerns. Between approximately 1 a.m. and 2:20 a.m. on December 22, 2005, Stephanou and Contorinis had a series of telephone conversations, during which Stephanou provided Contorinis

2

**A-39**

with information regarding the collapse of the negotiations. Later that morning, Stephanou confirmed that the transaction would not occur. Stephanou advised Contorinis of these facts. Stephanou also told Contorinis that a press release would not be issued during the trading day. On or about December 22 and 23, 2005, Stephanou sold his Albertson's stock.

7.      In or about early January 2006, Stephanou learned from Ramesh Chakrapani that Blackstone chairman Stephen Schwarzman had contacted the CEO of Albertson's and urged him to complete the transaction. Stephanou advised Contorinis of these facts.

8.      Between early January 2006 and January 11, 2006, Stephanou learned that: (1) the antitrust concerns that had caused the Albertson's negotiations to founder were likely to be resolved (through the divestiture of certain assets), (2) there were no other issues that prevented the transaction from being completed, (3) the transaction price would be similar to the price that had been discussed in December, and (4) it would take a couple of weeks before the transaction could be completed and announced publicly. On or before January 11, 2006, Stephanou advised Contorinis of these facts. On or about January 11, 2006, Stephanou purchased Albertson's stock.

9.      Stephanou also kept Contorinis updated regarding the expected offer price. As reflected in e-mails that have been produced, as of January 17, 2006, the UBS team expected an offer of approximately $26.35 per share.

3

**A-40**

Dated: New York, New York
      July 2, 2010

                                    PREET BHARARA
                                    United States Attorney

                    By: _____
                                    Andrew L. Fish
                                    Reed M. Brodsky
                                    Assistant United States Attorneys
                                    Tel. (212) 637-2548/2492

4

# EXHIBIT G

# Exhibit Redacted

# EXHIBIT H

# Exhibit Redacted

# EXHIBIT I

Exhibit Redacted

# EXHIBIT J

# Exhibit Redacted

# EXHIBIT K

| | |
|---|---|
| **From:** | Rothfeld, Michael ▊▊▊▊▊▊▊ |
| **Sent:** | Friday, May 30, 2014 11:34 AM |
| **To:** | William Walters |
| **Subject:** | RE: Wall Street Journal article |

Hi Billy –

I wanted to let you know about one additional point we plan to include – that the investigation is also focusing on trading in Dean Foods.

Again, let me know if you'd like to comment on any aspect of this. I am here if you want to reach me.

Thanks,
Michael

---

**From: Rothfeld, Michael**
**Sent: Friday, May 30, 2014 12:20 PM**
**To: 'wwalters@**▊▊▊▊▊▊**
**Subject: Wall Street Journal article**

Hi Billy,

I just left you a voicemail to provide a few additional details of what we plan to write beyond what I told you before you said you declined to comment and hung up the phone.

Beyond its general scope, as I described to you, we also plan to report that the government investigation, including by the FBI and SEC, is examining trading in multiple stocks including that of Clorox around the time in 2011 that Mr. Icahn was active in it. Based on our reporting, the government has looked at large options positions you held in Clorox at that time. Also, we plan to report that you struck up a friendship with Mr. Icahn through a mutual acquaintance when his company owned the Stratosphere. And, that you have a friendship with Mr. Mickelson surrounding your shared interest in golf. We will also include some general background about your life, and that you are 67 years old.

If you would like to discuss or comment on any of these things, please call me at either of the numbers below or email me as soon as possible. This story is likely to be published today.

Thanks,
Michael Rothfeld

Michael Rothfeld
The Wall Street Journal
office: ▊▊▊▊▊▊▊
mobile: ▊▊▊▊▊▊▊

https://twitter.com/mrothfeld

1

Confidential Treatment Under FOIA
Requested By Reed Smith LLP

# EXHIBIT L

FBI, SEC Probe Trading of Carl Icahn, Billy Walters, Phil Mickelson - WSJ

| U.S.

# FBI, SEC Probe Trading of Carl Icahn, Billy Walters, Phil Mickelson

Insider-Trading Investigation Began in 2011 With Unusual Trades in Clorox



Federal investigators are examining trading patterns by golfer Phil Mickelson, shown playing in an Ohio tournament on Thursday.
*GETTY IMAGES*

By **SUSAN PULLIAM** and **MICHAEL ROTHFELD**
Updated May 30, 2014 7:58 p.m. ET

78 COMMENTS

Federal investigators are pursuing a major insider-trading probe involving finance, gambling and sports, examining the trading of investor Carl Icahn, golfer Phil Mickelson and Las Vegas bettor William "Billy" Walters.

The Federal Bureau of Investigation and the Securities and Exchange Commission are examining whether Mr. Mickelson and Mr. Walters traded illicitly on nonpublic information from Mr. Icahn about his investments in public

FBI, SEC Probe Trading of Carl Icahn, Billy Walters, Phil Mickelson - WSJ

companies, people briefed on the probe said.



The probe includes investor Carl Icahn. *REUTERS*

FBI, SEC Probe Trading of Carl Icahn, Billy Walters, Phil Mickelson - WSJ



Sports bettor Billy Walters at his Carlsbad, Calif., home. *NOAH WEBB FOR THE WALL STREET JOURNAL*

Investigators are examining whether over the past three years Mr. Icahn tipped Mr. Walters—famous in Las Vegas for his sports-betting acumen—about potentially market-moving investments by Mr. Icahn's company.

The FBI and SEC are examining whether Mr. Walters on at least one occasion passed a tip on to Mr. Mickelson, these people said, and are studying the two men's trading patterns.

"We do not know of any investigation," Mr. Icahn said on Friday. "We are always very careful to observe all legal requirements in all of our activities." The suggestion that he was involved in improper trading, he said, was "inflammatory and speculative."

Mr. Mickelson said in a statement Saturday that he has done nothing wrong and was cooperating with the investigation.

On Friday, Glenn Cohen, a lawyer for Mr. Mickelson, said "Phil is not the target of any investigation. Period." He added that an FBI agent had told him Mr. Mickelson wasn't a target. The FBI declined to comment on Mr. Cohen's statement.

FBI, SEC Probe Trading of Carl Icahn, Billy Walters, Phil Mickelson - WSJ

Two FBI agents approached Mr. Mickelson on Thursday after he finished a round of golf at the Memorial Tournament in Dublin, Ohio, seeking to speak with him in connection with the investigation, a person familiar with the situation said. Mr. Mickelson referred them to his attorney, this person said.

When asked to comment about the investigation, Mr. Walters, reached by phone on Friday, said, "I don't have any comment about anything," and then hung up.

