UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                        :

UNITED STATES OF AMERICA,     :

     -v-                  :

WILLIAM T. WALTERS        :
    a/k/a "Billy,"           :

            *Defendant.*    :

                        :
———————————————————— x

**ECF CASE**

S1 16 Cr. 338 (PKC)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WILLIAM T. WALTERS'S PRETRIAL MOTIONS FOR A BILL OF PARTICULARS, *BRADY* MATERIAL, AND A HEARING TO ADDRESS GOVERNMENT MISCONDUCT

Barry H. Berke
Paul H. Schoeman

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Counsel for Defendant William T. Walters*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT .......................................................................... 1

I.   THE GOVERNMENT SHOULD PROVIDE A BILL OF PARTICULARS TO
     PREPARE FOR TRIAL AND AVOID UNFAIR SURPRISE ......................................... 2

     A.   BACKGROUND .......................................................................... 3

     B.   ARGUMENT ................................................................................ 4

          1.   The Government Should Cure the Indictment's Overly Vague
               Pleading of When the Conspiracy Started .................................. 5

          2.   The Government Should Identify All Known Co-Conspirators ................ 7

          3.   The Government Should Particularize the "Inside Information" Mr.
               Walters Allegedly Received ........................................................ 9

          4.   The Government Should Particularize Any Benefit that it Contends
               Mr. Davis Received in Exchange for Providing Inside Information ........ 11

          5.   The Government Should Identify Any Allegedly Coded Language
               that it Contends Was Used by Any Member of the Conspiracy .............. 12

          6.   The Defense Should Be Protected from Unfair Surprises at Trial
               About Which Trades the Government Contends Were Based on
               Inside Information .................................................................... 13

          7.   The Government Should Identify the Wires That Correspond to
               Each Substantive Wire Fraud Count ............................................ 14

II.  THE GOVERNMENT SHOULD REVIEW MATERIAL WITHIN THE SEC'S
     POSSESSION TO COMPLY WITH *BRADY* AND OTHER DISCLOSURE
     OBLIGATIONS ............................................................................ 16

     A.   BACKGROUND .......................................................................... 16

     B.   ARGUMENT ................................................................................ 17

III. THE GOVERNMENT'S MISCONDUCT DURING THE INVESTIGATION
     SHOULD BE ADDRESSED AT A HEARING .......................................... 19

     A.   BACKGROUND .......................................................................... 20

          1.   ███████████████████ .......................................... 20

          2.   ███████████████████ .......................................... 21

          3.   The Government's Misconduct .................................................. 22

          4.     █████████████████████████████ ....... 30

          5.     The Government Continues to Leak to the Press ...................................... 31

          6.     Known Consequences of the Government's Misconduct ......................... 32

   B.     ARGUMENT ............................................................................................... 34

          1.     This Court Has the Power to Address the Government's Misconduct ................................................................................................... 34

          2.     The Government's Misconduct Warrants a Hearing So That the Court May Fashion an Appropriate Remedy ............................................ 36

CONCLUSION .................................................................................................................... 41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barry v. United States,*
    865 F.2d 1317 (D.C. Cir. 1989) ................................................................................36, 37

*Brady v. Maryland,*
    373 U.S. 83 (1963) ...............................................................................................16, 17, 18

*Giglio v. United States,*
    405 U.S. 150 (1972) ....................................................................................................17, 18

*Gov't of Virgin Islands v. Fahie,*
    419 F.3d 249 (3d Cir. 2005) .............................................................................................35

*In re Grand Jury Matter,*
    682 F.2d 61 (3d Cir. 1982) ...............................................................................................37

*In re Grand Jury Subpoena,*
    103 F.3d 234 (2d Cir. 1996) .............................................................................................37

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ..........................................................................................................17

*In re Sealed Case No. 98-3077,*
    151 F.3d 1059 (D.C. Cir. 1998) .......................................................................................40

*In re Sealed Case No. 99-3091,*
    192 F.3d 995 (D.C. Cir. 1999) .........................................................................................37

*United States v. Ansaldi,*
    372 F.3d 118 (2d Cir. 2004) .............................................................................................15

*United States v. Barnes,*
    158 F.3d 662 (2d Cir. 1998) ...............................................................................................4

*United States v. Bin Laden,*
    92 F. Supp. 2d 225 (S.D.N.Y. 2000) ..........................................................................5, 9, 11

*United States v. Bortnovsky,*
    820 F.2d 572 (2d Cir. 1987) .....................................................................................4, 5, 14

*United States v. Crouse,*
    227 F.R.D. 36 (N.D.N.Y. 2005) ........................................................................................5

*United States v. Cuervelo,*
    949 F.2d 559 (2d Cir. 1991) .......................................................................................34, 36

KL3 3094799.1

*United States v. Davidoff,*
    845 F.2d 1151 (2d Cir. 1988)................................................................................13

*United States v. Eskow,*
    422 F.2d 1060 (2d Cir. 1970)................................................................................16

*United States v. Espinal,*
    96 F. Supp. 3d 53 (S.D.N.Y. 2015)......................................................................35

*United States v. Feola,*
    651 F. Supp. 1068 (S.D.N.Y. 1987), *aff'd* 875 F.2d 857 (2d Cir. 1989).................8

*United States v. Ganim,*
    225 F. Supp. 2d 145 (D. Conn. 2002)............................................................10, 12

*United States v. Gupta,*
    848 F. Supp. 2d 491 (S.D.N.Y. 2012)............................................................17, 18

*United States v. Gutierrez-Flores,*
    No. 94 CR. 393 (CSH), 1994 WL 558034 (S.D.N.Y. Oct. 11, 1994) ......................6

*United States v. Hauze,*
    501 F. App'x 638 (9th Cir. 2012) ..........................................................................16

*United States v. Hogan,*
    712 F.2d 757 (2d Cir. 1983)..................................................................................35

*United States v. Kortright,*
    No. 10 CR 937 (KMW), 2011 WL 4406352 (S.D.N.Y. Sept. 13, 2011)...................7

*United States v. Lino,*
    No. 00 CR. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001)............................8

*United States v. Martoma,*
    990 F. Supp. 2d 458 (S.D.N.Y. 2014)...................................................................18

*United States v. Martoma,*
    No. 12 Cr. 973 (PGG), 2013 WL 2435082 (S.D.N.Y. June 5, 2013)...........8, 14 n.3

*United States v. Ming He,*
    94 F.3d 782 (2d Cir. 1996)....................................................................................35

*United States v. Nachamie,*
    91 F. Supp. 2d 565 (S.D.N.Y. 2000)..................................................................9, 14

*United States v. Newman,*
    773 F.3d 438 (2d Cir. 2014), *cert. denied*, 126 S. Ct. 242 (2015) ........................11

KL3 3094799.1

*United States v. Omni Int'l Corp.*,
  634 F. Supp. 1414 (D. Md. 1986) ...................................................................................36

*United States v. Oruche*,
  No. 07 Cr. 0124 (WHP), 2008 WL 612694 (S.D.N.Y. Mar. 5, 2008) .....................................8

*United States v. Rajaratnam*,
  No. 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ....................5, 8, 9, 11

*United States v. Reale*,
  No. S4 96 CR. 1069 (DAB), 1997 WL 580778 (S.D.N.Y. Sept. 17, 1997) ....................15, 16

*United States v. Rioux*,
  97 F.3d 648 (2d Cir. 1996) .........................................................................................37

*United States v. Ross*,
  372 F.3d 1097 (9th Cir. 2004) *reh'g in part*, 138 F. App'x 902 (9th Cir. 2005) ....................35

*United States v. Sabri*,
  973 F. Supp. 134 (W.D.N.Y. 1996) .........................................................................34, 35

*United States v. Savin*,
  No. 00-CR-45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ........................................9

*United States v. Soberon*,
  929 F.2d 935 (3d Cir. 1991) .......................................................................................36

*United States v. Stein*,
  435 F. Supp. 2d 330 (S.D.N.Y. 2006) .........................................................................37

*United States v. Taylor*,
  707 F. Supp. 696 (S.D.N.Y. 1989) ................................................................................7

*United States v. Torres*,
  901 F.2d 205 (2d Cir. 1990), *overruled on other grounds as recognized by*
  *United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) ..........................................................4

*United States v. Toscanino*,
  500 F.2d 267 (2d Cir. 1974) *abrogated on other grounds as recognized by In*
  *re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157 (2d Cir.
  2008) .....................................................................................................................35

*United States v. Upton*,
  856 F. Supp. 727 (E.D.N.Y. 1994) ..............................................................................15

*United States v. Voigt*,
  89 F.3d 1050 (3d Cir. 1996) .......................................................................................36

KL3 3094799.1

*United States v. Williams,*
    504 U.S. 36 (1992) ............................................................................................35

*United States v. Williams,*
    527 F.3d 1235 (11th Cir. 2008) ....................................................................16

**Articles and Press Statements**

Michael Rothfeld and Jenny Strasburg, *Ex-Analyst at SAC Felt Pressured for
    Tips*, Wall St. J. (Feb. 14, 2013) ............................................................26 n.7

