UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

UNITED STATES OF AMERICA,                        :

            -v-                                :

WILLIAM T. WALTERS                                :
    a/k/a "Billy,"                               :

                *Defendant.*              :

                               :

———————————————————————— x

**ECF CASE**

S1 16 Cr. 338 (PKC)

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT WILLIAM T. WALTERS'S PRETRIAL MOTIONS FOR A BILL OF
## PARTICULARS, *BRADY* MATERIAL, AND A HEARING TO ADDRESS
## GOVERNMENT MISCONDUCT

Barry H. Berke
Paul H. Schoeman

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Counsel for Defendant William T. Walters*

## TABLE OF CONTENTS

                                                          **Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

I.      A BILL OF PARTICULARS IS NECESSARY SO THAT MR. WALTERS CAN ADEQUATELY PREPARE FOR TRIAL AND AVOID UNFAIR SURPRISE .............. 2

II.      THE SEC'S FILES MUST BE REVIEWED FOR EXCULPATORY INFORMATION BECAUSE THE GOVERNMENT AND SEC ENGAGED IN JOINT FACT-GATHERING ............................................................................................... 9

         A.      Factual Background on the Joint Investigation ...................................................... 10

         B.      Case Law Clearly Supports a Finding that this Was a Joint Investigation ............ 11

III.      THE GOVERNMENT'S OPPOSITION RAISES MORE QUESTIONS ABOUT POSSIBLE MISCONDUCT THAN IT ANSWERS, FURTHER JUSTIFYING THE NEED FOR A HEARING ...................................................................................... 15

         A.      The Government's Response Leaves the Most Important Questions Unanswered ........................................................................................................... 15

         B.      The Government Was the Source of the Leaks ...................................................... 17

         C.      Rule 6(e) Material Was Included in the Leaks ...................................................... 18

         D.      The Government Was Not Candid with the Court in Connection with the Wiretap ................................................................................................................. 20

         E.      A Hearing is Necessary to Determine What Remedies Should be Imposed ......... 22

CONCLUSION .......................................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barry v. United States,*
    865 F.2d 1317 (D.C. Cir. 1989) ...............................................................................................17

*Ferreira v. United States,*
    350 F. Supp. 2d 550 (S.D.N.Y. 2004) ......................................................................................12

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ..................................................................................................................14

*SEC v. Stanard,*
    06 Civ. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007) ...............................12 n.4

*United States v. Bin Laden,*
    92 F. Supp. 2d 225 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings*
    *of U.S. Embassies in E. Africa,* 552 F.3d 93 (2d Cir. 2008) ......................................................7

*United States v. Bonventre,*
    No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013), *aff'd in*
    *part,* 646 F. App'x 73 (2d Cir. 2016) ...................................................................................8 n.2

*United States v. Bonventre,*
    646 F. App'x 73 (2d Cir. 2016) ...........................................................................................12 n.4

*United States v. Finnerty,*
    411 F. Supp. 2d 428 (S.D.N.Y. 2006) .................................................................................12 n.4

*United States v. Guerrerio,*
    670 F. Supp. 1215 (S.D.N.Y. 1987) .........................................................................................12

*United States v. Gupta,*
    848 F. Supp. 2d 491 (S.D.N.Y. 2012) ............................................................................. *passim*

*United States v. Guttenberg,*
    No. 07 Cr. 141 (DAB), 2007 WL 3114152 (S.D.N.Y. Oct. 5, 2007) ..................................8 n.2

*United States v. Guttenberg,*
    No. 07 Cr. 141 (DAB), 2007 WL 4115810 (S.D.N.Y. Nov. 14, 2007) ...............................8 n.2

*United States v. Lino,*
    No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ........................................3 n.1

*United States v. Locascio,*
    6 F.3d 924 (2d Cir. 1993) ...................................................................................................12 n.4

KL3 3100240.1

*United States v. Martoma,*
  990 F. Supp. 2d 458 (S.D.N.Y. 2014)..................................................................... *passim*

*United States v. Martoma,*
  No. 12 Cr. 973 (PGG), 2013 WL 2435082 (S.D.N.Y. June 5, 2013) ..........................................3

*United States v. Quinn,*
  445 F.2d 940 (2d Cir. 1971)...................................................................................12 n.4

*United States v. Rajaratnam,*
  No. 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) .............................3, 4, 7

*United States v. Reale,*
  No. S4 96 CR. 1069 (DAB), 1997 WL 580778 (S.D.N.Y. Sept. 17, 1997) ...............................9

*United States v. Skelos,*
  No. 15 Cr. 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) .................................17

*United States v. Stewart,*
  No. 15 Cr. 287 (LTS) (S.D.N.Y. Jan. 19, 2016).....................................................................6

*United States v. Taylor,*
  707 F. Supp. 696 (S.D.N.Y. 1989).........................................................................................3

*United States v. Upton,*
  856 F. Supp. 727 (E.D.N.Y. 1994) .......................................................................................12

*Yanni v. United States,*
  441 F. Supp. 1280 (S.D.N.Y. 1977), *aff'd*, 573 F.2d 1300 (2d Cir. 1978) ..............................7

## Rules and Regulations

Fed R. Crim. P. 6(e)...................................................................................................18

28 C.F.R. 50.2(b) ......................................................................................................18

KL3 3100240.1

## PRELIMINARY STATEMENT

Defendant William T. Walters respectfully submits this reply memorandum of law in further support of his pre-trial motions.