The probe comes as part of the government's increased focus on insider trading, which has resulted in 85 convictions and guilty pleas out of 90 people charged by prosecutors in Manhattan federal court since August 2009. None has been acquitted; five cases are pending.

The most prominent of those cases largely have involved Wall Street traders, corporate executives and others in the financial world. Messrs. Icahn, Walters and Mickelson are among the highest-profile group of figures to be in the government's sights.



There is no indication the government will bring a case in the current investigation, the people briefed on the probe said. Indeed, publicity of the probe could jeopardize the government's ability to put together any potential case, they

said, by limiting its ability to covertly gather evidence.

The investigation signals that the FBI and the SEC are concerned about a potential dark side of shareholder activism. Activist investors push for broad changes at companies or try to move stock prices with their arguments. Mr. Icahn, a 78-year-old billionaire, has come to epitomize such activism in U.S. boardrooms.

Investigators are focusing on potentially abusive practices among such activists, including whether they are leaking information about their stakes before making public disclosures—the subject of a Wall Street Journal page-one article in March.

It isn't clear what legal theory the investigators would use if they built a case against the three men. Leaks by activists about positions they are building is a murky area of securities law. Some lawyers in recent years have advised investing clients that such leaks don't violate securities laws because they don't represent a "breach," or violation, of a duty to keep the information secret.

One potential legal theory could involve the duty an investor has to shareholders at a public company, some lawyers say. Mr. Icahn runs publicly traded Icahn Enterprises LP. One question is whether investors like Mr. Icahn have a duty to keep their nonpublic trading a secret in the interest of their shareholders, some lawyers say.

Federal securities law also prohibits trading based on nonpublic information about tender offers that are in the works.

Mr. Walters, born in Kentucky to a family of professional poker players, is a legendary sports bettor who wagers based on computerized forecasts of the outcomes of games, among other factors. He has also become a force in the Las Vegas real-estate world and has bought and sold golf courses.

Mr. Icahn met Mr. Walters, 67, through a mutual acquaintance when Mr. Icahn's company owned the Stratosphere Hotel in Las Vegas. Mr. Icahn bought the Stratosphere in 1998 and sold it along with several other properties for $1.2 billion in 2008.

The two struck up a friendship. Mr. Icahn was once an avid poker player and enjoys betting on football games. The two have spoken about stocks.

Mr. Walters and Mr. Mickelson, 43, play golf together, said people familiar with their relationship. Sometimes Mr. Walters has suggested stocks for Mr. Mickelson to consider buying, one of the people said.

Mr. Mickelson, who has one of the most loyal followings of top professional golfers, has won the prestigious Masters three times.

Mr. Icahn said he didn't know who Mr. Mickelson was.

The government investigation began three years ago after Mr. Icahn accumulated a 9.1% stake in Clorox Co. in February 2011, said the people briefed on the probe. On July 15, 2011, he made a $10.2 billion offer for Clorox that caused the stock to jump.

Well-timed trading around the time of his bid caught the attention of investigators, who began digging into the suspicious trading in Clorox stock, the people familiar with the probe said.

On Wall Street, rumors had swirled that word leaked out ahead of Mr. Icahn's Clorox bid. Large, highly risky trades had been made in Clorox options four days before his bid. After his $76.50-a-share offer was announced, those options soared in value along with Clorox shares, which closed on July 15 up 8.9% at $74.55.

Investigators have examined trades in Clorox options, the people briefed on the probe said.

Clorox rejected Mr. Icahn's overture. He launched a proxy battle in August 2011, proposing a slate to replace the company's board with 11 of his nominees. In September 2011, he dropped his proxy battle.

By December 2011, he had sold his entire 12 million shares in the company. Clorox shares, which reached a high in 2011 just after Mr. Icahn's bid, closed at around $66 at the end 2011. A Clorox spokeswoman declined to comment.

The investigators expanded their probe to look at trading patterns by Mr. Walters and Mr. Mickelson relating to Dean Foods Co., said the people briefed on the probe. The FBI, following its approach to Mr. Mickelson on Thursday, expressed an interest in his trading in Dean Foods, a person familiar with the situation said.

Mr. Icahn said he never traded in Dean Foods. A Dean Foods spokesman declined to comment.

—*Jenny Strasburg contributed to this article.*

**Write to** Susan Pulliam at susan.pulliam@wsj.com and Michael Rothfeld at michael.rothfeld@wsj.com

# EXHIBIT M

Investor, Bettor, Golfer: Insider Trading Inquiry Includes Mickelson, Icahn and William T. Walters - The New York Times

# DealB%k

WITH FOUNDER
ANDREW ROSS SORKIN

MERGERS & ACQUISITIONS | INVESTMENT BANKING | PRIVATE EQUITY | HEDGE FUNDS | I.P.O./OFFERING

Search

# Investor, Bettor, Golfer: Insider Trading Inquiry Includes Mickelson, Icahn and William T. Walters

By MATTHEW GOLDSTEIN and BEN PROTESS   MAY 30, 2014 8:07 PM



The investigation is focusing on trading in two different stocks by Phil Mickelson, above, and the gambler William Walters. Sam Greenwood/Getty Images

Email

Share

Tweet

Save

More

The divergent lives of a championship golfer, a high-rolling gambler and a billionaire investor have collided in a federal insider trading investigation.

Federal authorities are examining a series of well-timed trades made by the golfer Phil Mickelson and the gambler William T. Walters, people briefed on the investigation said, focusing on trading in two different stocks. The authorities are also questioning what role, if any, the investor Carl C. Icahn may have had in sharing information about one of the stocks: the consumer products company Clorox.

Mr. Walters, an owner of golf courses who is often considered the most successful sports bettor in the country, placed his Clorox trade in 2011, the people briefed on the investigation said. Mr. Icahn, a 78-year-old billionaire and one of the best-known investors in the world, was mounting a takeover bid for Clorox around the time of that trade.

The F.B.I. and Securities and Exchange Commission, which are leading the inquiry along with federal prosecutors in Manhattan, are examining whether Mr. Icahn leaked details of his Clorox bid to Mr. Walters, the people briefed on the investigation said. One initial theory, the people said, is that Mr. Walters might have passed that information to Mr. Mickelson. But Mr. Mickelson, a three-time winner of the Masters golf tournament and one of the country's highest-earning athletes, did not bet on Clorox, though he did trade in the stock of another company tied to Mr. Walters, the people added.