Michael Rothfeld, Jenny Strasburg, and Susan Pulliam, *More Charges Set for
    Insider Probe*, Wall St. J. (Dec. 1, 2011) ...............................................26 n.7

Bloomberg Video, *Bharara News Conference: Gambler Charged in Insider Case*
    (May 19, 2016) .................................................................................................19

Press Release, U.S. Att'y's Office, S.D.N.Y., *William T. "Billy" Walters Charged
    In Manhattan Federal Court With Insider Trading* (May 19, 2016) ...................19

Press Release, U.S. Securities & Exchange Commission, *SEC Announces Insider
    Trading Charges in Case Involving Sports Gambler and Board Member* (May
    19, 2016) ..........................................................................................................19

**Statutes, Rules and Regulations**

18 U.S.C. § 2518(1)(c) ............................................................................................38

28 C.F.R. 50.2(b) ....................................................................................................38

Fed. R. Crim. P. 6(e) ................................................................................36, 37, 38

Fed. R. Crim. P. 7(f) ...........................................................................................1, 4

S.D.N.Y. Local Criminal Rule 23.1(b) ..................................................................38

**Other Authorities**

Grand Jury Secrecy, 1 Fed. Prac. & Proc. Crim. § 106 (4th ed.) ............................36

KL3 3094799.1

## PRELIMINARY STATEMENT

Defendant William Walters respectfully submits this memorandum of law in support of his motions (1) for a bill of particulars under Federal Rule of Criminal Procedure 7(f), (2) to require the government to review information within the SEC's possession in order to comply with the government's disclosure obligations, and (3) for a pre-trial hearing, to be followed by appropriate remedial measures, to address government misconduct during the investigation leading to the Indictment in this case.

The motion for a bill of particulars is necessitated by the government's surprising refusal to provide information that is required to be disclosed and that the government has provided voluntarily or at the direction of the court in other similar insider trading cases in this district. The specific information the defense seeks through a bill of particulars is necessary to permit the defense to prepare adequately for trial. Without the requested particulars, the defense will be left to guess at the meaning of ambiguous, unspecified and overbroad allegations in the Indictment, and remain in the dark about critical aspects of the charges. This is information that the government is required to disclose and has at its fingertips but for tactical reasons refuses to provide.

The government's refusal to search the SEC's files for exculpatory information or other material subject to disclosure is similarly unjustified. The government and the SEC worked in tandem during the investigation, sharing documents, attending joint interviews and applauding their mutual assistance at the joint press conference announcing the Indictment and parallel SEC case. Now that it is the defense's turn to receive information, the government seems intent on shirking its responsibilities. Rather than review the SEC's files to fulfill the government's disclosure obligation, the government would limit itself to searching only the

specific material that the government chose to access from the SEC.  If the SEC has other information that is exculpatory or otherwise material to the defense, the government does not intend to produce it.   We respectfully request that this Court, as other judges in this district have done in comparable cases, order the government to conduct a complete review of the SEC files so as to satisfy its discovery obligations without further delay.

Finally, it appears clear from the evidence currently available to the defense that during the investigation of this case, the government engaged in a pattern of improper conduct, including making false and misleading statements to the court and leaking grand jury information to the press, as part of a concerted effort to breathe life into a flagging investigation. The misconduct occurred in the midst of a fruitless wiretap of Mr. Walters's phone in what appears to have been an attempt to prod Mr. Walters and other targets of the investigation to engage in incriminating conduct.  Mr. Walters does not seek to suppress the wiretap recordings, since the calls are innocuous and fully consistent with Mr. Walters's innocence.  But this does not mean that the government's unfair and improper tactics should go unaddressed.  In particular, the government should not be permitted to benefit from misconduct or prevent the full extent of the misconduct from coming to light.  Since the most appropriate remedy to employ is a question that can only be answered based on a more complete record, we respectfully request a hearing so that the record before the Court can be developed and appropriate remedial measures imposed.

I.     **THE GOVERNMENT SHOULD PROVIDE A BILL OF PARTICULARS TO PREPARE FOR TRIAL AND AVOID UNFAIR SURPRISE**

Mr. Walters respectfully requests that this Court order the government to particularize the Indictment's ambiguous and overbroad allegations so that he may prepare adequately for trial and avoid unfair surprise.

A.   **BACKGROUND**

After at least five years of investigating Mr. Walters's trading activity, on May 19, 2016, the government unsealed an indictment charging him with one count of conspiracy to commit securities fraud, one count of conspiracy to commit wire fraud, four counts of securities fraud, and four counts of wire fraud.  The Indictment alleges a lengthy scheme involving Mr. Walters and the government's cooperating witness, Tom Davis.  According to the Indictment, "[f]rom at least 2008 through in or about 2014, [Mr. Walters] and Davis participated in a scheme in which Davis provided material, non-public information to [Mr. Walters], who used that information to purchase and sell securities, all of which occurred" in brokerage accounts in the names of The Walters Group and Nature Development B.V.  Indictment ¶¶ 1-7.

On May 31, 2016, Mr. Walters requested that the government provide a bill of particulars.  The request asked the government to remedy certain prominent ambiguities and omissions in the Indictment's allegations and provide the kind of particulars that the government has provided – often without waiting for a judicial order – in other recent insider trading cases in this district.  A week later, the government responded by refusing to provide any particulars in this case, directing counsel's attention only to "the detailed Indictment and the anticipated discovery in this case."  Letter from the United States Attorney's Office to Barry H. Berke, Esq., *United States v. Walters*, S1 16 Cr. 338 (PKC) (June 7, 2016) ("June 7, 2016 Letter") (attached hereto as Ex. A to the Declaration of Paul H. Schoeman, Esq. ("Schoeman Decl."); *see also* (Schoeman Decl. ¶ 4).

The government's reflexive response is particularly misguided in this case.  The key issue here is not that the government's discovery is voluminous (it is), but rather that the information the defense seeks is not contained in the discovery.  As far as we can tell, the 200,000 documents of varying kinds and formats (trading records going back 20 years and

- 3 -

covering over 90 securities, telephone records for 60 numbers, two months of wiretaps, business records from various sources, etc.) do not reveal a single piece of inside information that Mr. Walters allegedly received in connection with Dean Foods. There is not an email, memo, recording or other record of any kind in the discovery that we can review that will indicate what specific inside information Mr. Walters is accused of receiving about Dean Foods. The only source of the information is likely the statements of the government's cooperating witness, Tom Davis, which the government will not provide any time soon. Nor is there any documentation that will make it possible for the defense to discern when the charged conspiracy is alleged to have started, who was a member, and a host of other critical details that the defense needs to know in order to be able to prepare for trial and avoid being unfairly surprised.

**B.     ARGUMENT**

Under Rule 7(f) of the Federal Rules of Criminal Procedure, the Court may require the government to file a bill of particulars so that a defendant can "identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam) (citing *Wong Tai v. United States*, 273 U.S. 77, 82 (1927)). A bill of particulars is required when the indictment does not "advise the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) (discussing plain error standard of review). Thus, a defendant is entitled to a bill of particulars when the indictment fails "to provide the defendant with sufficient detail to defend adequately the charges against him." *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998). Moreover, when a bill of particulars is "necessary to give the defendant enough information about the charge to prepare

- 4 -

his defense, 'it will be required even if the effect is disclosure of evidence or of theories.'" *Id.*
(quoting 1 Charles Alan Wright, *Federal Practice & Procedure* § 129 (1982)).

While in certain instances the government can provide the necessary information
in discovery, it does not "fulfill its obligation merely by providing mountains of documents to
defense counsel who [are] left unguided" as to which ones relate to the charges against the
defendant. *Bortnovsky*, 820 F.2d at 574-75; *see also United States v. Bin Laden*, 92 F. Supp. 2d
225, 234 (S.D.N.Y. 2000) ("It is no solution to rely solely on the quantity of information
disclosed by the government; sometimes the large volume of material disclosed is precisely what
necessitates a bill of particulars."). Courts in this district have recognized that to defend against
allegations of a lengthy insider trading conspiracy, a bill of particulars is necessary because "the
potential for unfair surprise and the difficulty of preparing a defense are amplified." *United
States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *2 (S.D.N.Y. July 13,
2010).

In order to permit the defense to prepare for trial, we respectfully request that the
Court order the government to provide particulars as set forth below.

1.  <u>The Government Should Cure the Indictment's Overly Vague Pleading of
    When the Conspiracy Started</u>

The Indictment alleges a conspiracy involving Mr. Walters and Mr. Davis "[f]rom
*at least* 2008 through in or about 2014." Indictment ¶ 7 (emphasis added). This allegation is
insufficient to provide adequate notice to the defendant and permit defense counsel to prepare to
meet the government's allegations at trial. The use of the phrase "at least" is a significant
departure from the standard wiggle room the government gives itself when it uses the familiar
"on or about" qualifier for the dates in an indictment. An event that occurs "on or about" a
certain date occurs on approximately that date. *See, e.g., United States v. Crouse*, 227 F.R.D. 36,

- 5 -

41 (N.D.N.Y. 2005) ("The Indictment sets forth the beginning of the conspiracy as 'in or about 2003' and the end date as October 22, 2003, and thus adequately identifies the time frame within which the alleged conspiracy occurred."); *United States v. Gutierrez-Flores*, No. 94 CR. 393 (CSH), 1994 WL 558034 at *2 (S.D.N.Y. Oct. 11, 1994) (declining to require bill of particulars on when narcotics conspiracy began, where indictment alleged "that the conspiracy lasted from approximately May 1994 to June 3, 1994"). But "at least 2008" could mean 2007, 2006, 1995 or, literally any year before 2008. "From at least 2008" does not provide an approximate date, but instead provides only an open-ended range.