The government's approach to the motion for a bill of particulars is to stonewall, delaying until the last possible moment the identification of particulars that the defense requires to prepare for trial and avoid unfair surprises. To this end, the government's opposition does nothing to clarify the vague and ambiguous allegations in the Indictment and points only generically and misleadingly to the voluminous discovery as a potential source of answers. The government is clearly hoping that Mr. Walters's trial preparation will continue to be hobbled for as long as possible and that the government's ability to surprise the defense at trial will be preserved. This is exactly why a bill of particulars is necessary.

The government's resistance to complying with its *Brady* obligations with respect to the SEC's files reflects a stubborn refusal to follow the law. The government contends that the recent case law in the District is simply wrong and should not be followed. But the government can find no authority, because there is no such authority, that permits the government to refuse to turn over exculpatory information in the SEC's files where, as here, the government and the SEC have engaged in joint fact-gathering. The government's additional protest that requiring compliance with the law is simply too inconvenient deserves no sympathy.

Finally, the government opposes Mr. Walters's motion for a hearing on government misconduct by submitting a declaration that raises more questions than it answers and largely confirms rather than rebuts the *prima facie* case set forth in the opening brief. In particular, the government's declaration discloses that the prosecution team – the FBI and the USAO – were in close contact with the *Wall Street Journal* in the weeks before that paper broke

the story of the investigation. Moreover, the facts set forth in the declaration, once unscrambled, make it plain that the FBI and the USAO were planning to interview targets of the investigation

███████████████████████████████████████████████████████████████████████████████

A hearing is therefore necessary to develop a factual record of what actually happened and determine the appropriate remedy.

## I.   A BILL OF PARTICULARS IS NECESSARY SO THAT MR. WALTERS CAN ADEQUATELY PREPARE FOR TRIAL AND AVOID UNFAIR SURPRISE

Neither the Indictment nor the material provided in discovery adequately discloses the particulars requested in Mr. Walters's motion – particulars routinely provided in this District and necessary to preparing Mr. Walters's defense. The government's arguments to the contrary are all unavailing.

*1. When Did the Conspiracy Begin?* The government stands by the Indictment's insufficient allegation that the alleged conspiracy was in existence "from at least 2008." (Ind. ¶ 7). In so doing, the government fails to address the specific points raised in Mr. Walters's opening brief and instead falls back on a boilerplate defense of a generic refusal to identify "exactly" when the conspiracy started. (Gov't Opp. at 12). No one is asking the government to say anything "exactly." Instead, the defense pointed out that the phrase "at least 2008" is highly unusual in an indictment, is completely open-ended and encompasses nearly all of human history. Mr. Walters further demonstrated that the government's purposeful ambiguity is significant because he traded in Dean Foods stock prior to 2008 and the government has produced in discovery records of such trades back to 2006. The government is therefore playing a game: it refuses to tell the defense (and the Court) whether the trading activity that predates 2008 is alleged to have been illegal insider trading. The government's tactics – open-ended drafting of the Indictment, refusal to provide a bill of particulars and an opaque motion response

- 2 -

– have created unnecessary and time-consuming uncertainty and leave open the possibility of unfair surprise at trial. We respectfully request that the Court require the government to identify – at least by year – when the conspiracy is alleged to have started. *See United States v. Taylor*, 707 F. Supp. 696, 700 (S.D.N.Y. 1989) (requiring disclosure of approximate dates of meetings or conversations at which the government would contend that defendant joined narcotics conspiracy).

　　　　2. *Identities of Known Co-conspirators*. The government has suggested in both the Indictment and its opposition brief that there may be other alleged co-conspirators beyond Mr. Walters and Mr. Davis. (*See, e.g.*, Ind. ¶¶ 48, 50, 52; *see also* Gov't Opp. at 12 (representing that the discovery includes "trading accounts of alleged co-conspirators")). But it refuses to identify who they are and does not suggest how the defense could determine from the vast productions of trading records and telephone records who the phrase "and others" is and is not intended to include. The government also fails to address, much less distinguish, the five recent insider trading cases in this District in which the government has provided the identity of known co-conspirators. *See United States v. Martoma*, No. 12 Cr. 973 (PGG), 2013 WL 2435082, at *7 (S.D.N.Y. June 5, 2013); *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *1 & n. 1 (S.D.N.Y. July 13, 2010); *United States v. Gupta*, No. S1 11 Cr. 907 (JSR) (S.D.N.Y. April 9, 2012), ECF No. 47 (Schoeman Decl. Ex. B); *United States v. Newman*, No. S2 12 Cr. 121 (RJS) (S.D.N.Y. Aug. 29, 2012), ECF No. 111 (Schoeman Decl. Ex. C); and *United States v. Steinberg*, No. S4 12 Cr. 121 (RJS) (S.D.N.Y. Sept. 18, 2013), ECF No. 299 (Schoeman Decl. Ex. D); (*see also* Walters Br. at 8).[1] In an insider trading case it is critical

---

[1]　　　The government unnecessarily devotes its energies to distinguishing the facts of *United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001), which Mr. Walters accurately cited as an example of a decision in this District granting a bill of particulars,

- 3 -

KL3 3100240.1

for the defense to know who the government will contend is a member of the conspiracy in order to be able to analyze the discovery and prepare for trial. The government's efforts to maintain its ability to surprise the defense at trial has no legitimate basis and should not be permitted to continue.