Aound the time of the Clorox trading, the S.E.C. sent Mr. Icahn a routine request for information about his dealings in the company, the people briefed on the matter said. Federal authorities, whose investigation has dragged on for more than two years without yielding definitive evidence of insider trading, are also examining phone records to see whether Mr. Walters spoke to Mr. Icahn shortly before the trades.

Mr. Icahn's bid for Clorox ultimately failed. Mr. Mickelson, Mr. Walters and Mr. Icahn have not been accused of any wrongdoing. Mr. Icahn, even if he did leak secret information about his firm's intentions with Clorox, may have done so legally. It would be illegal if he breached a duty of confidentiality to his own investors.

In a separate strand of the investigation, federal authorities are looking into trading in Dean Foods that has no apparent connection to Mr. Icahn, the people briefed on the matter said. Mr. Walters and Mr. Mickelson placed the trades around August 2012, according to the people, just before the food and beverage company announced its quarterly earnings and a public offering of stock for one of its subsidiaries. The authorities are investigating whether Mr. Walters had a source inside the company itself — and whether others who know Mr. Walters may have traded on the information as well.

Mr. Walters, reached on Friday evening, said, "While I don't have any comment, pal, I'll talk to you later."

In an interview, Mr. Icahn said "I don't give out inside information," adding that "for 50 years I have had an unblemished record." Mr. Icahn, who acknowledged knowing Mr. Walters but said he never met or spoke to Mr. Mickelson, argued that any suggestion he did anything wrong is "irresponsible."

Representatives for Mr. Mickelson did not respond to a request for comment. Federal authorities declined to comment.

For two years, authorities had little to go on besides trading records and a hunch. Then last year, F.B.I. agents approached Mr. Mickelson at Teterboro Airport in New Jersey, one of the people briefed on the matter said, asking the celebrity golfer to discuss his trading.

It is unclear whether Mr. Mickelson knows Mr. Icahn or provided any evidence implicating him or Mr. Walters in the trading. It is possible that the investigations will not produce any charges.

But if the investigation proceeds, it could undermine the reputation of one of America's most popular athletes in Mr. Mickelson, who has won five major championships over a two-decade career. And for Mr. Icahn, the investigation might complicate one of the longest running and most successful careers on Wall Street.

Mr. Icahn made his foray into finance as a stockbroker in the 1960s. He later became a professional agitator, haranguing the country's biggest companies to give him a board seat.

Long before activist investing was in vogue, Mr. Icahn was waging war with executives at companies like Motorola, RJR Nabisco and United States Steel, pushing for corporate changes to increase shareholder value. In the 1980s, Mr. Icahn became synonymous with an era of corporate raiding, leading a hostile takeover of Trans World Airlines.

In recent years, his strategy has mellowed some. Mr. Icahn has become something of an elder statesman on Wall Street, often appearing on the CNBC business channel, at investing conferences and even on Twitter, though he continues to pursue headline-grabbing takeover bids for companies like Clorox.

Mr. Icahn laid the groundwork for a Clorox takeover in early 2011, when he disclosed in a regulatory filing that his various investment firms began amassing shares in the consumer goods manufacturer, thinking the stock was undervalued. Shares of Clorox rose about 6 percent in February 2011, after Mr. Icahn disclosed his stake.

The shares jumped again a few months later after he announced an unsolicited takeover bid for the company. In a letter to Clorox, Mr. Icahn proposed buying the company for $76.50 a share and noted that his firms were Clorox's largest investor.

In the days leading up to Mr. Icahn's bid, there was unusual trading activity in shares of Clorox and options to buy the stock, according to published reports at the time. Successful options trading that comes ahead of corporate deals can be a red flag for regulators.

The investigation into the Clorox trading began at the Financial Industry Regulatory Authority, or Finra, Wall Street's self-regulatory group that monitors suspicious trades. In 2011, the

people briefed on the matter said, Finra traced a series of well-timed Clorox trades to Mr. Walters and other investors, just as Mr. Icahn was aiming to gain a foothold on the company's board.

Ultimately, Clorox rebuffed Mr. Icahn's overture. By September 2011, Mr. Icahn withdrew the bid.

Because the bid failed, it is unclear what inside information, if any, Mr. Icahn may have been privy to other than the trading strategy of his own firm, Icahn Enterprises. If Mr. Icahn provided Mr. Walters a heads-up about his activities in connection with the takeover bid, it is not necessarily a violation. Under the laws that govern insider trading, it is not illegal to leak secret information about a future trade.

For such a leak to be illegal, Mr. Icahn most likely would have had to breach a duty to keep the information confidential. Since Mr. Icahn never joined the Clorox board, he probably owed no duty to the company or its shareholders.

Yet if any potential bidder for Clorox breached a duty of confidentiality to his or her own investors, then that could present a legal problem. And in certain cases, even if there is no duty of confidentiality, a little-known securities rule might prevent someone who is mounting a takeover bid to leak "material, nonpublic information" about the offer.

It is unclear how well acquainted Mr. Icahn and Mr. Walters are, but they have crossed paths in Las Vegas. Mr. Icahn is no stranger to the city. Over the years, Mr. Icahn has invested in Las Vegas real estate and is chairman of Tropicana Entertainment, a casino company based in the city. Regulatory filings also show that a small Nevada company controlled by Mr. Walters and his business partner was an early investor in the mobile data provider Voltari, whose largest shareholders include Mr. Icahn's investment firms.

Mr. Mickelson and Mr. Walters have participated in the Pebble Beach Pro Am golf tournament during which professional golfers partner with amateurs and celebrities. Mr. Walters won the tournament in 2008.

Mr. Walters, better known as Billy, has drawn federal scrutiny off and on for years. In 1992, he was acquitted of illegal gambling charges. Years later, the Nevada attorney general charged Mr. Walters with money laundering stemming from his gambling operation. The case resulted in three indictments; courts dismissed each one.

Despite the scrutiny, Mr. Walters firmly belongs to the Las Vegas elite, a generous philanthropist who epitomizes the city's unconventional brand of capitalism. He bought up golf courses — his Bali Hai Golf Club has hosted what it calls the "sexiest golf tournament" in the world, featuring female caddies — and auto dealerships. He also helped finance political campaigns.

In 2011, "60 Minutes" captured Mr. Walters's high-roller status. The anchor, Lara Logan, remarked that "It's hard to find anyone better at winning than Billy Walters."

But during the segment, Mr. Walters complained that his stock picks had not fared as well as his sports bets. He discussed how the worst "crooks" he met were on Wall Street, not in the casinos or betting parlors, mentioning that the most money he lost was on stocks like Enron.