The intentionally ambiguous drafting of the Indictment is significant because Mr. Walters's personal relationship with Mr. Davis, as alleged in the Indictment, dates to the "mid 1990s." Indictment ¶ 6. Moreover, the Indictment alleges that since "*at least* 2007," Mr. Walters and Mr. Davis "had numerous prospective and actual business dealings with each other . . . ." *Id* (prefacing the list of business dealings with "includ[ing], *among other things*") (emphasis added). And the evidence that the government produced reveals that Mr. Walters traded in the stock of Dean Foods well before 2008, and the brokerage statements obtained by the government during the investigation and produced in discovery date back to 1995.

In order to defend against such allegations, Mr. Walters must know when the charged conspiracy is alleged to have begun. Without that information, the quantity of information that must be reviewed and analyzed is multiplied exponentially – and for no legitimate reason. The government knows what evidence it put before the grand jury about when the conspiracy began and it knows – from its cooperating witness – when Mr. Davis says the conspiracy began. There is no reason why, through artful drafting of the Indictment, that information should not be provided to the defense so as to give notice of the allegations we will

- 6 -

confront at trial.  In these circumstances, a bill of particulars identifying when Mr. Walters

supposedly joined this conspiracy is therefore required.  *See, e.g., United States v. Kortright*, No.

10 CR 937 (KMW), 2011 WL 4406352, at *3 (S.D.N.Y. Sept. 13, 2011) (requiring the

government to provide "the approximate date and location of any meeting, conversation, or any

other sort of activity, at which the Government will contend that Defendant joined the

conspiracy"); *United States v. Taylor*, 707 F. Supp. 696, 700 (S.D.N.Y. 1989) (granting request

for particulars of dates "that each of the defendants allegedly joined the conspiracy," and "dates

and locations of any meetings or conversations at which the government will contend that

[defendant] joined the conspiracy").

        2.     The Government Should Identify All Known Co-Conspirators

       The government has identified only two co-conspirators – Mr. Walters and Mr.

Davis – but the Indictment repeatedly refers to other, unidentified co-conspirators.  *See, e.g.*,

Indictment ¶¶ 48, 50, 52.  The government's discovery does nothing to shed any light on who it

may contend is a co-conspirator at trial; the productions include documents such as phone

records, trading records, and bank accounts relating to several other people who are not

referenced in the Indictment.  In particular, the discovery to date contains records for at least 60

phone numbers, associated with over 30 people and entities, over the period 2008 to 2016.

Trading records and financial accounts are hardly more illuminating – the government has

produced trading account records associated with at least seven other people (some of whom

have multiple accounts) and other financial account records for at least 20 bank accounts.  Mr.

Walters cannot simply guess whether the government will contend that any of these individuals

(or any others) are co-conspirators.

       If the government will contend there are additional co-conspirators, the

government must identify them now so that Mr. Walters can adequately prepare for trial.  The

KL3 3094799.1

refusal to identify known, unindicted co-conspirators is simply unjustified. The government has been compelled to provide, or has voluntarily provided, the identities of known co-conspirators in recent insider trading cases. *See, e.g., United States v. Martoma*, No. 12 Cr. 973 (PGG), 2013 WL 2435082, at *7 (S.D.N.Y. June 5, 2013) (ordering government to identify all known co-conspirators); *Rajaratnam*, 2010 WL 2788168, at * 1 n. 1 (government provided co-conspirators for each count); Bill of Particulars, *United States v. Gupta*, No. S1 11 Cr. 907 (JSR) (S.D.N.Y. April 9, 2012) ECF No. 47 ("*Gupta* Bill of Particulars") (Schoeman Decl. Ex. B) at 1 (providing "the identity of additional known coconspirators in the charged conspiracy"); Bill of Particulars, *United States v. Newman*, No. S2 12 Cr. 121 (RJS) (S.D.N.Y. August 29, 2012) ECF No. 111 ("*Newman* Bill of Particulars") (Schoeman Decl. Ex. C) at 1 (providing "the identity of known co-conspirators"); Bill of Particulars, *United States v. Steinberg*, No. S4 12 Cr. 121 (RJS) (S.D.N.Y. September 18, 2013) ECF No. 299 ("*Steinberg* Bill of Particulars") (Schoeman Decl. Ex. D) at 1 (same). Indeed, requests for names of unindicted co-conspirators have been routinely granted in this district. *See, e.g., United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *12-13 (S.D.N.Y. Jan. 2, 2001) (ordering identification of co-conspirators in "wide-ranging" conspiracy with a "voluminous amount of discovery" even when government raised "legitimate security concerns"); *see also United States v. Feola*, 651 F. Supp. 1068, 1131-34 (S.D.N.Y. 1987) (granting demand for bill of particulars specifying "the names of all persons whom the government will claim at trial were co-conspirators"), *aff'd* 875 F.2d 857 (2d Cir. 1989).

Identification of all known co-conspirators is especially important when the alleged conspiracy spans a long period of time – regardless of the kind of conspiracy. *See, e.g., United States v. Oruche*, No. 07 Cr. 0124 (WHP), 2008 WL 612694, at *4 (S.D.N.Y. Mar. 5, 2008) (requiring in narcotics conspiracy spanning a number of years the identification of "any

KL3 3094799.1

known unindicted co-conspirator with respect to each paragraph of the Indictment in which the word 'others' appears"); *United States v. Nachamie*, 91 F. Supp. 2d 565, 572-73 (S.D.N.Y. 2000) (requiring identification of co-conspirators in alleged complex Medicare fraud conspiracy spanning over three years, involving 2,000 false claims and 200,000 pages of discovery); *United States v. Savin*, No. 00-CR-45 (RWS), 2001 WL 243533, at *5 (S.D.N.Y. Mar. 7, 2001) (requiring disclosure of co-conspirators involving 100,000 pages of discovery, a mail and wire fraud conspiracy over a six-year period, and "numerous transactions").  This case should be treated no differently, especially since there has been no suggestion of special circumstances that warrant withholding the identities of known co-conspirators, such as disclosure that would endanger someone or harm an ongoing investigation. *See Bin Laden*, 92 F. Supp. 2d at 241 (requiring disclosure of co-conspirator identities unless Government made a "particularized determination, in good faith," that disclosure would "either (1) expose the person or someone else to a significant risk of bodily harm; or (2) compromise an ongoing investigation").

> 3.     The Government Should Particularize the "Inside Information" Mr. Walters Allegedly Received

In an insider trading case, the defendant is entitled to know the inside information he is alleged to have obtained.  The reasons are obvious since:

> The merits of such a charge depend heavily on the facts and context. A defendant might argue that the information he sought to obtain was not material, or that it was already public at the time he tried to get it.  But he can only do that if he knows what the information *is* and when it was conveyed.

*Rajaratnam*, 2010 WL 2788168, at *2 (emphasis in original).  As a result, the government has regularly been compelled to provide, or provided on its own, these or similar disclosures in other recent insider trading prosecutions. *See, e.g., id.* at *4 (requiring the government to provide for various stocks "the substance of the information provided for any period"); *Newman* Bill of

- 9 -

Particulars (Schoeman Decl. Ex. C) at 1 (providing "the nature of the confidential information obtained or passed by one or more of the defendants and/or coconspirators," for each stock, such as "[a]ctual and forecast unit sales numbers for desktop and/or notebook computers, and pricing and market share information relating to hard drives from Dell's suppliers"); *Steinberg* Bill of Particulars (Schoeman Decl. Ex. D) at 3 (same).[1]

Here, the Indictment alleges that Mr. Davis provided Mr. Walters with inside information on "among other things" various topics. *See, e.g.*, Indictment ¶¶ 14, 17, 20. The government must specify what those "other things" are. *See United States v. Ganim*, 225 F. Supp. 2d 145, 155-56 (D. Conn. 2002) (requiring particulars where indictment in honest services mail fraud case alleged a list of benefits that elected official received in exchange for official acts, preceded by the phrase "among others"). And various other allegations concerning the nature of the inside information provided to Mr. Walters are too vague and ambiguous to be meaningful. For example, the Indictment refers to "Inside Information concerning the WhiteWave IPO . . . ." Indictment ¶ 37. It is critical to know what this "Inside Information" was because this allegation refers to the period after Dean Foods had already announced its filing of a