*3. The Inside Information.* The government's response to Mr. Walters's request for particulars concerning what inside information he is alleged to have received does not fairly present the facts. First, there is absolutely nothing in the voluminous discovery that identifies what inside information the alleged tipper, Mr. Davis, told Mr. Walters about Dean Foods – not a single email, text message, recorded call or anything else. Second, the Indictment itself, which is the only real source of information the government identifies, is often vague and ambiguous about what information was conveyed and when, and consistently uses the phrase "among other things" in order to deny the defense the particularity necessary to prepare for trial.

For example, the Indictment alleges that in advance of the April 30, 2008 earnings announcement, "in or about February 2008 and in or about March 2008, Davis provided WALTERS with Inside Information relating to, among other things, Dean Foods' internal full-year forecasts and quarterly financial results." (Ind. ¶ 14). What was the information? Was it positive, negative, mixed? Was it in line with analyst expectations? We cannot determine the answers to any of these questions from the discovery and therefore cannot even begin to assess whether the alleged inside information was material and non-public. *See Rajaratnam*, 2010 WL 2788168, at *2 ("A defendant [in an insider trading case] might argue that the information he sought to obtain was not material, or that it was already public at the time he tried to get it. But

---

while ignoring the five recent insider trading cases Mr. Walters also cited. (*See* Gov't Opp. at 14).

KL3 3100240.1

he can only do that if he knows what the information *is* and when it was conveyed") (emphasis in original).

Similarly, the Indictment alleges that in advance of the February 11, 2009 earnings announcement, "Davis informed WALTERS that, among other things, Davis remained positive about Dean Foods' financial results, notwithstanding market skepticism." (Ind. ¶ 20). But then the Indictment alleges that the relevant communications between Mr. Davis and Mr. Walters occurred on November 5, 2008, the day of the previous earnings release, and also three months later, on calls on the days preceding February 10, 2009. (Ind. ¶ 20(a)-(b)). Without real particulars about what was said and when, there is no way to test whether Mr. Davis's vaguely described optimism conveyed information that was both material and non-public at the time it was conveyed.

The alleged tips relating to Dean Foods' WhiteWave division present similar deficiencies. For example, the Indictment alleges that in advance of the May 10, 2010 earnings release, Mr. Davis told Mr. Walters, "among other things, that the Company was exploring strategic options related to WhiteWave...." (Ind. ¶ 23). The Indictment also alleges that *nearly two years* later, Mr. Davis provided Mr. Walters with inside information about "plans regarding the WhiteWave spinoff." (Ind. ¶ 30.) As these allegations indicate, and as the government well knows, Dean Foods' potential spinoff of WhiteWave was under consideration for years and was the subject of considerable commentary by analysts. Describing the alleged inside information as vaguely as the Indictment does cannot provide the defense with sufficient notice to permit the kind of preparation and analysis that is required.

Without undertaking any analysis, the government attempts to sweep aside the many similar insider trading cases in this District that routinely found the defendants were

- 5 -

entitled to receive this information in a bill of particulars. (*See* Walters Br. at 9-11). Instead, the government relies solely on one purported counterexample, *United States v. Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. Jan. 19, 2016), ECF No. 64. (*See* Gov't Opp. at 14-15). There, Judge Swain concluded that the government's allegations, combined with a complaint that provided a "detailed preview of the testimony of the government's cooperating witness," were so straightforward that greater particularity was not required. *See Stewart*, No. 15 Cr. 287, ECF No. 64 at 22. Indeed, the crux of the government's argument in its brief to the court in *Stewart* was: "Stewart even has in hand a summary, contained in the [31-page] Complaint, of what the principal witness against him, Cunniffe, will say at trial." Government Opposition, *United States v. Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. Oct. 16, 2015), ECF No. 46 at 26. Here, by contrast, the defense has no detailed preview of what the principal witness will say concerning the inside information allegedly conveyed to Mr. Walters. A bill of particulars is, therefore, required.

*4. The Benefit.* The government's response to Mr. Walters's request for particulars with respect to the benefit he supposedly provided to Mr. Davis in exchange for alleged inside information is completely off the mark. Mr. Walters is not asking for more particulars about what is alleged in the Indictment; he is asking the government to include in a bill of particulars anything that is not alleged. The Indictment recites that in exchange for inside information, Mr. Walters "provided Davis with pecuniary benefits in the form of business opportunities, investment capital, and two loans that were never fully repaid." (Ind. ¶ 47(d)). This vague formulation appears to refer to six "business dealings" that are identified "among others" in paragraph 6 of the Indictment. The question we have raised is whether, by using the phrase in paragraph 6 "among others," the government is just indulging a bad habit or is it trying to leave the door open to a surprise at trial. Avoiding such an unfair surprise is exactly the point

- 6 -

KL3 3100240.1

of the disclosures that the government was required to make in *United States v. Gupta*, both in the superseding indictment, No. 11 Cr. 907 (JSR) (S.D.N.Y. Jan. 31, 2012), ECF No. 25, at ¶ 29, and in a supplementary bill of particulars, (Schoeman Decl. Ex. B). The decision of Judge Rakoff in *Gupta*, on which the government wrongly focuses, rejected a defense request to compel more granular descriptions of benefits that had been specifically identified (and suggested that all of the details were already known from the lengthy *Rajaratnam* trial that had just occurred). Here, Mr. Walters is not seeking more details on what is alleged in the Indictment. But if there is anything else that the government contends was part of the alleged *quid pro quo* for the inside information, it must be identified in a bill of particulars.