*Alexandra Stevenson, Azam Ahmed and Peter J. Henning contributed reporting.*

### Correction: June 12, 2014
*An article on May 31 about an insider trading investigation, using information from people briefed on the inquiry, overstated the scope of an investigation involving the golfer Phil Mickelson. While investigators are looking at his trading in some stocks, Clorox is not among them. The error was repeated in articles on June 1 and June 2 and in the Common Sense column on Saturday. An article about the latest developments in the investigation appears today on Page B1.*

A version of this article appears in print on 05/31/2014, on page A1 of the NewYork edition with the headline: Investor, Bettor, Golfer: Inquiry Into Big Names.

# EXHIBIT N

**The New York Times**

# Authorities Find Insider Trading Case Tied to Phil Mickelson Is Slow to Take Shape

By Ben Protess and Matthew Goldstein    May 31, 2014 4:27 pm

**Related Links**
Investor, Bettor, Golfer: Inquiry Into Big Names (May 30, 2014)

In the summer of 2011, a series of winning stock trades raised immediate red flags for financial regulators.

The traders — a cross-section of investors including the championship golfer Phil Mickelson and the high-rolling gambler and golf course owner William T. Walters — collectively reaped several million dollars, according to people briefed on the matter who spoke anonymously because they were not authorized to discuss the investigation.

The trades, some of which were options contracts to buy Clorox stock, came just days before the billionaire investor Carl C. Icahn announced an unsolicited takeover bid for the company that drove up the stock price. And trading records indicated that the bets came not just from Mr. Walters but also from at least one other investor connected to the golfing world, one of the people briefed on the matter said. That investor, another person said, is not now under investigation.

The previously unreported details about the size and scope of the trading, emerging a day after a federal insider trading investigation first came to light, might seem to stack up in the government's favor. As federal authorities examine whether Mr. Icahn leaked details of his Clorox bid to Mr. Walters, the people said, they are exploring a theory that Mr. Walters might have separately passed on other information to Mr. Mickelson.

And yet, nearly three years after the trades flashed some telltale signs of possible insider trading, a case has yet to materialize.

A recounting of the government's tactics, described in interviews with people briefed on the matter, provides a case study in the hurdles of building an insider trading investigation. Even after the United States attorney's office in Manhattan racked up a perfect record under Preet Bharara — more than 80 insider trading convictions and no defeats — a case can wither without a smoking-gun email, a loose-lipped cooperating witness or wiretapped conversations.

In the case of Clorox, the authorities initially planned to secure cooperation from one of Mr. Icahn's top employees, the people briefed on the matter said, but shifted gears when they lacked the leverage to do so.

The focus then turned to Mr. Mickelson, whom authorities hoped to scare into cooperating. As one of America's most popular athletes, Mr. Mickelson had much to lose under the glare of the government's spotlight.

But when the F.B.I. approached Mr. Mickelson — first pulling him off a plane at Teterboro Airport in New Jersey last year, the people said, and then confronting him on Thursday at a golf tournament in Ohio — Mr. Mickelson had little to offer. In the airport discussion last year, which lasted no more than an hour, the people said, Mr. Mickelson pledged to cooperate but explained that he did not know Mr. Icahn and had no clue that the stock tips might have been improper. On Thursday, Mr. Mickelson said, he instructed F.B.I. agents to "speak to my lawyers."

Mr. Mickelson, Mr. Walters and Mr. Icahn have not been accused of any wrongdoing. Even if Mr. Icahn did leak secret information about his firm's intentions with Clorox, he may have done so legally. It would have been illegal if he breached a duty of confidentiality to his own investors.

Through his agent, Mr. Mickelson released a statement saying that he had "done absolutely nothing wrong." At the golf tournament on Saturday, Mr. Mickelson said, "I'm really not going to say anything more until sometime in the near future," adding that "I'll cooperate as much as I can with the F.B.I."

In an interview, Mr. Icahn said "I don't give out inside information," adding that "for 50 years I have had an unblemished record." Mr. Icahn argued that any suggestion he had done anything wrong was "irresponsible."

Mr. Walters, reached on Friday evening, said, "While I don't have any comment, pal, I'll talk to you later."

The insider trading investigation is not the first time that Mr. Walters, often considered the most successful sports bettor in the country, has drawn federal scrutiny. In 1992, he was acquitted of illegal gambling charges. Since then, the Nevada attorney general has charged Mr. Walters with money laundering stemming from his gambling operation, but courts dismissed that case.

Now Mr. Walters, better known as Billy, is at the center of the insider trading investigation.

A year after the 2011 Clorox trades, Mr. Walters and Mr. Mickelson placed trades in Dean Foods, the people briefed on the matter said, just before the food and beverage company announced its quarterly earnings and a public stock offering for a subsidiary. The authorities, who have not found any connection between Mr. Icahn and the Dean Foods trading, are investigating whether Mr. Walters had a source inside the company itself.

Mr. Icahn, a frequent visitor to Las Vegas with a number of business interests there, acknowledges knowing Mr. Walters but says he has no connection to Mr. Mickelson. Mr. Walters, for his part, has crossed paths with Mr. Mickelson at golf tournaments.

"With this breaking in the media, the government's next step will likely be sending out grand jury subpoenas to the parties for all documents, emails and text messages," said Reed Brodsky, a partner with Gibson Dunn & Crutcher and a former federal prosecutor.

In recent months, authorities have pored over phone records, the people briefed on the matter said, seeking to line up Mr. Icahn's calls to Mr. Walters with the trading in Clorox. But phone records provide only circumstantial leads.

A relentless investigation of Steven A. Cohen, a hedge fund billionaire, turned up phone records showing that just after he spoke to an employee who possessed inside information, Mr. Cohen placed a major trade. Federal prosecutors ultimately indicted Mr. Cohen's hedge fund, SAC Capital Advisors, but never charged the billionaire himself.

In some ways, the investigation into Mr. Icahn echoes the pursuit of Mr. Cohen. While authorities are interested in those who traded on Clorox, the ultimate focus is a Wall Street titan.

In the case of Clorox, authorities have some additional hurdles. For example, they have struggled to establish that Mr. Icahn and Mr. Walters were close enough that the financier might jeopardize his long-running career to share secrets about his Clorox strategy with an acquaintance like Mr. Walters.

There is little in the public record linking the two men to business deals — and even less that suggests they socialized together in Las Vegas.

The most visible connection is a mobile data provider called Voltari, where Mr. Icahn's son is a director and whose largest shareholders are firms controlled by Mr. Icahn. A small Nevada company controlled by Mr. Walters and his business partners was an early-stage investor in the company, though that hardly suggests that Mr. Icahn would alert Mr. Walters to inside information.