---

[1] *See also* Letter from the United States Attorney's Office to Nathaniel Marmur, Esq., *United States v. Martoma*, 12 Cr. 793 (PGG) (March 15, 2013) ECF No. 25-5 ("*Martoma* Letter") (Schoeman Decl. Ex. E) at 1 (providing defendant with information concerning "the nature of the Inside Information and its disclosure to the defendant"); *Gupta* Bill of Particulars (Schoeman Decl. Ex. B) at 3 ("In the afternoon of September 23, 2008, Gupta disclosed . . . material, nonpublic information relating to Warren Buffett's/Berkshire Hathaway's $5 billion investment in Goldman Sachs, prior to the public announcement of that investment after the close of the market on September 23, 2008"); Bill of Particulars, *United States v. Contorinis*, No. 09 Cr. 1083 (RJS) (S.D.N.Y. July 2, 2010) ("*Contorinis* Bill of Particulars") (Schoeman Decl. Ex. F) (providing ordered particulars such as "1. On or about September 2, 2005, Stephanou was advised that he was on the Albertson's deal team at UBS . . . . Shortly thereafter, Stephanou told Contorinis that (a) UBS was representing Cerberus . . . in connection with the potential acquisition of Albertson's, (b) Stephanou was on the Albertson's deal team at UBS, and (c) Stephanou would keep Contorinis updated regarding developments in the potential acquisition. 2. Stephanou routinely updated Contorinis on these developments until the transaction was announced publicly on January 23, 2006.").

registration statement for an IPO of WhiteWave, *see* Indictment ¶ 32, and therefore a lot of information "concerning the WhiteWave IPO" was already public.

Such particularization is necessary in order to prepare for trial because, for every piece of information the government will contend is material and non-public, it is a defense to show that it was actually immaterial or public at the time of the allegedly unlawful disclosure, for example, by comparing it to SEC filings, press releases, earnings call transcripts, presentations at conferences, analyst reports, etc. To perform that time-intensive research, Mr. Walters must have sufficient particularity concerning the purported inside information itself. *See Rajaratnam*, 2010 WL 2788168, at *3 n. 3 ("[T]o the extent the government seeks to prove the existence of the conspiracy by showing that the defendants received inside information, the defendants may defend against it by showing that they knew the information to be public or obviously immaterial. Defendants can only prepare this defense if they know more about the nature of the information."). Without the particulars of what allegedly material non-public information was provided to Mr. Walters, the defense will not be able to adequately prepare for trial and will be required to perform "seemingly unlimited research and investigation." *See Bin Laden*, 92 F. Supp. 2d at 237. The government must therefore particularize the material non-public information that it alleges Mr. Davis provided to Mr. Walters.

    4.    <u>The Government Should Particularize Any Benefit that it Contends Mr. Davis Received in Exchange for Providing Inside Information</u>

The personal benefit that Mr. Davis allegedly received from Mr. Walters is a critical aspect of the charges against Mr. Walters. To sustain an insider trading charge, the personal benefit must be one "that is objective, consequential, and represents at least a potential gain of pecuniary or similarly valuable nature." *United States v. Newman*, 773 F.3d 438, 452 (2d Cir. 2014), *cert. denied*, 126 S. Ct. 242 (2015). The government has regularly provided the

particulars of the alleged personal benefit, even before the Second Circuit's reversal of the

convictions in *Newman*, and it should continue to do so here.[2]

         According to the Indictment, Mr. Davis provided material non-public information

about Dean Foods and Darden in exchange for "significant benefits from [Mr. Walters],

*including* approximately $1 million in loans that were, in large measure, never repaid by Davis."

Indictment ¶ 12 (emphasis added).  The Indictment further alleges that Mr. Walters and Mr.

Davis "had numerous prospective and actual business dealings with each other," identifying six

transactions "among other things . . . ."  Indictment ¶ 6.  In order to prepare for trial and

challenge whether the purported benefits that Mr. Davis received were in exchange for illegal

inside information and were sufficiently "objective" and "consequential" under *Newman*, Mr.

Walters must know with particularity what those benefits actually are – not merely examples.

*Cf. Ganim*, 225 F. Supp. 2d at 155-56 (requiring particulars as to benefits received in exchange

for official acts when indictment included a non-exclusive list).

         5.    The Government Should Identify Any Allegedly Coded Language that it
               Contends Was Used by Any Member of the Conspiracy

         The Indictment alleges that Mr. Walters and Mr. Davis communicated using

coded language and provides one example:  the use of "Dallas Cowboys" in place of "Dean

Foods."  Indictment ¶ 47(c).  If this is the only example of the use of code that the government

---

[2] *See, e.g.*, *Martoma* Letter (Schoeman Decl. Ex. E) at 2 ("The Government alleges that Dr.
Gilman directly and indirectly benefited by providing Inside Information to Martoma through (1)
financial payments made by the Gerson Lehrman Group to Gilman for consultations with
Martoma and (2) the development of a perceived friendship with Martoma"); *Newman* Bill of
Particulars (Schoeman Decl. Ex. C) at 1, 5 (providing "the nature of the benefit received by the
tippers of the information" such as "career advice and actual assistance – as well as promises of
future assistance – with opportunities to work in the securities industry" and "to maintain a
personal friendship"); *Steinberg* Bill of Particulars (Schoeman Decl. Ex. D) (same); *Gupta* Bill
of Particulars (Schoeman Decl. Ex. B) at 5 (providing "additional benefits, direct and/or indirect,
to Gupta from the insider trading scheme," such as the "hope[] that Rajaratnam would help
Gupta recoup some and/or all of his losses from Gupta's investment in Voyager").

KL3 3094799.1

will introduce at trial, the government should say so. But if there are other examples, they need

to be particularized for the defense. To our knowledge, there are no documents in the discovery

from which we can determine what other coded language Mr. Walters or Mr. Davis is alleged to

have used. Without that information – a key to the code – the defense will not be in a position to

determine whether any communications – emails or recorded calls – between Mr. Walters and

Mr. Davis are alleged to be encoded.

      6.      <u>The Defense Should Be Protected from Unfair Surprises at Trial About
Which Trades the Government Contends Were Based on Inside
Information</u>

      The Indictment identifies trading in the stocks of two companies – Dean Foods

and Darden – as being part of the charged conspiracy. It further identifies specific trading in

advance of a total of ten public announcements (nine relating to Dean Foods and one relating to

Darden). We do not believe that the Indictment provides notice of any other trading activity by

Mr. Walters that the government will contend at trial was part of the conspiracy. But the

government's perfunctory response to our request for particulars references "the discovery" that

has now been produced, and that discovery includes trading by Mr. Walters – near constant

trading over many years, including over 1,000 trades in approximately 90 securities between

2008 and 2014. That trading activity includes purchases and sales of Dean Foods stock that are

not alleged in the Indictment to have been illegal. It also includes accounts associated with at

least seven individuals other than Mr. Walters.

      If the government is to offer evidence at trial of allegedly illegal trades beyond

those identified in the Indictment, it must provide notice through a bill of particulars. *See United

States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (reversing conviction for failure to grant

bill of particulars where indictment alleged extortion of one company but at trial the defendant

was "confronted with evidence of extortions aimed at entirely different companies"). This kind

- 13 -

of basic information – a description of the trading activity – is necessary to prepare for trial on charges of insider trading, and has previously been provided in insider trading cases, particularly where the government alleges a conspiracy over an extended period of time.[3]  Without a bill of particulars, Mr. Walters would have to analyze and defend not only the trading activity specifically identified in the Indictment, but also all of his trades that the government has produced with regards to Dean Foods and other stocks, as well as trades that others directed. Forcing Mr. Walters to prepare to explain twenty years of his own trading activity as well as the circumstances surrounding others' trades is unrealistic and impermissibly shifts the burden of proof to Mr. Walters.  *See Bortnovsky*, 820 F.2d at 574-75 (production of 4,000 documents in connection with mail fraud charges was insufficient as long as "defense counsel . . . were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged"); *Nachamie*, 91 F. Supp. 2d at 572 ("Because the Government has declined to identify which of the [200,000 pages of] documents provided to the defense pursuant to Rule 16(a)(1)(C) it intends to use in its case-in-chief at trial, it must, instead, respond to an appropriate bill of particulars.").

> 7.   The Government Should Identify the Wires that Correspond to Each Substantive Wire Fraud Count

The Indictment also fails to provide sufficient information concerning the four substantive counts of wire fraud (Counts Seven through Ten).  These counts do not actually

---

[3] *See, e.g., Steinberg* Bill of Particulars (Schoeman Decl. Ex. D) at 7 (identifying "Trading Activity In Furtherance of the Conspiracy" such as: "Between on or about August 18, 2008 and on or about August 28, 2008, Sigma Capital executed securities transactions in Dell stock based in whole or in part on Inside Information"); *Newman* Bill of Particulars (Schoeman Decl. Ex. C) at 7-10 (same).  Decisions that have rejected an "itemization" of trading activity are not to the contrary; in those cases, the defendant asked for far more granular trading information.  *Cf. Martoma*, 2013 WL 2435082, at *6 (rejecting request for further particularity concerning "(i) the date of each purchase, sale, or other trade; (ii) the number and type of shares purchased; and (iii) the price of each purchase, sale, or other trade") (alterations omitted).

identify the wire transmissions underlying each count, rendering these counts legally insufficient and multiplicitous.