   *5. Codes.* The Indictment alleges that the use of code words was a means and method of the conspiracy and gives one example; it alleges that "Dallas Cowboys" refers to Dean Foods. (Ind. ¶ 47(c)). If there are other examples, they should be disclosed in a bill of particulars because there is no other way to determine what they are and the defense will not have had a fair opportunity to defend against this allegation if other purported code words are identified for the first time at trial. *Cf. United States v. Bin Laden*, 92 F. Supp. 2d 225, 241 (S.D.N.Y. 2000) ("We conclude that the Government must disclose to the Defendants the identities, including all *aliases and code names*, of all unindicted co-conspirators to whom it will refer at trial . . . ." (emphasis added)), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008). This is not a case where the fact that a code is being used will be obvious from the available discovery, as when a conspirator in a drug case says 3.5 "shirts" and means 3.5 kilos of heroin. *See Yanni v. United States*, 441 F. Supp. 1280, 1282 (S.D.N.Y. 1977), *aff'd*, 573 F.2d 1300 (2d Cir. 1978). If there really are other examples beyond "Dallas Cowboys," there is no legitimate reason for the government not to disclose them now.

- 7 -

    *6. Trading Activity.* The government stubbornly refuses to confirm that it will not rely on trading activity that is not even referenced in the Indictment. This strains the bounds of plausible advocacy. In an insider trading case, the defense is entitled to know when the alleged insider trades occurred and the specific inside information the defendant allegedly received. The government has argued (wrongly) that with respect to the trades specifically identified in the Indictment, the Indictment is sufficiently detailed to provide the required notice. (Gov't Opp. at 14-15). Seemingly ignoring its own argument, a few pages later, the government tries to reserve the right to rely at trial on trading that is nowhere mentioned in the Indictment, where no inside information is particularized. (Gov't Opp. at 17-18). Cleary, the government takes this position solely to gain an improper tactical advantage over the defense, which will be left guessing what trades the government will rely on at trial and potentially spinning its wheels analyzing reams of potentially irrelevant trading records and other information.[2] More significantly, without knowing the alleged trades, the defense will be unable to perform the time-consuming, painstaking work necessary to analyze any previously unidentified trade the

---

[2]  To the extent the government relies on *United States v. Guttenberg*, No. 07 Cr. 141 (DAB), 2007 WL 4115810, at *5 (S.D.N.Y. Nov. 14, 2007) to suggest that it need not specify the trading that is allegedly based on inside information, it overlooks the fact that there the government had stated in its opposition to the defendant's motion for a bill of particulars that it was "in the process of producing draft charts *listing trades for each relevant account that were based on the UBS Inside Information*," and that "[t]he Government has already produced draft charts prepared by the SEC relating to several [] accounts, and ... expects to complete its production of draft charts within the next several weeks." Government Opposition Brief, *United States v. Guttenberg*, No. 07 Cr. 141 (DAB), 2007 WL 3114152, at *3 (S.D.N.Y. Oct. 5, 2007) (emphasis added). The court specifically noted this fact in its decision denying the request for particulars. *Guttenberg*, 2007 WL 4115810, at *5. Likewise, in *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *7 (S.D.N.Y. May 28, 2013), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016), while denying the request for a bill of particulars, Judge Swain "ordered [the government] to produce a list of exhibits and copies of the exhibits that it will use to prove the charges in [the] case no later than 60 days before the commencement of trial" in light of the complexity of the allegations and in consideration of the "generic categories of documents listed in the [i]ndictment[.]"

KL3 3100240.1

government later claims was based on inside information in order to prove that the trade was based on public information or made for some other legitimate reason. This is particularly significant for Mr. Walters who undisputedly was an extremely active trader in Dean Foods and other stocks throughout the time of the alleged conspiracy.

7. *The Wires*. The government appears to misunderstand the law with respect to the multiplicity of the wire fraud counts. In response to Mr. Walters's request that it identify the specific wire transmission that corresponds to each of the four counts of wire fraud – as the case law requires, (*see* Walters Br. at 15) – the government simply refers Mr. Walters to the Indictment, (*see* Gov't Opp. at 18-19). To be sure, the wire fraud chart has four rows. However, each row does not correspond to a wire transmission, but to a securities transaction that, according to the government, must have involved a wire transmission. But which wire transmission? That was the question Mr. Walters posed, and that is the question the government was required to answer to ensure that the wire fraud counts are adequately alleged and not multiplicitous. (*See* Walters Br. at 15-16). Having been given the opportunity to cure this deficiency in a bill of particulars and having declined to do so, the Court should dismiss the wire fraud counts for failing adequately to allege a wire transmission for each count. *See United States v. Reale*, No. S4 96 CR. 1069 (DAB), 1997 WL 580778, at *14 (S.D.N.Y. Sept. 17, 1997) ("The lack of specificity does not warrant dismissing these counts at this time since the Government can provide Defendants with a Bill of Particulars detailing the individual mailings and wire transfers").