Federal authorities may also be grappling with whether Mr. Icahn, even if he did leak the information, violated the law. Under the laws that govern insider trading, it is not illegal to leak secrets about a future trade.

For such a leak to cause a legal problem, a bidder for Clorox would, for example, have had to breach a duty of confidentiality to his or her own investors.

And in certain cases, even if there is no duty of confidentiality, someone who is mounting a takeover bid may not leak "material, nonpublic information" about a tender offer. But in the case of Clorox, Mr. Icahn never submitted a tender offer.

The confluence of golf and an insider trading investigation is hardly new. The golf course has become something of an ideal scene for consummating many a big corporate deal. Wall Street investment banks often hold golf outings for investors, analysts and executives.

In 2001, the S.E.C. and federal prosecutors charged a San Diego man with making $137,485 in illegal profits from a stock tip he got while golfing with the director of a company that was in the middle of merger negotiations. Last year, an executive at KPMG, one of the country's largest accounting firms, was accused of leaking tips to a frequent golf partner. The San Diego man and the KPMG executive both pleaded guilty.

As for Mr. Mickelson, a three-time winner of the Masters golf tournament, he has played through the distractions.

But he finds himself in something of a slump just as he enters a critical period in his playing career: the run-up to an attempt to complete a career Grand Slam by winning the United States Open. It is the first time since 2003 that he has gone this far into a P.G.A. Tour season without a victory.

At the Ohio tournament on Saturday, the crowd cheered Mr. Mickelson, saying, "Good luck, Phil," and "You're the man, Phil." From his fellow golfer Robert Garrigus, Mr. Mickelson received some playful ribbing.

"How's it going, Phil?" he asked. Mr. Mickelson, letting out a laugh, replied, "Been an interesting evening."

Mr. Garrigus added in jest that "I'm not sure I want to talk to you now."

*Karen Crouse contributed reporting.*

**Correction: June 12, 2014**
*An article on May 31 about an insider trading investigation, using information from people briefed on the inquiry, overstated the scope of an investigation involving the golfer Phil Mickelson. While investigators are looking at his trading in some stocks, Clorox is not among them. The error was repeated in articles on June 1 and June 2 and in the Common Sense column on Saturday. An article about the latest developments in the investigation appears today on Page B1.*

A version of this article appears in print on 06/01/2014, on page A15 of the NewYork edition with the headline: Authorities Find Insider Trading Case Tied to Golf Star Is Slow to Take Shape.

---

© 2016 The New York Times Company

# EXHIBIT O



9 of 11 DOCUMENTS

Copyright 2014 Factiva ®, from Dow Jones
All Rights Reserved



(Copyright (c) 2014, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

June 2, 2014 Monday
Correction Appended

**SECTION:** Pg. A1

**LENGTH:** 1020 words

**HEADLINE:** Trade Probe Hits Snag as Surveillance Is Derailed

**BYLINE:** By Michael Rothfeld and Susan Pulliam

**BODY:**

A snag has hit the insider-trading investigation of investor Carl Icahn, golfer Phil Mickelson and sports bettor William "Billy" Walters: News of the probe derailed government efforts to secretly deploy wiretaps, which have been key components of many successful insider-trading cases.

Criminal and civil investigators are examining whether Mr. Icahn tipped Mr. Walters about his plans relating to stocks of several companies, including Clorox Co., according to people briefed on the probe. The investigation was first reported by The Wall Street Journal on Friday. Messrs. Icahn, Walters and Mickelson have denied any wrongdoing.

Mr. Walters on Sunday declined to comment on the latest development, and Mr. Icahn didn't return calls for comment.

On Saturday, speaking to reporters after the third round of a tournament in Ohio, Mr. Mickelson said he has done "absolutely nothing wrong." The famous golfer said he was "fully cooperating with the FBI agents" and wouldn't let the probe distract him from golf.

Trade Probe Hits Snag as Surveillance Is Derailed The Wall Street Journal June 2, 2014 Monday Correction Appended

Authorities were considering the use of wiretaps in the investigation of the financier, gambler and golfer, people briefed on the probe said. Meantime, investigators were using other types of electronic and human surveillance in the probe, the people said.

In recent weeks, potentially promising surveillance through such methods had picked up in activity, the people said.

Even before the probe became public, investigators confronted roadblocks particular to the unusual nature of the people under scrutiny, according to the people briefed on the probe. As they considered whether they could wiretap Mr. Icahn, one of the people said, they learned that it could be hard to do so without him finding out -- because he owned a stake in a telecommunications company through which surveillance might have to be conducted.

The investigation of Messrs. Icahn, Mickelson and Walters is the latest, and most high profile, in a string of insider-trading probes by the Federal Bureau of Investigation and the Manhattan U.S. attorney's office that has resulted in 85 convictions and guilty pleas in the last five years.

The high success rate by federal investigators in prosecuting insider-trading cases in recent years has been due partly to their ability to record conversations of people under scrutiny through wiretaps and other secret evidence-gathering techniques.

The government has also made use of cooperating witnesses in many cases, enlisting individuals to record conversations with associates who didn't know that their activities were under investigation by the government.

Now the government has lost that advantage after publicity surrounding the investigation of the three men.

The investigation is focused on whether Mr. Icahn, a billionaire corporate raider who has been investing in companies for decades, gave nonpublic, market-moving information about his investments to Mr. Walters.

The two met during the time when Mr. Icahn's company owned a Las Vegas casino and hotel, the Stratosphere, from 1998 until 2008, and have talked on occasion since then, including about stocks.

In addition, investigators are examining whether Mr. Walters passed stock tips, including some information he received from Mr. Icahn, to Mr. Mickelson, the people briefed on the probe said.

Messrs. Icahn and Mickelson have said they don't know one another.

Trading by Mr. Walters and Mr. Mickelson in Clorox around the time of a July 2011 offer for the company by Mr. Icahn is under scrutiny, the people briefed on the probe said.

FBI agents have also inquired about Mr. Mickelson's trading in Dean Foods, a stock suggested to him by Mr. Walters (although Mr. Mickelson had also owned it previously), according to a person familiar with the matter. Mr. Icahn has said he never took a stake in Dean Foods.

After three years in which they struggled to make much headway, the investigation was still in a relatively early stage, despite the new leads that FBI officials had hoped would bear fruit.

But when they learned that news of the investigation might become public, investigators accelerated their pace, dispatching a pair of agents on a plane from New York on Thursday to confront Mr. Mickelson after a round of golf at the Memorial Tournament in Dublin, Ohio. He told them to speak to his lawyer.