Where mail or wire fraud charges do not identify specific mailings or wires, the indictment is "insufficient to allow Defendants to prepare an adequate defense." *See United States v. Reale*, No. S4 96 CR. 1069 (DAB), 1997 WL 580778, at *14 (S.D.N.Y. Sept. 17, 1997). A bill of particulars that "detail[s] the individual mailings and wire transfers" is therefore necessary. *Id.* (requiring bill of particulars where mail and wire fraud counts "fail[ed] to identify any specific mailing or the approximate date on which it occurred"); *United States v. Upton*, 856 F. Supp. 727, 740-41 (E.D.N.Y. 1994) (if "the government has supplied defendants with a bill of particulars which identifies those wire communications upon which it will rely at trial" then wire fraud indictment need not specify the wire). The government, however, has refused to supply even this basic information. The Court should require the government to identify in a bill of particulars the wire transmission corresponding to each count of wire fraud.

Moreover, if the government continues to refuse to identify the wire transmissions, the Indictment would be multiplicitous. "An indictment is multiplicitous if it charges the same crime in two counts." *United States v. Ansaldi*, 372 F.3d 118, 124 (2d Cir. 2004). When this occurs, the "primary problem is that the jury can convict on both counts, resulting in two punishments for the same crime in violation of the Double Jeopardy Clause of the Fifth Amendment." *Id.* Because the Indictment charges the same statutory violation more than once, "the question is whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution." *See id.* And the "unit" for a wire fraud prosecution is the wire transmission. *See Reale*, 1997 WL 580778, at *14 ("It is well-settled that each use of the mail or wires in furtherance of a scheme to defraud constitutes a separate crime"); *see also*

- 15 -

*United States v. Eskow*, 422 F.2d 1060, 1064 (2d Cir. 1970) ("Since each mailing pursuant to an alleged scheme to defraud constitutes a separate offense, the indictment is not vulnerable to a claim of multiplicity.").

In Counts Seven through Ten, the Indictment does not identify which four wires correspond to which wire fraud counts. Instead, the Indictment identifies "securities transactions" that correspond to each count. Indictment ¶¶ 56-57. As the Indictment stands, a single wire transmission could underlie all four counts, resulting in multiplicitous charges. *Cf. United States v. Hauze*, 501 F. App'x 638, 639 (9th Cir. 2012) (indictment not multiplicitous where "[e]ach count of mail and wire fraud included in the indictment alleged a separate act of mailing or wiring"); *United States v. Williams*, 527 F.3d 1235, 1243 (11th Cir. 2008) ("Each resultant wire fraud count requires proof of a separate wire transmission made in furtherance of [defendant's] scheme to defraud – an element not required by the others."). Absent adequate particularization, the multiplicitous wire fraud counts should be dismissed. *See Reale*, 1997 WL 580778, at *14 ("The lack of specificity does not warrant dismissing these counts *at this time* since the Government can provide Defendants with a Bill of Particulars detailing the individual mailings and wire transfers.") (emphasis added).

## II.   THE GOVERNMENT SHOULD REVIEW MATERIAL WITHIN THE SEC'S POSSESSION TO COMPLY WITH *BRADY* AND OTHER DISCLOSURE OBLIGATIONS

Mr. Walters respectfully requests that the Court order the government to comply fully with its discovery obligations by reviewing the SEC's investigative files for exculpatory and other discoverable information.

### A.   BACKGROUND

Following the Indictment, Mr. Walters requested that the government produce materials and information pursuant to Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963) and

its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972). Mr. Walters explicitly

requested that the government produce such materials and information within the possession,

custody, or control of not only the United States Attorney's Office, but also of the SEC (as well

as the FBI and United States Postal Inspection Service). (Schoeman Decl. ¶ 3). At this point,

the government merely responded that it was "aware of its disclosure obligations and will

comply with them." June 7, 2016 Letter (Schoeman Decl. Ex. A). On August 31, 2016, Mr.

Walters again asked for materials and information under *Brady* and its progeny, including

various statements that may have been made to the government or the SEC. (Schoeman Decl. ¶

3). In conversations on September 13 and September 16, 2016, the government explained for the

first time that it refused to review materials within the SEC's possession, custody, or control, in

order to comply with its *Brady* obligations; the government would instead review and produce

materials or information that it had actually received from the SEC, or to which it had access. *Id.*

The government's position is contrary to settled law.

    **B.**    **ARGUMENT**

        In order to comply with *Brady* and *Giglio*, the prosecutor "has a duty to learn of

any favorable evidence known to the others acting on the government's behalf in the case,"

which can include those outside the prosecutor's office. *Kyles v. Whitley*, 514 U.S. 419, 437

(1995). Where the government conducts a "joint investigation" with another agency, "the

prosecutor's duty extends to reviewing the materials in the possession of that other agency for

*Brady* evidence." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012). And

courts within this district have repeatedly recognized that "any argument that the Government's

duty" under *Brady* does not extend to reviewing certain materials "merely because another

agency, not the USAO, is in actual possession of the documents created or obtained as part of the

joint investigation is both 'hypertechnical and unrealistic.'" *Id.* (quoting *United States v. Shakur*,

543 F. Supp. 1059, 1060 (S.D.N.Y. 1982)); *see also United States v. Martoma*, 990 F. Supp. 2d

458, 460 (S.D.N.Y. 2014) ("Courts in this District apply this 'joint investigation' analysis in

assessing the USAO's obligations with respect to *Brady* and *Giglio* material held by the SEC.").

 "For *Brady* purposes, it is enough that the agencies are engaged in joint fact-

gathering, even if they are making separate investigatory or charging decisions, because the

purpose of *Brady* is to apprise the defendant of exculpatory evidence obtained during the fact-

gathering that might not otherwise be available to the defendant." *Gupta*, 848 F. Supp. 2d at 494

(rejecting the government's argument that it did not have to review SEC materials when there

was a parallel SEC investigation but not a joint prosecution).  Simply put, "where the

investigation is conducted jointly, the Government is charged with reviewing all documents and

information connected to that joint investigation and disclosing any exculpatory information."

*Id.* at 495.

 The facts available to Mr. Walters show that there has been joint fact-gathering

between the U.S. Attorney's Office and the SEC.  It is our understanding that the two offices

jointly interviewed witnesses on multiple occasions.  Based on the discovery we have received,

we can see that the SEC provided the government with at least 32 categories of documents

constituting records provided to the U.S. Attorney's Office by the SEC, totaling over 185,000

pages of documents, including over 60,000 pages that The Walters Group produced to the SEC.

*See Martoma*, 990 F. Supp. 2d at 461 (finding joint investigation based in part on the fact that

"[t]he SEC also provided the USAO with documents it obtained during its investigation,

including all documents that it received from [defendant's employer].") (internal citations

omitted).  And in announcing the parallel criminal and civil enforcement cases, both offices

thanked each other for their "assistance" in press releases and at a joint press conference. *See*

KL3 3094799.1

Press Release, U.S. Attorney's Office for the Southern District of New York, *William T. "Billy" Walters Charged In Manhattan Federal Court With Insider Trading* (May 19, 2016) *available at* https://www.justice.gov/usao-sdny/pr/william-t-billy-walters-charged-manhattan-federal-court-insider-trading* ("Mr. Bharara praised the work of the FBI and the Postal Inspection Service, and thanked the SEC and [FINRA] for their assistance."); Press Release, U.S. Securities & Exchange Commission, *SEC Announces Insider Trading Charges in Case Involving Sports Gambler and Board Member* (May 19, 2016) *available at* https://www.sec.gov/news/pressrelease/2016-92.html ("The SEC appreciates the assistance of the U.S. Attorney's Office for the Southern District of New York, Federal Bureau of Investigation, U.S. Postal Inspection Service, and [FINRA]."); Bloomberg Video, *Bharara News Conference: Gambler Charged in Insider Case* (May 19, 2016) *available at* http://www.bloomberg.com/news/videos/2016-05-19/bharara-news-conf-gambler-charged-in-insider-case-video.

Because these facts show a joint fact-gathering between the U.S. Attorney's Office and the SEC, the government's disclosure obligations to Mr. Walters extends to material and information within the SEC's possession, custody, or control. The entire SEC file – including SEC interview notes and memoranda – and not merely the documents that the government chose to receive from the SEC, is subject to the government's obligation to review and produce discovery.

## III.   THE GOVERNMENT'S MISCONDUCT DURING THE INVESTIGATION SHOULD BE ADDRESSED AT A HEARING

Mr. Walters respectfully requests that the Court conduct a hearing to address the strong evidence of false and misleading statements to the court and leaks of grand jury information during the investigation of this case, and to determine the appropriate remedy to prevent the government from benefiting from its improper conduct.

- 19 -

A.    **BACKGROUND**

1.    

KL3 3094799.1



2.

[5] The Assistant United States Attorneys who have appeared on behalf of the government after the Indictment was returned do not appear to have played any role in the wiretap applications or in any of the misconduct set forth in this motion.