## II.   THE SEC'S FILES MUST BE REVIEWED FOR EXCULPATORY INFORMATION BECAUSE THE GOVERNMENT AND SEC ENGAGED IN JOINT FACT-GATHERING

The government acknowledges that when there has been a joint investigation with another agency, its *Brady* obligations extend to reviewing the materials in the other agency's

- 9 -

KL3 3100240.1

possession, custody or control. (Gov't Opp. at 23). The government then struggles mightily and in vain to contend that in this case there was no joint investigation, only a "parallel" investigation. In viewing "parallel" and "joint" investigations as mutually exclusive, the government advances a position plainly contrary to the recent decisions in *United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012), and *United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014). As Judge Rakoff explained in rejecting the government's approach: "[W]hether parallel investigations are also 'joint' investigations must be evaluated in light of the disclosures being requested, and when it comes to *Brady* disclosures, the relevant context is one of fact-gathering, not charging determinations or otherwise." *Gupta*, 848 F. Supp. 2d at 494. This is so because "[f]or purposes of *Brady*, how the agencies use the facts discovered jointly is irrelevant, and the joint investigation need not result in a joint prosecution." *Id.* at 494-95.

A.    **Factual Background on the Joint Investigation**

The government acknowledges numerous ways in which its fact-gathering was closely coordinated with the SEC. For example:

- The government submitted an "access request letter to the SEC, which was granted" at the outset of the investigation. (Gov't Opp. at 20). As the government explained, "[t]his access request letter allowed the SEC to provide to the government documents and materials that the SEC obtained as part of its investigation (and which were otherwise not subject to any privilege or limitation)." (*Id.*).

- The government "obtained tens of thousands of documents from the SEC." (Gov't Opp. at 20). This included "documents and other materials" which it had not yet subpoenaed. (*See* Kasulis Decl. ¶ 5).

- The government and SEC "conducted *a number* of witness interviews together" where "[f]or the most part" they both asked questions. (Gov't Opp. at 20-21) (emphasis added). The government suggests that it actually conducted *all but two* witness interviews together. (*Id.* at 21, fn. 5) ("The SEC also conducted at least two interviews without the Government.").

- While the government noted that "an FBI agent took the only notes and drafted FD-302 reports memorializing the interviews," there were times when "an attorney for

KL3 3100240.1

the SEC went to the U.S. Attorney's Office to review and create notes and/or memoranda" of various FD-302s. (Gov't Opp. at 21).

Given the sharing of documentary evidence, the participation in joint witness interviews, and the sharing of FD-302s, we can also be certain that there were countless calls, emails and other coordinating activities undertaken by the two agencies. Such close coordination was on full display when the government and the SEC announced charges on the same day in a joint press conference with charging instruments that are as close to identical as a criminal indictment and SEC civil complaint can be. Clearly, the two agencies were working together and not simply investigating the same conduct at the same time.[3]

**B.    Case Law Clearly Supports a Finding that this Was a Joint Investigation**

The "joint investigation" inquiry considers factors such as whether "the two agencies conferred about their investigations," whether they "jointly conducted interviews," and whether "the SEC provided the government with documents it obtained as part of its investigation." *Martoma*, 990 F. Supp. 2d at 462; *see also Gupta*, 848 F. Supp. 2d at 494 ("it is enough that the agencies are engaged in joint fact-gathering"). The court in *Gupta* found a joint investigation where the government and SEC interviewed witnesses together, prepared memoranda summarizing the relevant information after the interviews, and consulted with one another. 848 F. Supp. 2d at 493-94. Likewise, in *Martoma* the same types of conduct – joint witness interviews, sharing documents, conferring between the agencies – persuaded Judge Gardephe that there was a joint investigation. 990 F. Supp. 2d at 461. These same factors are all present here.

---

[3]    The government appears to suggest that Mr. Walters's characterization of the civil and criminal proceedings post-indictment as "parallel" undermines the notion that this is a joint investigation. (*See* Gov't Opp. at 22). There is an obvious difference however between parallel court *proceedings* and the joint investigation leading up to the charges.

- 11 -

At bottom, the government simply dislikes the *Gupta* and *Martoma* decisions and the joint-fact-gathering test. But in an effort to discredit these two recent decisions in similar insider trading cases, the government parades an assortment of cases that clearly do not support its position or articulate anything resembling the legal test that the government now urges on this Court. Many of the cases cited are complete non-sequiturs.[4] Others that are within some plausible universe of relevance lend no support to the government's position. On the contrary, all of them support the reasoning in *Gupta* and *Martoma* that joint investigations in which federal prosecutors work cooperatively with other government agencies give rise to *Brady* obligations. *See, e.g., United States v. Guerrerio*, 670 F. Supp. 1215, 1219 n.6 (S.D.N.Y. 1987) (distinguishing cases where there is a "cooperative effort" between the government and another agency from those where there is little to no inter-agency collaboration); *Ferreira v. United States*, 350 F. Supp. 2d 550, 556–57 (S.D.N.Y. 2004) (noting that when the government conducts an investigation in cooperation with prosecutors from other jurisdictions, there may be an imputation of *Brady* duties on the government to produce evidence collected by the other prosecutors); *United States v. Upton*, 856 F. Supp. 727, 750 (E.D.N.Y. 1994) ("The inquiry is not

---

[4]    *See, e.g., SEC v. Stanard*, 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (denying discovery under the Federal Rules of Civil Procedure, not *Brady*, where "the USAO has actively refused to provide the FBI notes to the SEC or even to allow the SEC to copy them"); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Chin, J.) (no joint investigation between the government and the New York Stock Exchange "NYSE," because the NYSE was not a "state actor" that conducted an independent investigation and refused to provide the government with documents to aid in its investigation); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (evidence discovered after trial that had been in the possession of FBI agents involved in a separate investigation was immaterial and cumulative of other evidence and therefore did not require a new trial); *United States v. Bonventre*, 646 F. App'x 73, 82 (2d Cir. 2016) (prosecution's failure to produce an FBI agent's notes that contained evidence that could have been used to impeach a prosecution witness was immaterial because the notes were cumulative and the witness's testimony was corroborated by other evidence); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (prosecution had not suppressed evidence of the mid-trial indictment of one of its witnesses because the indictment was issued under seal by prosecutors in Florida without the knowledge of the New York prosecutors).