That is a step the government wouldn't have otherwise taken at that point, before it had gathered more evidence, the people briefed on the probe said.

Additionally, an agent leading the case was out of the country and couldn't help with the approach.

Trade Probe Hits Snag as Surveillance Is Derailed The Wall Street Journal June 2, 2014 Monday Correction Appended

Mr. Mickelson's lawyer said Friday that an agent told him by phone that Mr. Mickelson wasn't a "target" of the probe. They planned to schedule a meeting in the coming days to discuss the government's concerns.

The FBI declined to comment on the statement by Mr. Mickelson's lawyer that his client wasn't a target.

That is a legal term usually reserved for people likely to be charged in the later stages of an investigation and who may receive a "target letter" by prosecutors notifying them of possible charges.

The government has in the past altered its investigative strategies in response to disclosures of its investigations.

In late 2010, the FBI raided several hedge funds on the first Monday after The Wall Street Journal revealed over a weekend that there was a large-scale ongoing probe of insider-trading relating to "expert networks" that arrange calls between public-company employees and traders.

While the publicity is likely to damage the government's ability to conduct covert surveillance, investigators can sometimes use publicity to their advantage.

After news reports, the subjects of investigations will often discuss the reports or take actions to avoid being caught, and those maneuvers can cause them to get caught, law-enforcement officials have said.

In the 2010 investigation, some hedge-fund traders, upon reading The Wall Street Journal's account of that insider-trading probe, moved to destroy evidence, according to a criminal complaints later filed in federal court charging traders with obstruction of justice.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**CORRECTION:**

Corrections & Amplifications

Golfer Phil Mickelsondidn't trade Clorox securities, according to his lawyer. A Page One article on June 2 about snags hitting a U.S. insider-trading investigation incorrectly said Mr. Mickelson's trading in Clorox was under scrutiny.

(WSJ June 13, 2014)

(END)

**LOAD-DATE:** June 13, 2014

# EXHIBIT P

# Exhibit Redacted

# EXHIBIT Q

# Exhibit Redacted

# EXHIBIT R

**The New York Times**

# Golfer Mickelson's Role Said to Be Overstated in Insider Inquiry

By Matthew Goldstein and Ben Protess   June 11, 2014 8:57 pm

**Related Links**

Investor, Bettor, Golfer: Inquiry Into Big Names (May 30, 2014)

Phil Mickelson, the famed golfer, did not trade in the shares of Clorox just as the billionaire investor Carl C. Icahn was mounting an unsolicited takeover bid for the company in 2011, say four people briefed on the matter.

Recent reports in The New York Times and other news organizations said that Clorox was among the stocks that federal authorities were examining as part of a two-year investigation into well-timed trades made by Mr. Mickelson and the sports gambler William T. Walters. Initially, some investigators pursued a theory that Mr. Icahn shared private details of his Clorox bid with Mr. Walters, who then traded on the information and passed on the tip to Mr. Mickelson.

Although Mr. Icahn and Mr. Walters remain under investigation over Clorox, the F.B.I. and the Securities and Exchange Commission have found no evidence that Mr. Mickelson traded Clorox shares. The overstated scope of the investigation came from information provided to The Times by other people briefed on the matter who have since acknowledged making a mistake.

The F.B.I. is pursuing a criminal investigation, while the S.E.C. is running a parallel civil inquiry.

Mr. Mickelson and Mr. Walters, as previously reported, still face an investigation over separate well-timed trades they made in Dean Foods in 2012 just before the company's stock soared. Those trades generated more than $15 million in proceeds for Mr. Walters and nearly $1 million for Mr. Mickelson, one of the four people briefed on the matter said. Mr. Mickelson has denied any wrongdoing.

Mr. Mickelson, a three-time winner of the Masters golf tournament who is set to compete on Thursday at the United States Open, received some assurances from the government itself. An F.B.I. agent, two of the people briefed on the matter said, has informed Mr. Mickelson that the government is seeking information from him about Mr. Walters and has no plans to criminally charge him. That did not stop the government, which has not accused anyone of wrongdoing in the investigation and ultimately might not file either a criminal or a civil case, from making a pitch to secure Mr. Mickelson's cooperation. F.B.I. agents have twice approached him out of the blue, the people said, once at an airport and once on a golf course at a tournament.

The new details, provided in the interviews with the people briefed on the matter, indicate that Mr. Mickelson's ties to the investigation are weaker than previously reported. The details may also raise questions about the government's decision to deploy what appear to be unusually aggressive tactics in the investigation, particularly when the F.B.I. agents publicly approached Mr. Mickelson even though he is known to have a lawyer and a sports agent.

At the airport in September, one of the people said, Mr. Mickelson had little to offer. He pledged to cooperate but explained that he did not know Mr. Icahn and had no clue that any stock tip he received from Mr. Walters might have been improper.

When confronted at a golf tournament in Ohio last month, Mr. Mickelson instructed F.B.I. agents to "speak to my lawyers," according to a nearby observer.

Mr. Mickelson has hired Gregory B. Craig, a partner at the law firm Skadden, Arps, Slate, Meagher & Flom who was previously White House counsel under President Obama.

Several former federal prosecutors who worked on insider trading investigations, speaking on the condition of anonymity to avoid antagonizing law enforcement officials, questioned the decision to approach Mr. Mickelson after he finished a round of golf at the Memorial Tournament in Dublin, Ohio. The former prosecutors speculated that the government wanted to embarrass him into cooperating against Mr. Walters.

"If this were the only effort they made at that time to contact him, having it be so public could be seen as an aggressive move," said Daniel C. Richman, a criminal law professor at the Columbia University School of Law.

Mr. Mickelson, Mr. Icahn and Mr. Walters have issued statements denying any wrongdoing. Mr. Mickelson, who said he has "done absolutely nothing wrong," added "I'll cooperate as much as I can with the F.B.I." In an interview, Mr. Icahn said, "I don't give out inside information," adding that "for 50 years I have had an unblemished record."

Richard Wright, a lawyer for Mr. Walters, said his client had not had any contact with the authorities about his trading activity. Mr. Wright said no one from the F.B.I., the S.E.C. or the Justice Department had reached out to Mr. Walters, who is known to be an active stock trader, either before or after the investigation became public.

Mr. Icahn similarly has not received any subpoenas from the authorities, a person briefed on the matter said.

The lack of subpoenas struck some former prosecutors as odd. Once the investigation became public, the former prosecutors said, they would have anticipated authorities sending out subpoenas seeking access to emails and other records. Such documents would most likely be needed to help establish that Mr. Walters and Mr. Mickelson had traded stocks while in possession of inside information.