KL3 3094799.1

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

3.     The Government's Misconduct

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████   On May 29, 2014, Mr. Davis was approached at

his Texas home and Mr. Mickelson was approached near the locker room after completing a

round of golf in a tournament in Ohio. ███████████████████████████████

████████████████████ teams of agents were in different cities on the following Thursday

strongly indicates that the decision to conduct these interviews had been made (and the plane

tickets may even have been purchased) ███████████████████████. The

government has disclosed that Mr. Davis denied any wrongdoing and "stated that he never gave

insider information to [Mr.] Walters, and that he was '100 percent certain' of that fact."

KL3 3094799.1

(Schoeman Decl. ¶ 5).  The government has also disclosed that Mr. Mickelson denied any

wrongdoing.  (Schoeman Decl. ¶ 8).

        There is strong evidence that at the same time that the agents ███████████

████████████████ approached Mr. Davis and Mr. Mickelson, a member of the

investigative team improperly disclosed the details of the grand jury's investigation to the media.

On May 30, a reporter from the *Wall Street Journal*, Michael Rothfeld, called Mr. Walters's

cellphone ████████████████████████████████████████████████████████

████████████████████████████████████████.  As set forth below,

these calls and the media reports that followed clearly indicate that a member of the

government's team with complete knowledge of all aspects of the grand jury's investigation was

feeding information to the press in an apparent effort to generate incriminating calls on the

wiretap that could be used to bolster the government's insubstantial case against Mr. Walters.



KL3 3094799.1



Mr. Rothfeld followed up yet again with two e-mails to Mr. Walters about the anticipated *Wall Street Journal* article, further detailing his extensive knowledge of the government's investigation, including knowledge that trading in Dean Foods was under review, and asking Mr. Walters to call or e-mail him:

> Beyond its general scope, as I described to you, we also plan to report that the government investigation, including by the FBI and SEC, is examining trading in multiple stocks including that of Clorox around the time in 2011 that Mr. Icahn was active in it. Based on our reporting, the government has looked at large options

KL3 3094799.1

positions you held in Clorox at that time. Also, we plan to report that you struck up a friendship with Mr. Icahn through a mutual acquaintance when his company owned the Stratosphere. And, that you have a friendship with Mr. Mickelson surrounding your shared interest in golf. We will also include some general background about your life, and that you are 67 years old. If you would like to discuss or comment on any of these things, please call me at either of the numbers below or email me as soon as possible. This story is likely to be published today.

. . .

I wanted to let you know about one additional point we plan to include – that the investigation is also focusing on trading in Dean Foods.

Again, let me know if you'd like to comment on any aspect of this. I am here if you want to reach me.

E-mail from Michael Rothfeld to William Walters (May 30, 2014) (WG 0053512) (Schoeman Decl. Ex. K).

Later that day, the *Wall Street Journal* broke the story that "[f]ederal investigators are pursuing a major insider-trading probe involving finance, gambling and sports, examining the trading of investor Carl Icahn, golfer Phil Mickelson and Las Vegas bettor William 'Billy' Walters." See Susan Pulliam and Michael Rothfeld, *FBI, SEC Probe Trading of Carl Icahn, Billy Walters, Phil Mickelson – Insider-Trading Investigation Began in 2011 with Unusual Trades in Clorox*, Wall St. J. (May 30, 2014) (Schoeman Decl. Ex. L). The article repeatedly referred to unidentified sources who were familiar with the investigation, and provided detailed information concerning the investigations into trading in both Dean Foods and Clorox:

- Federal investigators are pursuing a major insider-trading probe involving finance, gambling and sports, examining the trading of investor Carl Icahn, golfer Phil Mickelson and Las Vegas bettor William "Billy" Walters. The Federal Bureau of Investigation and the Securities and Exchange Commission are examining whether Mr. Mickelson and Mr. Walters traded illicitly on nonpublic information from Mr. Icahn about his investments in public companies, *people briefed on the probe said.*

- 25 -

- The FBI and SEC are examining whether Mr. Walters on at least one occasion passed a tip on to Mr. Mickelson, *these people said*, and are studying the two men's trading patterns.

- The government investigation began three years ago after Mr. Icahn accumulated a 9.1% stake in Clorox Co. in February 2011, *said the people briefed on the probe*.  On July 15, 2011, he made a $10.2 billion offer for Clorox that caused the stock to jump. Well-timed trading around the time of his bid caught the attention of investigators, who began digging into the suspicious trading in Clorox stock, *the people familiar with the probe said*.

- The investigators expanded their probe to look at trading patterns by Mr. Walters and Mr. Mickelson relating to Dean Foods Co., *said the people briefed on the probe*. The FBI, following its approach to Mr. Mickelson on Thursday, expressed an interest in his trading in Dean Foods, *a person familiar with the situation said*.

*Id.* at 1-2, 3, 6 (emphasis added).

      The information reflected in Mr. Rothfeld's communications with Mr. Walters, and later reflected in the article, makes it clear that the source of the information was someone "briefed on the probe" who knew details about both strands of the government investigation: tips from Mr. Icahn and tips from Mr. Davis.[7]  The leak cannot plausibly have come from the individuals whom the government approached, since neither Mr. Davis nor Mr. Mickelson were in a position to know about the government's investigation of Mr. Icahn, including the fact that it

---

[7] The record of leaks in recent insider trading cases brought in this district has made it plain that the *Wall Street Journal*, and specifically reporters Michael Rothfeld and Susan Pulliam, is the government's favorite recipient of non-public grand jury information. *See, e.g.*, Michael Rothfeld, Jenny Strasburg, and Susan Pulliam, *More Charges Set for Insider Probe*, Wall St. J. (Dec. 1, 2011) *available at* http://www.wsj.com/articles/SB10001424052970204397704577070 423777097892 (The article stated that "Federal authorities are pursuing charges against individuals at three prominent investment firms . . . according to people familiar with the matter," and referenced three individuals by name, including Fayad Abbasi of Neuberger Berman, who was never charged but was immediately placed on leave by his firm following the leak.); Michael Rothfeld and Jenny Strasburg, *Ex-Analyst at SAC Felt Pressured for Tips*, Wall St. J. (Feb. 14, 2013) *available at* http://www.wsj.com/articles/SB10001424127887323443200045 78302243722094464 (The article identified a cooperating witness used by the government "to build a case against the SAC portfolio manager, Michael Steinberg," and specifically noted that "[a]uthorities currently are preparing to present evidence to a grand jury against Mr. Steinberg, according to a person familiar with the investigation.").

had begun three years earlier.  And, of course, neither of these individuals would have any

possible motivation to create a media firestorm in which the allegations that they engaged in

insider trading were publicly aired.

It also appears that the government was simultaneously leaking to *The New York*

*Times*.  Shortly after the *Wall Street Journal* article broke, Matthew Goldstein and Ben Protess

ran a story with substantially the same information, although this time specifically crediting the

United States Attorney's Office for the Southern District of New York with playing a leading

rule in the investigation:

> • The F.B.I. and Securities and Exchange Commission, which are leading the inquiry
> *along with federal prosecutors in Manhattan*, are examining whether Mr. Icahn
> leaked details of his Clorox bid to Mr. Walters, *the people briefed on the investigation
> said*. One initial theory, the people said, is that Mr. Walters might have passed that
> information to Mr. Mickelson.

*See Investor, Bettor, Golfer: Insider Trading Inquiry Includes Mickelson, Icahn and William T.*

*Walters*, N.Y. Times (May 30, 2014) (Schoeman Decl. Ex. M) (emphasis added).  As with the

*Wall Street Journal*, *The New York Times* mentioned both Clorox and Dean Foods and made

multiple references to "people briefed on the investigation."  The Times also revealed the length

of the investigation (which no one outside the government would have known) and disclosed

information from the telephone and trading records ████████████████████████████

██████████████████████████ :

> • Federal authorities, *whose investigation has dragged on for more than two years*
> without yielding definitive evidence of insider trading, *are also examining phone
> records* to see whether Mr. Walters spoke to Mr. Icahn shortly before the trades.

> • In a separate strand of the investigation, federal authorities are looking into trading in
> Dean Foods that has no apparent connection to Mr. Icahn, the people briefed on the
> matter said. Mr. Walters and Mr. Mickelson *placed the trades around August 2012,
> according to the people*, just before the food and beverage company announced its
> quarterly earnings and a public offering of stock for one of its subsidiaries. The
> authorities are investigating whether Mr. Walters had a source inside the company

- 27 -

KL3 3094799.1

itself – and whether others who know Mr. Walters may have traded on the
information as well.

*Id.* at 2 (emphasis added).