- 12 -

whether the United States Attorney's Office physically possesses the discovery material; the inquiry is the extent to which there was a 'joint investigation' with another agency"). In other words, far from being outliers, *Gupta* and *Martoma* are perfectly in line with the body of case law that has developed in this area.

In addition to disliking the holdings in *Gupta* and *Martoma*, the government misleadingly describes them. In neither case did the court craft limited *Brady* obligations or suggest that the merit of the defense's motion was based on the extent of the burden it imposed on the government. In both cases, the court ruled that there had been a joint investigation between the government and the SEC. *Gupta*, 848 F. Supp. 2d at 495; *Martoma,* 990 F. Supp. 2d at 461. As Judge Rakoff stated in *Gupta*, "where the investigation is conducted jointly, the Government is charged with reviewing all documents and information connected to that joint investigation and disclosing any exculpatory information." *Gupta*, 848 F. Supp. 2d at 495; *see also Martoma*, 990 F. Supp. 2d at 460.

Although the *holding* in both cases was broad, the *application* of that holding to the facts at hand was more concrete. In *Gupta,* the court required the government to review notes relating to 44 interviews that the government and SEC had conducted together. But that was simply because the only other material that the government had initially refused to review for *Brady* purposes were notes of two interviews the SEC conducted without the prosecutors, but which the SEC agreed at oral argument to turn over to the prosecutors for their review. *Gupta*, 848 F. Supp. 2d at 494. In other words, the limited remedy was based on the fact that what the government was refusing to review and produce was limited.

Similarly, *Martoma* did not "extend" the scope of the *Brady* obligation articulated in *Gupta* – since that obligation already extended to all documents and information connected to

KL3 3100240.1

the joint investigation. Rather, in *Martoma*, the Court *applied* the joint investigation doctrine to the materials that remained in dispute, which included communications between the SEC and counsel for the cooperating witnesses constituting threats or promises. *Martoma*, 990 F. Supp. 2d at 459. The Court held that such materials, which the government is required to disclose as *Brady/Giglio* material, were not immune from disclosure because they were in the possession of the SEC. Again, the specific directive of the court resulted from the application of a general principle to the specific materials that the government was refusing to review and produce.

Here, as in *Gupta* and *Martoma*, the real scope of the parties' dispute is limited. We assume that the vast majority of the materials in the SEC's file have either already been produced to Mr. Walters as part of the government's Rule 16 discovery or will be produced in a timely manner by the SEC in the civil enforcement action. The material that is likely in dispute is the same material as in the earlier cases: (1) notes and memoranda of witness interviews and (2) communications with witnesses or their counsel. Mr. Walters is not in a position to know whether there is anything else that the government, if left to its own devices, would decline to review or produce. But, as in every case, it is the government that "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

Finally, the government's argument that it "routinely does not ask the SEC for its entire investigative file ..., as it cannot afford to take on obligations it cannot realistically be expected to meet," (Gov't Opp. at 27), is precisely the problem with the government's approach. The government does not get to pick and choose what to receive from the SEC in order to limit its *Brady* obligations. Nor should this Court be sympathetic to the government's plight. Had the government accepted its obligations and followed the clear holdings in the most relevant recent

- 14 -

KL3 3100240.1

cases in this District, the government would already have been able to satisfy its obligations. There was plenty of time for the government to conduct the necessary review of SEC files, both during the five years of investigation and the five months since the return of the Indictment. The burden that the government now feels from having to do what it should have been doing all along is a problem of the government's own making and provides no basis for limiting the scope of the government's constitutional *Brady* obligations.

## III.    THE GOVERNMENT'S OPPOSITION RAISES MORE QUESTIONS ABOUT POSSIBLE MISCONDUCT THAN IT ANSWERS, FURTHER JUSTIFYING THE NEED FOR A HEARING

Although it was submitted for the opposite purpose, the government's response to Mr. Walters's motion supports the *prima facie* case that the government was a source of improper leaks to the press, that the leaks concerned "matters occurring before a grand jury" as well as other matters known only to the government and its team, and that the government was less than candid with the court ███████████████. Rather than eliminate the need for a hearing to address these matters, the government's response shows exactly why a hearing is necessary.

### A.    The Government's Response Leaves the Most Important Questions Unanswered

The government's response concedes that members of the government's team were speaking with reporters for weeks prior to the first news stories on May 30, 2014. But the government declines, with no explanation, to say who was speaking to whom and what was being said. Specifically, the declaration submitted by Assistant United States Attorney Kasulis states that "On or about May 8, 2014, the USAO learned for the first time that the *Wall Street Journal* was considering publishing an article about our investigation…." (Kasulis Decl. ¶ 11). How did the government learn this? Someone from the government was clearly in contact with a

- 15 -

KL3 3100240.1

reporter about the case. It also seems that in order to submit this declaration, Mr. Kasulis learned, or should have learned, who that person is, but he refuses to say. Mr. Kasulis further states that on May 13, 2014, "the USAO learned from the FBI press office that the *Wall Street Journal* would not be able to publish a story about our investigation until May 22, 2014 at the earliest, and that it might well be later." (Kasulis Decl. ¶ 12). Again, this is a cryptic statement of fact that cries out for more explanation. It certainly seems like what was happening is that the reporter was willing to hold off publishing the story if the government would cooperate with the reporter's inquiry.