And even if Mr. Icahn did share secret information about his firm's Clorox intentions, he may have done so legally. It would be illegal if he breached a duty of confidentiality to his own investors.

Any suspicion that the three — Mr. Mickelson, Mr. Icahn and Mr. Walters — formed a triangle of insider trading has failed to materialize. Nothing in the public record suggests Mr. Icahn and Mr. Mickelson even know each other. Mr. Icahn and Mr. Walters both have acknowledged knowing each other — people who know them say the two men have wagered on sporting events together. But both Mr. Icahn and Mr. Walters insist they have never shared inside information.

Mr. Mickelson and Mr. Walters have participated in golf tournaments together. And outside the world of sports gambling, Mr. Walters, better known as Billy, is a prominent Las Vegas figure as the owner of popular golf courses.

It is unclear why federal authorities initially suspected that Mr. Mickelson may have played a role in the Clorox trades. The S.E.C. began the inquiry into Clorox trading after finding suspicious trades in the stock just days before Mr. Icahn's unsolicited bid.

Although Mr. Mickelson is not connected to the Clorox trades, he is not in the clear on Dean Foods.

The F.B.I., federal prosecutors in Manhattan and the S.E.C. continue to investigate well-timed trades made by Mr. Mickelson and Mr. Walters in shares of Dean Foods in the summer of 2012, the people briefed on the matter said.

The authorities are pursuing a theory that a source inside Dean Foods gave Mr. Walters a heads-up about the company's plan to spin off its WhiteWave Foods subsidiary in an initial public offering, though it is unclear what exactly prompted Mr. Walters and Mr. Mickelson to trade.

Shares of Dean Foods surged 41 percent on Aug. 8, 2012, the day after the company officially announced the spinoff in a news release.

The trading in Dean Foods has no apparent connection to Mr. Icahn.

A version of this article appears in print on 06/12/2014, on page B1 of the NewYork edition with the headline: Golfer's Role in Trading Said to Be Overstated

© 2016 The New York Times Company

# EXHIBIT S

**The New York Times**

# Dean Foods Receives a Subpoena in an Investigation Into Mickelson's Trades

By Matthew Goldstein and Ben Protess   June 23, 2014 8:40 pm

Federal authorities are seeking information from Dean Foods as part of an investigation into well-timed trades placed by the championship golfer Phil Mickelson and the well-known sports gambler William T. Walters.

Prosecutors working for Preet Bharara, the United States attorney in Manhattan, recently subpoenaed the food and beverage company for documents, according to people briefed on the matter. The request came shortly after published reports disclosed that the federal authorities were investigating whether Mr. Walters and Mr. Mickelson possessed inside information about Dean Foods's plan to announce a spinoff of its WhiteWave Foods subsidiary in August 2012.

Shortly before the spinoff was announced, Mr. Walters and Mr. Mickelson placed separate trades in the stock of Dean Foods, according to another person briefed on the matter. Those trades generated more than $15 million in proceeds for Mr. Walters and nearly $1 million for Mr. Mickelson, that person said. Shares of Dean Foods soared nearly 41 percent after the company formally announced the planned spinoff on Aug. 8.

For nearly two years, federal authorities have been investigating the trades. One theory the authorities are pursuing is that a person inside Dean Foods provided Mr. Walters advance notice of the WhiteWave deal, prompting him to share that information with Mr. Mickelson.

Separately, the authorities are examining Mr. Walters's trading in the stock of Clorox. Mr. Mickelson has no connection to those trades.

The investigation of the two men has generated a good deal of publicity because Mr. Mickelson, a three-time winner of the Masters golf tournament, is one of the world's most famed golfers. Mr. Walters, meanwhile, is regarded as one of the most successful sports gamblers and has been profiled on "60 Minutes" and in a number of golfing publications.

In earlier statements, both men have denied wrongdoing. It is possible that the authorities will close the investigation without taking any action.

On Monday, a lawyer for Mr. Mickelson, Gregory B. Craig, said in a statement that "Phil has done absolutely nothing wrong," adding that "He has been cooperating with the investigation" and is currently "totally focused on getting ready" for the Scottish Open and the British Open. Richard Wright, a lawyer for Mr. Walters, did not respond to requests for comment.

On two occasions over the last 10 months, agents with the F.B.I. have approached Mr. Mickelson to discuss his trading and what, if any, information he may have received from Mr. Walters. The first approach occurred last September, when the agents talked to Mr. Mickelson for about an hour at an airport. Then in May, F.B.I. agents approached Mr. Mickelson as he was finishing a round of golf at a tournament in Dublin, Ohio. A spokesman for Mr. Bharara and a spokesman for the Federal Bureau of Investigation in New York both declined to comment.

Jamaison Schuler, a Dean Foods spokesman, declined to comment on whether federal authorities had made any requests for documents. But he added, "We are reviewing this matter, and our practice is to offer our full support to any government investigation."

It is unclear what documents federal prosecutors requested from Dean Foods. The request to the company was made within the past couple of weeks, said the people briefed on the matter.

Separately, the authorities continue to question Mr. Walters's trading in Clorox. That trading came around the same time in 2011 that the billionaire investor Carl C. Icahn began an unsolicited takeover bid for the company, drawing suspicion that Mr. Icahn may have shared details of his ultimately unsuccessful effort with Mr. Walters, with whom he has occasionally crossed paths.

Mr. Icahn has denied sharing any inside information with anyone. And even if he did share details of his takeover bid with Mr. Walters, it is not clear that he would have violated any laws.

Dean Foods Receives a Subpoena in an Investigation Into Mickelson's Trades - The New York Ti...   Page 2 of 2

Not long after Mr. Icahn began his takeover bid for Clorox, regulators asked the billionaire investor for some information about his trading. A person briefed on the matter said this type of request often happens around a prominent takeover bid.

A version of this article appears in print on 06/24/2014, on page B3 of the New York edition with the headline: Dean Foods Receives a Subpoena in an Investigation Into Mickelson's Trades.