The next day, Saturday, May 31, 2014, another *New York Times* article contained

more details.  The article claimed that Mr. Mickelson and Mr. Walters earned "several million

dollars" on a series of stock trades, "according to people briefed on the matter *who spoke*

*anonymously because they were not authorized to discuss the investigation*." Ben Protess and

Matthew Goldstein, *Authorities Find Insider Trading Case Tied to Phil Mickelson Is Slow to*

*Take Shape*, N.Y. Times (May 31, 2014) (Schoeman Decl. Ex. N) at 1 (emphasis added).  The

article included even more specifics on what Mr. Walters's and Mr. Mickelson's trading records

showed:

- And trading records indicated that the bets came not just from Mr. Walters but also
  from at least one other investor connected to the golfing world, *one of the people*
  *briefed on the matter said*.

*Id.* (emphasis added).

Beyond disclosing information obtained during the investigation, *The New York*

*Times* article revealed what the *prosecutors* working on the case were thinking and provided a

justification about why the United States Attorney's Office had not yet brought charges:

- *The previously unreported details about the size and scope of the trading*, emerging a
  day after a federal insider trading investigation first came to light, might seem to
  stack up in the government's favor. As federal authorities examine whether Mr. Icahn
  leaked details of his Clorox bid to Mr. Walters, the people said, *they are exploring a*
  *theory* that Mr. Walters might have separately passed on other information to Mr.
  Mickelson.

- A recounting of the government's tactics, described in interviews with people briefed
  on the matter, provides a case study in the hurdles of building an insider trading
  investigation. Even after the United States attorney's office in Manhattan racked up a
  perfect record under Preet Bharara – more than 80 insider trading convictions and no
  defeats – *a case can wither without a smoking-gun email, a loose-lipped cooperating*
  *witness or wiretapped conversations*.

- 28 -

KL3 3094799.1

- In recent months, authorities have pored over phone records, *the people briefed on the matter said*, seeking to line up Mr. Icahn's calls to Mr. Walters with the trading in Clorox. But phone records provide *only circumstantial leads.*

*Id.* at 1, 2 (emphasis added).

On June 2, 2014 Pulliam and Rothfeld at the *Wall Street Journal* ran another article disclosing even more about what the prosecutors were thinking. Michael Rothfeld and Susan Pulliam, *Trade Probe Hits Snag as Surveillance is Derailed*, Wall St. J. (June 2, 2014) (Schoeman Decl. Ex. O). It appears that the reporters may have been briefed in some way about the government's earlier use of pen registers and other surveillance techniques, and specifically told the reason wiretaps could not be used on Mr. Icahn's phone. The article stated:

- Authorities *were considering the use of wiretaps in the investigation* of the financier, gambler and golfer, *people briefed on the probe said.* Meantime, investigators were using other types of electronic and human surveillance in the probe, the people said. *In recent weeks, potentially promising surveillance through such methods had picked up in activity, the people said.*

- *Even before the probe became public, investigators confronted roadblocks particular to the unusual nature of the people under scrutiny, according to the people briefed on the probe.* As they considered whether they could wiretap Mr. Icahn, one of the people said, they learned that it could be hard to do so without him finding out—because he owned a stake in a telecommunications company through which surveillance might have to be conducted.

*Id.* at 2 (emphasis added). ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████

KL3 3094799.1

Tellingly, the *Wall Street Journal* article suggests that the reporters asked their government source why he or she was leaking all of this non-public information and received a candid response (or knew the answer based on experience with prior government leaks):

- While the publicity is likely to damage the government's ability to conduct covert surveillance, investigators can sometimes use publicity to their advantage. After news reports, the subjects of investigations will often discuss the reports or take actions to avoid being caught, and those maneuvers can cause them to get caught, law-enforcement officials have said. In the 2010 investigation, some hedge-fund traders, upon reading The Wall Street Journal's account of that insider-trading probe, moved to destroy evidence, according to a criminal complaint later filed in federal court charging traders with obstruction of justice.

Wall St. J. (June 2, 2014) (Schoeman Decl. Ex. O) at 3.

4.





5.      The Government Continues to Leak to the Press

On June 10, 2014 the FBI approached Mr. Walters for the first time. Although he

reportedly "stated that the agent was a true gentleman . . . he did not wish to answer any

questions without an attorney present . . . ." (Schoeman Decl. ¶ 6).  After Mr. Walters rebuffed

the government's overtures, the leaks continued, with ever more detail.  The next day, June 11,

2014, *The New York Times* ran another story that included specific dollar figures that Mr.

Walters and Mr. Mickelson purportedly earned in "trades they made in Dean Foods in 2012 just

before the company's stock soared.  Those trades generated more than $15 million in proceeds

for Mr. Walters and nearly $1 million for Mr. Mickelson, *one of the four people briefed on the*

*matter said.*"  Matthew Goldstein and Ben Protess, *Golfer Mickelson's Role Said to Be*

*Overstated in Insider Inquiry*, N.Y. Times (June 11, 2014) (Schoeman Decl. Ex. R) at 1.  In other words, one person knew how much profit Mr. Walters and Mr. Mickelson had each earned on the trades, which is something that only someone with access to both men's trading records would know and certainly would not be information that anyone on the defense side would have any motivation to publicize.

Less than two weeks later, on June 23, 2014, *The New York Times* ran another article with details about the grand jury investigation, entitled "Dean Foods Receives a Subpoena in an Investigation into Mickelson's Trades."  *See* (Schoeman Decl. Ex. S).  According to the article, "Prosecutors working for Preet Bharara, the United States attorney [sic] in Manhattan, recently subpoenaed the food and beverage company for documents, according to people briefed on the matter."  *Id.* at 1.  While the article cited unnamed sources – "people briefed on the matter" – it made clear that this leak did not come from Dean Foods, the subpoena recipient: "Jamaison Schuler, a *Dean Foods spokesman, declined to comment* on whether federal authorities had made any requests for documents."  *Id.* (emphasis added).  And in addition to discussing the grand jury subpoenas, the article referenced the government's theory of the case: "One theory the authorities are pursuing is that a person inside Dean Foods provided Mr. Walters advance notice of the WhiteWave deal, prompting him to share that information with Mr. Mickelson."  *Id.*  Pulliam and Rothfeld ran a similar article the same day, announcing that Dean Foods recently "received a subpoena from criminal authorities ordering the company to produce information, said a person familiar with the matter."  *See U.S. Seeks Records in Inquiry Tied to Dean Foods, Clorox*, Wall St. J. (June 23, 2014) (Schoeman Decl. Ex. T).

6.    Known Consequences of the Government's Misconduct

███████████████████████████████████████

███████████████████████████████████████

- 32 -

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████

To be clear, the defense does not believe that the calls between Mr. Walters and Mr. Davis are in any way incriminating of Mr. Walters and is not seeking to suppress the wiretap evidence. However, it is also clear that the government views the calls as helpful to its case and, more importantly, made use of these recordings in its effort to convince Mr. Davis to cooperate.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████[8] Although the calls are in fact completely consistent with Mr. Walters's innocence, the government has clearly used the calls that were prodded by its improper conduct in debriefing sessions with Mr. Davis as part of its efforts to induce Mr. Davis (who previously denied any wrongdoing) to cooperate with the government's effort to build a case against Mr. Walters.

The government is also likely to seek to benefit from causing Mr. Davis to dispose of the pre-paid cell phone. As part of his cooperation deal, Mr. Davis has pleaded guilty

---

[8] ██████████████████████████████████████████████████████
██████████████████ Mr. Walters objected to this practice because the calls, transcripts of which were redacted exhibits to the government's reply memorandum, are not inculpatory (for example, Mr. Walters said "just as long as lawyers talk, you know we, you and I can't discuss it, but uh, it's okay if our attorneys will do that"). *See Letter from Barry H. Berke, Esq., SEC v. Walters*, No. 16 Civ. 3722 (LLS) (S.D.N.Y. Aug 26, 2016), ECF 59 at 1.

KL3 3094799.1

to obstruction of justice in connection with the destruction of the phone. As Mr. Davis allocuted

to the Court: "[i]n or around May or June 2014, *after the FBI visited my home*, I knowingly

destroyed the prepaid cellular phone that Billy Walters had previously provided me with and in

order to covertly provide Billy Walters with material, nonpublic information described above.

Specifically I attempted to dispose of the cellular phone by throwing it into a creek near my

home in Dallas. I did so with the intent both to impair the integrity of the cellular phone and to

make it unavailable for any subsequent criminal proceeding." Transcript of the Plea Hearing,

*United States v. Davis*, No. 16 Cr. 338 (PKC) (S.D.N.Y. May 16, 2016) at 23 (emphasis added).

Because the pre-paid phone has not been recovered, the only evidence connecting it to the

alleged insider trading scheme is Mr. Davis's word. According to a government filing, Mr.

Davis "is no longer in possession of the Cellphone and cannot recall the exact number."

(Schoeman Decl. at ¶ 7). In other words, it appears that Mr. Davis spoliated potentially relevant

evidence in response to conduct by the government – FBI agents showing up to interview him.