The cozy relationship between the government and the reporter is further evidenced by the fact that the *Wall Street Journal* held off publishing its first story until the day after the government interviewed Mr. Mickelson and Mr. Davis. The government claims that it "scrambled to dispatch agents to Ohio and Texas to approach Mickelson and Davis before the investigation became public...." (Gov't Opp. at 46). The government then points to the June 2, 2014 *Wall Street Journal* article as corroboration of this fact. The article states: "when they learned the investigation might become public, investigators accelerated their pace, dispatching a pair of agents ... to confront Mr. Mickelson...." (*Id.*). But how did the *Wall Street Journal* know that the government was "scrambling" to dispatch agents? Who was talking to the reporter and what was said again seem like important facts that are known, or could be known, but which the government has declined to set forth.

It is also curious that the denial of government responsibility for leaking that is included in Mr. Kasulis's declaration is extraordinarily narrow. He states that he personally did not disclose information to the press and that Special Agent Thoresen similarly denies leaking. (Kasulis Decl. ¶ 17). But that is as far as the declaration goes. The omission of declarations, or

- 16 -

even secondhand denials, from any other member of the prosecution team, including any other FBI agents, certainly suggests the government is aware of the high probability that someone on its team leaked and is consciously avoiding finding out, or disclosing, who it is. The government knows how to conduct a real investigation. If the government did one here, it is certainly at pains to avoid revealing what it found.

### B.    The Government Was the Source of the Leaks

To show that the government was the likely source of the leaks, Mr. Walters's opening brief relied principally on the substance of articles that contained the leaked information. *See United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, *11 (S.D.N.Y. Oct. 20, 2015) ("[T]he article need not expressly implicate the Government, if the nature of the information disclosed therein makes clear the connection."); *Barry v. United States*, 865 F.2d 1317, 1325 (D.C. Cir. 1989) ("It is not necessary for [an] article to expressly implicate the Justice Department as the source of the disclosures if the nature of the information disclosed furnishes the connection."). The new information provided by the government in its opposition papers only supports, and certainly does not rebut, our conclusions. Specifically, we now know that:

- As set forth above, the government had several weeks of advance notice before the first articles were published. During that time, USAO and FBI employees had a series of contacts with the news media about the investigation. (*See* Kasulis Decl. ¶ 11-12, 14).

- The government was in possession of all the information referenced in the articles, including trading records and telephone records, either through SEC access requests, grand jury subpoenas or other means.

- No evidence had been presented to a grand jury at the time of the leaks, thus eliminating the possibility that a grand juror or grand jury witness was the source of the leaks. (Kasulis Decl. ¶ 20).

- 17 -

- The SEC was not aware that the government was using electronic surveillance, *i.e.*, wiretaps, and therefore could not be the source of the leak of that information. (Gov't Opp. at 55).

These facts, combined with the details of the articles discussed in Mr. Walters's opening brief, including statements about the prosecutors' theory, are more than sufficient to make it "likely" that one or more people on the prosecution team, including both the USAO and its agents at the FBI, was a source of the leaks. To be sure, not every other possibility can be ruled out with absolute certainty – an SEC attorney could have purloined pen register applications and leaked them to the press – but it is not Mr. Walters's burden to disprove every fanciful scenario when the simplest explanation is mostly likely to be the right one. Determining with certainty exactly what happened is the reason to hold a hearing, which is all the defense is asking for at this time.

### C.      Rule 6(e) Material Was Included in the Leaks

The government's opposition proceeds as if Mr. Walters contends that all of the information leaked to the press was protected by Rule 6(e). That is not the case. A detailed recitation of all the information that appeared in the articles makes it clear that the source of the information was a member of the prosecution team who was knowledgeable about all aspects of the criminal probe. All of the leaking violated the Department of Justice's regulations (28 C.F.R. 50.2(b)), but only some of the leaked information concerned matters occurring before the grand jury within the scope of Rule 6(e).

On this issue, the government concedes in a footnote that all information obtained pursuant to a grand jury subpoena, including the contents of documents, are subject to the secrecy provisions of Rule 6(e). (Gov't Opp. at 40-41, n.10). Accordingly, it is not important that, as Mr. Kasulis states, matters relating to the case were not presented in the grand jury room until after the offending articles appeared. (Kasulis Decl. ¶ 20). What matters, and what the

- 18 -

government cannot successfully refute, is that the available evidence shows that at the very least the government improperly disclosed the existence of grand jury subpoenas and certain information gathered pursuant to grand jury subpoenas to the press.