© 2016 The New York Times Company

# EXHIBIT T

U.S. Seeks Records in Inquiry Tied to Dean Foods, Clorox – WSJ

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/criminal-and-civil-investigators-examining-investor-carl-icahn-sports-bettor-william-walters-golfer-phil-mickelson-1403559329

MARKETS

# U.S. Seeks Records in Inquiry Tied to Dean Foods, Clorox

SEC, FBI Investigating Activist Investor Carl Icahn, Sports Bettor Billy Walters, Golfer Phil Mickelson



The FBI and SEC are seeking information from Dean Foods and Clorox in an insider-trading investigation involving, from left, financier Carl Icahn, pro golfer Phil Mickelson, and developer and high-profile sports bettor Billy Walters. *ASSOCIATED PRESS/HENNY RAY ABRAMS/WILFREDO LEE/LAS VEGAS REVIEW-JOURNAL/JESSICA EBELHAR*

By **SUSAN PULLIAM** and **MICHAEL ROTHFELD**
Updated June 23, 2014 10:39 p.m. ET

Federal authorities have sought information from two companies in connection with an insider-trading probe examining the activities of investor Carl Icahn, sports bettor William T. Walters and professional golfer Phil Mickelson, according to people familiar with the matter.

Dean Foods Co., a Dallas-based dairy and soy company, in recent weeks received a subpoena from criminal authorities ordering the company to produce information, said a person familiar with the matter.

Clorox Co., a cleaning products company, received a request for information from the Securities and Exchange Commission in 2011 related to trading in the company's shares, according to a person familiar with the matter. Mr. Icahn also received a request for information from the SEC around that time.

The government investigation began after Mr. Icahn accumulated a 9.1% stake in Clorox in February 2011, said people briefed on the probe. On July 15, 2011, he made a $10.2 billion offer for Clorox that caused the stock to jump. Investigators are looking into whether Mr. Icahn tipped Mr. Walters about his actions involving Clorox, the people said.

U.S. Seeks Records in Inquiry Tied to Dean Foods, Clorox – WSJ



The U.S. is examining the trading activities of Carl Icahn, William T. Walters and Phil Mickelson, pictured here. *ASSOCIATED PRESS*

While Mr. Icahn never owned shares of Dean Foods and has had no involvement with the company, according to a person familiar with the matter, authorities are also looking at trading into the food company as part of the same investigation as the Clorox trading. They are probing whether Mr. Walters provided stock tips to Mr. Mickelson about Dean Foods, said people familiar with the matter. Authorities are examining trading in Dean Foods shares related to the 2012 spinoff of its WhiteWave Foods Co. division and its aftermath.

Mr. Icahn and Mr. Mickelson don't know each other.

Investigators routinely subpoena or request documents from companies when they are scrutinizing leaks of nonpublic information, including emails, phone records and other records, to determine who had access to the information and may have improperly disclosed it. It isn't clear what records they sought from Dean Foods and Clorox.

The subpoena to Dean Foods highlights how criminal investigators have shifted their tactics following the disclosure of the probe in media reports last month. Before that, the criminal investigation had been covert and they avoided taking certain actions that might have tipped off the people under scrutiny.

Dean Foods also is doing its own investigation of the matter.

"We are reviewing this matter, and our practice is to offer our full support to any government investigation," the company said in a statement. Shares of Dean Foods traded down 2% at $17.20 in after-hours trading Monday after The Wall Street Journal first reported on the subpoena. The shares had fallen more than 8% at one point in the after-hours session.

None of the men have been charged, and there is no indication charges will be filed. Messrs. Walters, Mickelson and Icahn have denied wrongdoing.

Mr. Mickelson has said he was willing to cooperate with the FBI. He was first approached by agents in September 2013, at an airport in Bedford, Mass., after playing in the Deutsche Bank Championship golf tournament. The Wall Street Journal reported that he was approached again by a pair of agents after finishing a round at an Ohio golf tournament on May 29, the day before news of the investigation became public. He referred them to his lawyer.

In a statement, another lawyer for Mr. Mickelson, Gregory B. Craig, said, "Phil has done absolutely nothing wrong. He has been cooperating with the investigation."

The probe is part of the government's increased focus on insider trading. The most

U.S. Seeks Records in Inquiry Tied to Dean Foods, Clorox – WSJ

RELATED

- FBI, SEC Probe Trading of Carl Icahn, Billy Walters, Phil Mickelson (http://online.wsj.com/articles/fbi-sec-probe-trading-of-carl-icahn-billy-walters-phil-mickelson-1401492772)
- Activist Investors Often Leak Their Plans to a Favored Few (http://online.wsj.com/news/articles/SB10001424052702304888404579381250791474792)
- Insider-Trading Probe Could Snarl a Deal for Icahn (http://online.wsj.com/articles/icahn-bought-50-million-in-fannie-freddie-shares-from-fairholme-fund-1401805004)
- Insider-Trading Probe Hits Snag (http://online.wsj.com/articles/insider-trading-probe-1401665146)
- Phil Mickelson Denies Wrongdoing, Regarding Investigation (http://online.wsj.com/articles/phil-mickelson-denies-wrongdoing-regarding-investigation-1401575942)

prominent of those cases largely have involved Wall Street traders, corporate executives and others in the financial world. Messrs. Icahn, Walters and Mickelson are among the highest-profile group of figures to be in the government's sights in a string of insider-trading probes by the FBI and the Manhattan U.S. attorney's office that has resulted in 85 convictions and guilty pleas in the past five years.

Even if Mr. Icahn, a billionaire corporate raider who has been investing in companies for decades, gave nonpublic, market-moving information about his investments to Mr. Walters, leaks by such investors fall under a murky area of securities law. Some lawyers have argued in recent years that such leaks don't violate securities laws because they don't represent a "breach," or violation, of a duty to keep the information secret.

The high success rate by federal investigators in prosecuting insider-trading cases in recent years has been aided by their ability to record conversations of people under scrutiny, in part, through wiretaps. The government has also made strategic use of cooperating witnesses.

Mr. Walters is a sports-betting legend, who acknowledges wagering as a child growing up in Kentucky. He moved to Las Vegas and became a multimillionaire, on gambling as well as his ownership of a car dealership and his investments in stocks and bonds.

Mr. Walters came under scrutiny in 2011 after making well-timed, profitable purchases of Clorox securities around the time Mr. Icahn made his investment, people briefed on the current probe said.

"Yes, I have studied and invested in the stock market for many years and no one says anything when I lose money or when I am not successful," Mr. Walters said in a statement earlier this month. "And certainly that's happened, like it has to many of us."

FBI agents have inquired about Mr. Mickelson's trading in Dean Foods, a stock suggested to him by Mr. Walters, although Mr. Mickelson had also owned it previously, according to a person familiar with the matter. Mr. Mickelson, a three-time Masters Tournament champion, is one of professional golf's most popular and recognizable athletes, earning many millions of dollars in endorsement deals beyond his golf winnings.

The probe also is examining other individuals who may have given out nonpublic information or traded on it, said people briefed on the investigation.

**Write to** Susan Pulliam at susan.pulliam@wsj.com and Michael Rothfeld at michael.rothfeld@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.