█████████████████████████████████████████████████████████

### B.   ARGUMENT

#### 1.   This Court Has the Power to Address the Government's Misconduct

The most severe sanction for government misconduct is dismissal of the

indictment in its entirety. "A Court may dismiss an indictment when 'the conduct of law

enforcement agents is so outrageous that due process principles would absolutely bar the

government from invoking judicial processes to obtain a conviction[.]'" *United States v. Sabri*,

973 F. Supp. 134, 146 (W.D.N.Y. 1996) (citing *United States v. Russell*, 411 U.S. 423 (1973));

*see also United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) ("[I]f the government

violates a protected right of the defendant, due process principles may bar the government from

- 34 -

invoking the judicial process to obtain a conviction, if the government's conduct reached a demonstrable level of outrageousness.").

Even where the admittedly high bar of "outrageous" government conduct is not met, this Court may exercise its supervisory powers "to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules (imposed by the Constitution or laws)." *United States v. Williams*, 504 U.S. 36, 46 (1992). The Second Circuit has affirmed that "[a] federal court, 'guided by considerations of justice,' may exercise its supervisory powers to formulate procedural rules not mandated by the Constitution" and exercise "general supervisory authority over members of the bar of this Court, lawyers who are at the same time United States attorneys." *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996) (citations omitted). "The purposes underlying the use of courts' supervisory powers are broad and include implementing remedies for violations of recognized rights and remedies designed to deter illegal conduct" in the future. *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 258-59 (3d Cir. 2005).

Although a district court may exercise its supervisory authority to dismiss an indictment, *United States v. Hogan*, 712 F.2d 757, 762 (2d Cir. 1983); *United States v. Espinal*, 96 F. Supp. 3d 53, 58 (S.D.N.Y. 2015) (Chin, Circuit Judge, by designation); *Sabri*, 973 F. Supp. at 139, other sanctions short of dismissal may be imposed, *see United States v. Toscanino*, 500 F.2d 267, 276 (2d Cir. 1974) ("[T]he supervisory power is not limited to the admission or exclusion of evidence, but may be exercised in any manner necessary to remedy abuses of a district court's process.") *abrogated on other grounds as recognized by In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157 (2d Cir. 2008). The supervisory power provides a court with the flexibility to tailor an appropriate remedy in the face of a wide variety of government misconduct. *See United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004) ("The

- 35 -

supervisory powers provide a wider range of remedial options than would otherwise exist . . . ."), *on reh'g in part*, 138 F. App'x 902 (9th Cir. 2005); *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1438-39 (D. Md. 1986) ("A common thread underlying many decisions is that the magnitude of the misconduct affects the use of the supervisory power, whether or not actual prejudice is shown.  In determining the proper remedy pursuant to the supervisory power, the relief chosen should be directly related to the seriousness of the misconduct").

Similarly, this Court is empowered to impose a range of sanctions for violations of the grand jury secrecy provisions contained in Federal Rule of Criminal Procedure 6(e).  "A knowing violation of Rule 6 . . . may be punished as a contempt of court."  Fed. R. Crim. P. 6(e)(7).  "Other possible remedies are suppression of grand-jury material or dismissal of an indictment."  *See* Grand Jury Secrecy, 1 Fed. Prac. & Proc. Crim. § 106 (4th ed.).  Indeed, "the Rule indicates no limits on the relief available to address violations."  *Barry v. United States*, 865 F.2d 1317, 1321 (D.C. Cir. 1989).

      2.      The Government's Misconduct Warrants a Hearing So That the Court May Fashion an Appropriate Remedy

In order to determine the extent and impact of the government's misconduct and evaluate possible sanctions and remedies, we respectfully request that the Court hold a hearing.  "Most often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist."  *Cuervelo*, 949 F.2d at 567 (remanding for hearing on outrageous government conduct); *see also United States v. Voigt*, 89 F.3d 1050, 1067-68 (3d Cir. 1996) (recognizing that district court should have held a hearing prior to trial into claim of prosecutorial misconduct where the defendant had "raised enough of a specter of ethical impropriety on the government's part to warrant closer scrutiny"); *United States v. Soberon*, 929 F.2d 935, 941 (3d Cir. 1991) (where there is a reasonable suspicion of prosecutorial misconduct

the "the proper course would [be] to hold an evidentiary hearing on the issue."); *United States v. Stein*, 435 F. Supp. 2d 330, 352, 382 (S.D.N.Y. 2006) (after an evidentiary hearing as to government misconduct that violated the defendants' Fifth and Sixth Amendment rights, recognizing that "the determination of guilt or innocence must be made fairly – not in a proceeding in which the government has obtained an unfair advantage long before the trial even has begun").

And, of course, a hearing is required where, as here, a defendant has made a *prima facie* showing of a violation of Rule 6(e). To determine whether there has been such a showing the Court should examine "(1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e)." *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996). "It is not necessary for an article to expressly implicate the Justice Department as the source of the disclosures if the nature of the information disclosed furnishes the connection." *Barry*, 865 F.2d at 1325 (alterations omitted). Nor is it necessary that the article specifically reference the grand jury. "[M]atter occurring before the grand jury" includes "anything that will reveal what transpired during the grand jury proceedings." *In re Grand Jury Subpoena*, 103 F.3d 234, 238 (2d Cir. 1996) (citing *In re Grand Jury Investigation ("Lance")*, 610 F.2d 202, 216-17 (5th Cir. 1980)). The secrecy extends to "not only what has occurred and what is occurring, but also what is likely to occur." *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1001 (D.C. Cir. 1999). "Both the direct and indirect disclosure of information are proscribed." *In re Grand Jury Matter*, 682 F.2d 61, 63 (3d Cir. 1982).

As set forth above, the record as it currently stands reflects a pattern of false and misleading statements to the court and leaks of grand jury information to the press by the government to further its investigation of Mr. Walters. Along the way, the investigating team appears to have abused or ignored the specific requirements of 18 U.S.C. § 2518(1)(c) (requiring "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous"), Fed. R. Crim. P. 6(e) (requiring that matters occurring before the grand jury be kept secret), 28 C.F.R. 50.2(b) (prohibiting Department of Justice Personnel from leaking to the press), and – with respect to any government attorney participating in leaking – Local Criminal Rule 23.1(b) (prohibiting lawyers from leaking grand jury information to the press). The context of this offensive conduct amply demonstrates that the government investigative team was motivated to bolster a flagging investigation by publicly embarrassing the high-profile targets of the investigation, prompting communications that could be recorded on the wiretap that the government could use (and mischaracterize) to further its investigation, and encouraging targets to engage in obstructive conduct.

The apparent misconduct – at least what we know based on available information – includes the following:

- 

- Leaking detailed information to the press about all aspects of the grand jury's investigation, including the names of the targets and the contents of records obtained through grand jury subpoenas, which no one outside the government knew or had a motive to leak.

- Continuing to leak additional information over time in order to increase pressure on the targets when they refused the agents' efforts to obtain statements and cooperation.

- Discussing with reporters that electronic surveillance, i.e. pen registers, conducted pursuant to sealed court orders had been used and were "potentially promising."



- Recklessly causing Mr. Davis to destroy evidence.

Accordingly, we respectfully request that the Court conduct an evidentiary hearing. The facts set forth above are more than sufficient to require explanations and disclosures from the government. Examples of the questions that the government should be required to answer to the Court's satisfaction include:

- When were plans made to interview Mr. Davis and Mr. Mickelson?

- Has the government conducted an investigation of the leaks and, if so, what was the result?

- If the government has not previously investigated the leaks, can the government rebut the *prima facie* case that the leaks originated from government sources?

- What specific disclosures about electronic surveillance were made to the press?



- What statements did the agents who first interviewed Mr. Davis make to Mr. Davis with respect to the preservation or destruction of evidence?

- What information about the alleged use of the prepaid phone does the government seek to present at trial despite its destruction?

KL3 3094799.1

- What information about the wiretap recordings was disclosed to Mr. Davis as part of the government's effort to persuade him to cooperate?

Following a hearing at which these types of questions, or any other question that the Court deems relevant, are addressed, the Court can determine what sanction, if any, is appropriate. Participation by defense counsel is especially important at this remedy-crafting stage, "since '[w]hat appears to be harmless to a district judge may be prejudicial if seen in light of a defense counsel's special familiarity with a given prosecution.'" *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1077 n. 21 (D.C. Cir. 1998).

Again, to be clear, the defense is not seeking suppression of the wiretap calls, which the defense does not believe are inculpatory. But a range of other possible sanctions exists. Even if the record developed at a hearing does not reveal conduct sufficiently outrageous as to warrant dismissal, other measures – including contempt sanctions, granting the defense the ability to conduct or receive additional discovery, pre-trial evidentiary rulings, curative instructions to the jury – may be appropriate to prevent prejudice to the defendant or benefit to the government from the government's improper conduct.

KL3 3094799.1

## CONCLUSION

For all of the foregoing reasons, we respectfully request that the Court grant a bill of particulars, require the government to review information within the SEC's possession in order to comply with its disclosure obligations, and grant a hearing to address the government's misconduct.

Dated: New York, New York
September 23, 2016

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:   /s/ Barry H. Berke
Barry H. Berke
Paul H. Schoeman

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100  (Phone)
(212) 715-8000  (Fax)
bberke@kramerlevin.com
pschoeman@kramerlevin.com

*Counsel for Defendant William T. Walters*

KL3 3094799.1