Certain articles specifically referenced grand jury subpoenas. As a June 23, 2014 *New York Times* article explained: "Prosecutors working for Preet Bharara, the United States attorney in Manhattan, recently subpoenaed the food and beverage company [Dean Foods] for documents...." Matthew Goldstein and Ben Protess, *Dean Foods Receives a Subpoena in an Investigation into Mickelson's Trades*, N.Y. Times (June 23, 2014) (Schoeman Decl. Ex. S); *see also* Susan Pulliam and Michael Rothfeld, *U.S. Seeks Records in Inquiry Tied to Dean Foods, Clorox*, Wall St. J. (June 23, 2014) (Schoeman Decl. Ex. T). Other articles also revealed the specific trading at issue. *See* Susan Pulliam and Michael Rothfeld, *FBI, SEC Probe Trading of Carl Icahn, Billy Walters, Phil Mickelson – Insider-Trading Investigation Began in 2011 with Unusual Trades in Clorox*, Wall St. J. (May 30, 2014) (Schoeman Decl. Ex. L); Matthew Goldstein and Ben Protess, *Investor, Bettor, Golfer: Insider Trading Inquiry Includes Mickelson, Icahn and William T. Walters*, N.Y. Times (May 30, 2014) (Schoeman Decl. Ex. M). With respect to the trading in Dean Foods, the leak revealed the specific dollar figures that Mr. Walters and Mr. Mickelson purportedly earned in Dean Foods trades in 2012. *See* Matthew Goldstein and Ben Protess, *Golfer Mickelson's Role Said to Be Overstated in Insider Inquiry*, N.Y. Times (June 11, 2014) (Schoeman Decl. Ex. R).

According to the government, it obtained trading records by grand jury subpoena as well as from the SEC via an access request. Mr. Kasulis's declaration is less than clear about which records were obtained by which method and when, although he does admit that certain records relating to Mr. Mickelson's trading in 2012 had been obtained both by grand jury

- 19 -

KL3 3100240.1

subpoena and by access request *prior to* the time that information drawn from those records was leaked. (Kasulis Decl. ¶ 5). The government urges the Court to assume that any leak of this information would have been based on the copy of the records obtained from the SEC rather than by grand jury subpoena, but this is exactly the kind of unsupported speculation that should be tested at a hearing.

Moreover, in addition to trading records, the *New York Times* also disclosed that Mr. Walters's telephone records were being reviewed: "Federal authorities, ..., are also examining phone records to see whether Mr. Walters spoke to Mr. Icahn shortly before the trades." N.Y. Times Article (May 30, 2014) (Schoeman Decl. Ex. M). ██████████ ████████████████ these records were obtained by grand jury subpoena and there is no contention by the government that the telephone records were also obtained by the SEC and transmitted to the government pursuant to an access request.

In sum, there is an ample basis for the Court to conclude that grand jury information was not scrupulously excluded from the information that a member of the prosecution team was leaking to the press. The government's declaration falls far short of rebutting the *prima facie* evidence and therefore the factual contentions the government urges the Court to accept should be tested at a hearing.

### D.     The Government Was Not Candid with the Court in Connection with the Wiretap

The government's opposition papers do little to rehabilitate the misleading statements made to the court in connection with the wiretap. ████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████ We now know

- 20 -

that on May 13, 2014 the USAO and FBI learned that the *Wall Street Journal* would be publishing a story on the investigation, and that the story would appear on May 22 or anytime thereafter. (Kasulis Decl. ¶¶ 11-12). ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

        ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████

        The purpose of making these observations about the government's lack of candor in connection with the wiretaps is not to suppress the recordings – which are fully consistent with Mr. Walters's innocence. Rather, the significance of the misleading statements is that they evidence an improper intent by the government to use leaks to resuscitate a moribund investigation by prompting the targets to have conversations and take actions (like destroying a

- 21 -

KL3 3100240.1

cell phone) that the government could later seek to use to its advantage. The government's opposition does nothing to negate that inference.

**E.    A Hearing is Necessary to Determine What Remedies Should be Imposed**

The government contends that even if the government engaged in misconduct, including but not limited to violations of grand jury secrecy and making misleading statements to the court ███████████, there is nothing that this Court can do about it. That is not true and it is not right.

As explained in Mr. Walters's opening brief, the remedies available to this Court go beyond dismissal of the Indictment. (*See* Walters Br. at 34-36). This Court is therefore not constrained by the standards that courts must impose on a defendant who strictly seeks dismissal of charges for outrageous government conduct or violations of grand jury secrecy. Here, Mr. Walters is in the relatively fortunate position of having discovered government misconduct prior to trial and is seeking to prevent the fairness of the trial from being prejudiced by that conduct. The evidence indicates that the government agents' conduct at least recklessly caused Mr. Davis to destroy a cell phone and that the government may seek to benefit at trial from that misconduct, even though the government and not Mr. Walters is to blame. And it appears that when the government was proffering Mr. Davis, but before he signed a cooperation agreement and pleaded guilty, the agents used the wiretap recordings (that were the product of leaks and false statements) to overcome the last of his resistance. (*See* Kasulis Decl. ¶¶ 18-19). Furthermore, the information that has come to light so far raises significant issues regarding the credibility of government agents who the government may seek to rely on at trial.

Far from conferring a windfall on Mr. Walters, as the government contends, a hearing to develop the factual record will serve to level the playing field and help prevent the

KL3 3100240.1

government from reaping benefits at trial from improper and manipulative conduct during the investigation. The evidence put forward by Mr. Walters, which has largely been supplemented and not rebutted by the government's opposition, is more than sufficient to warrant this limited relief at this time.

## CONCLUSION

For all of the foregoing reasons, we respectfully reiterate our request that the Court grant a bill of particulars, require the government to review information within the SEC's possession in order to comply with its disclosure obligations, and grant a hearing to address the government's misconduct.

Dated: New York, New York
      November 4, 2016

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:    /s/  Barry H. Berke            
Barry H. Berke
Paul H. Schoeman

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100 (Phone)
(212) 715-8000 (Fax)
bberke@kramerlevin.com
pschoeman@kramerlevin.com

*Counsel for Defendant William T. Walters*

- 23 -

KL3 3100240.1