UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
                                 :

UNITED STATES OF AMERICA,       :

      -v-                       :

WILLIAM T. WALTERS         :
    a/k/a "Billy,"              :

            *Defendant.*     :

                                   :
———————————————————————x

**ECF CASE**

S1 16 Cr. 338 (PKC)

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT WILLIAM T. WALTERS' PRETRIAL MOTION TO DISMISS THE
## INDICTMENT FOR GOVERNMENT MISCONDUCT AND FOR A HEARING

Barry H. Berke
Paul H. Schoeman
Eric A. Tirschwell

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Counsel for Defendant William T. Walters*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 4

1.    Pre-Indictment Misconduct .......................................................................................... 5

     (a)    The Government Began its Campaign to Violate the Rights of Mr.
          Walters at Least as Early as April 2013 .................................................. 5

     (b)    ████████████████████████████████████
          ████████████████ . ............................................................... 6

     (c)    The FBI and USAO Were Aware of the Possibility of a Leak as
          Early as May 6 and May 8, 2014, Respectively. ...................................... 8

     (d)    The Wall Street Journal agreed to the FBI's Request that it Hold
          Publication of an Article about the Investigation ████████
          ████████████ . ....................................................................... 9

     (e)    ████████████████████████████████████
          ████████████████ .............................................................. 10

     (f)    The May 27, 2014 Meeting Between the FBI and Wall Street
          Journal Suggests that More than One FBI Agent was Responsible
          for Illegal Leaking ................................................................................. 11

     (g)    The FBI Approaches Target Subjects Immediately Following its
          Meeting with the Wall Street Journal. ................................................... 13

     (h)    As Expected, the Wall Street Journal and The New York Times
          Published Articles about the Walters Investigation on May 30,
          2014 ....................................................................................................... 15

     (i)    Davis Immediately Felt the FBI's Efforts to Pressure Him Through
          Illegal Leaks. ........................................................................................ 21

     (j)    The Media Blitz of Illegally Leaked Information Continued with
          Articles on May 31, 2014 and June 1, 2014. ......................................... 22

     (k)    The Target Subjects Were Recorded on the Wiretap Discussing the
          News Articles Containing Leaked Information. ...................................... 26

     (l)    Despite the FBI and USAO's Purported "Outrage," SSA Chaves
          Continued to Leak by Means of a Personal Cellphone and at Some
          Point Spoliated a Private Email Account. ............................................... 29

     (m)    The USAO Continued to Engage with the Press and Received
          Further Confirmation as to the Source of the Leaks. .............................. 31

|  | (n) | The Leaks Continued into Late June. | 32 |
|  | (o) | The Government's Illegal Leaking Strategy Yields Fruit: Mr. Davis Destroys Evidence. | 33 |
|  | (p) | The Leaks Continue Until Davis Agrees to Cooperate Sometime in 2016 | 34 |
| 2. |  | Evidence of Similar Misconduct in Other Cases | 36 |
| 3. |  | Post-Indictment:  The USAO Falsely Denies the Prior Misconduct | 42 |

ARGUMENT ............................................................................................................ 46

I. Legal Background: Grand Jury Secrecy and the Illegal Conduct of SSA Chaves .......................................................................................................... 46

II. The Indictment Should be Dismissed Because there are "Grave Doubts" about whether the Government's Illegal, Criminal Conduct Influenced the Grand Jury's Decision to Indict ...................................................................... 48

III. The Indictment Should be Dismissed Based on Systematic and Pervasive Government Misconduct Spanning Several Cases ......................................... 53

IV. The Indictment Should Also be Dismissed for Outrageous Government Misconduct ................................................................................................... 56

V. Mr. Walters is Entitled to an Evidentiary Hearing and Discovery to Further Develop the Record ........................................................................ 59

CONCLUSION ....................................................................................................... 65

KL3 3109083.1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) ................................................................................................ *passim*

*Douglas Oil Co. of Cal. v. Petrol Stops NW.*,
    441 U.S. 211 (1979) ........................................................................................................46

*Ganek v. Leibowitz*,
    No. 15 Civ. 1446 (S.D.N.Y. Feb. 26, 2015) ...............................................................8

*Germosen v. Cox*,
    No. 98-cv-1294 (BSJ), 1999 WL 1021559 (S.D.N.Y. Nov. 9, 1999) .....................47

*Gov't of the V.I. v. Fahie*,
    419 F.3d 249 (3d Cir. 2005) ..........................................................................................63

*In re Grand Jury Matter*,
    682 F.2d 61 (3d Cir. 1982) ............................................................................................46

*In re Grand Jury Proceedings, Special Grand Jury 89-2*,
    813 F. Supp. 1451 (D. Colo. 1992) ..............................................................................48

*Hodge v. FBI*,
    703 F.3d 575 (D.C. Cir. 2013) ......................................................................................47

*Martin v. Consultants & Admins., Inc.*,
    966 F.2d 1078 (7th Cir. 1992) ......................................................................................47

*The New York Times Co. v. Gonzales*,
    459 F.3d 160 (2d Cir. 2006) ..........................................................................................47

*Olmstead v. United States*,
    277 U.S. 438 (1928) ..........................................................................................................3

*Orena v. United States*,
    956 F. Supp. 1071 (E.D.N.Y. 1997) ...........................................................................52

*United States v. Al Kassar*,
    660 F.3d 108 (2d Cir. 2011) ............................................................................................7

*United States v. Barai*,
    11-MAG-332 (S.D.N.Y. Feb. 7, 2011) ..........................................................25, 26, 27

*United States v. Bowling,*
    108 F. Supp. 3d 343 (E.D.N.C. 2015)................................................................................50

*United States v. Brenson,*
    104 F.3d 1267 (11th Cir. 1997) .....................................................................................47

*United States v. Brito,*
    907 F.2d 392 (2d Cir. 1990)....................................................................................49, 53

*United States v. Broward,*
    594 F.2d 345 (2d Cir. 1979).........................................................................................63

*United States v. Busch,*
    795 F. Supp. 866 (N.D. Ill. 1992) ...............................................................................61

*United States v. Castro-Gonzalez,*
    No. 13-cr-0693 (AJB), 2014 WL 3490506 (S.D. Cal. July 11, 2014) .....................49

*United States v. Cerullo,*
    No.05-cr-1190 (BEN), 2007 WL 2683799 (S.D. Cal. Sept. 7, 2007).....................50

*United States v. Chapman,*
    524 F.3d 1073 (9th Cir. 2008) .....................................................................................63

*United States v. Chin,*
    934 F.2d 393 (2d Cir. 1991)........................................................................................57

*United States v. Colasuonno,*
    No. 05-cr-1110 (AKH), 2006 WL 3025880 (S.D.N.Y. Oct. 24, 2006) ...................52

*United States v. Cuervelo,*
    949 F.2d 559 (2d Cir. 1991)..............................................................................*passim*

*United States v. Felton,*
    755 F. Supp. 72 (S.D.N.Y. 1991).................................................................................53

*United States v. Fisher,*
    692 F. Supp. 495 (E.D. Pa. 1988) ...............................................................................54

*United States v. Forman,*
    71 F.3d 1214 (6th Cir. 1995) .......................................................................................48

*United States v. Hammad,*
    858 F.2d 834 (2d Cir. 1988)........................................................................................64

*United States v. Marshank,*
    777 F. Supp. 1507 (N.D. Cal. 1991) ..............................................................49, 57, 62

KL3 3109083.1

*United States v. Mendez-Hernandez,*
No. S-89-cr-323 (SWK), 1990 WL 64600 (S.D.N.Y. May 7, 1990), *aff'd sub nom. United States v. Almonte*, 948 F.2d 1276 (2d Cir. 1991) ...............................................53

*United States v. Miceli,*
774 F. Supp. 760 (W.D.N.Y. 1991) ..........................................................................65

*United States v. Ming He,*
94 F.3d 782 (2d Cir. 1996)........................................................................................64

*United States v. Nobrega,*
No. 1:10-cr-00186 (JAW), 2015 WL 8082455 (D. Me. Dec. 7, 2015) ...................48

*United States v. Omni Int'l Corp.,*
634 F. Supp. 1414 (D. Md. 1986)..............................................................................64

*United States v. Peralta,*
763 F. Supp. 14 (S.D.N.Y. 1991)..............................................................................50

*United States v. Pimental,*
199 F.R.D. 28 (D. Mass. 2001) .................................................................................61

*United States v. Rahman,*
189 F.3d 88 (2d Cir. 1999)...........................................................................................7

*United States v. Ross,*
372 F.3d 1097 (9th Cir. 2004) ..................................................................................64

*United States v. Russell,*
411 U.S. 423 (1973)........................................................................................56, 58, 59

*United States v. Sabri,*
973 F. Supp. 134 (W.D.N.Y. 1996) ...............................................................49, 56, 57

*United States v. Saget,*
9921 F.2d 702 (11th Cir. 1993) ................................................................................48

*United States v. Sells Eng'g, Inc.,*
463 U.S. 418 (1983)...................................................................................................46

*United States v. Stevens,*
771 F. Supp. 2d 556 (D. Md. 2011) ..........................................................................50

*United States v. Toscanino,*
500 F.2d 267 (2d Cir. 1974), *abrogated on other grounds as recognized by In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157 (2d Cir. 2008) ........................................................................................................................64

KL3 3109083.1

*United States v. Williams,*
    504 U.S. 36 (1992)..........................................................................................................49

**Statutes and Rules**

18 U.S.C. § 1503(a) ..................................................................................................... *passim*

18 U.S.C. § 2517(2) .............................................................................................1, 48, 51, 53

18 U.S.C. § 2518(8)(a)-(c) ...................................................................................1, 48, 51, 53

18 U.S.C. § 2520(g) .............................................................................................1, 48, 51, 53

Fed. R. Crim. P. 6(e) .................................................................................................. *passim*

**Other Authorities**

1 Wright & Miller, *Federal Practice & Procudure Criminal* § 106 (4th ed. Apr.
    2016 Update)..........................................................................................................46

KL3 3109083.1

## PRELIMINARY STATEMENT

The misconduct at issue here is significantly more flagrant, far-ranging and insidious than even we suspected when we first made this motion. We now know that the shield of grand jury secrecy was turned upside down, and misused instead as a sword in a systematic, deliberate, sustained, and illegal campaign by the government to leak and barter secret grand jury information as an investigative strategy to revive a moribund investigation. To carry out this criminal scheme, FBI Supervisory Special Agent ("SSA") David Chaves – the supervisor of the FBI's New York white-collar squad[1] – repeatedly and brazenly violated Fed. R. Crim. P. 6(e), and also appears to have committed multiple illegal acts, including the crime of obstruction of justice (18 U.S.C. § 1503(a)) and the unlawful disclosure of a sealed wiretap (18 U.S.C. §§ 2518(8)(a)-(c), 2517(2) and 2520(g)). It is difficult to imagine government misconduct more "outrageous," "deplorable" or "reprehensible" – all words that government actors in this very case used to describe what was happening while it was happening.

The fact that a supervising FBI special agent is under criminal investigation for illegally leaking and trading secret grand jury information to resuscitate a stalled investigation is truly extraordinary, and to our knowledge unprecedented. But the government misconduct here goes much deeper, and is even more troubling. The record in this investigation demonstrates early and active interactions with the press at various levels of the FBI, with knowledge of the U.S. Attorney's Office for the Southern District of New York (the "USAO"). It shows the FBI

---

[1] A recent bio of SSA Chaves describes him as follows: "Supervisory Special Agent David A. Chaves is a senior FBI Agent assigned to the New York Division. He serves as the securities fraud program manager for the most visible securities cases prosecuted over the last decade. **He is widely recognized as the chief strategist in coordinating these complex white collar investigations** and for infiltrating corrupt participants in the hedge fund industry through the use of sophisticated techniques, undercover operations, and wiretaps." *See* http://www.sifma.org/aml2015/speakers/ (emphasis added).

knew back in May 2014 that it had one or more leakers in its ranks, and that the illegal leaking was for the purpose of furthering its investigation of Mr. Walters, but did essentially nothing to find out who was responsible or to put a stop to this criminal conduct. Equally troubling, substantial evidence and simple common sense lead to the conclusion that Mr. Walters' case could not have been the first or only insider trading investigation in which SSA Chaves and his squad pursued this highly improper, illegal and criminal investigative strategy. Instead, it appears that illegal leaks of secret grand jury information became a standard and accepted investigative technique deployed in numerous cases.

Contrary to the government's initial response to our motion, the record also clearly establishes that the USAO too was well aware of the illegal FBI leaks in this case by June 2014, but made a decision not to do any investigation, not to take steps to stop them, and not to tell anyone outside the USAO and FBI what had happened. When Mr. Walters raised the issue of potential government leaks in his September 2016 motion to this Court, the USAO submitted papers that contained false statements and half-truths and aggressively and repeatedly denied what it knew had occurred. Had this Court not ordered a hearing in response to our initial motion, all of the extraordinary facts that have come to light thus far would have remained a secret.

Strategically leaking grand jury information that is by law required to be kept secret is the antithesis of how our government is allowed to investigate and try to build cases against its citizens. And yet that is exactly what happened here. The illegal leaks were intended to and did successfully revive a "dormant" investigation. As a result of and following the leaks and the extensive and accusatory news coverage reporting them, the FBI obtained investigatory information from the press (the precise parameters of which remain unknown); wiretapped

- 2 -

conversations were stimulated that the government has used and intends to use to support its case; and the government's principal witness destroyed evidence, and later decided to reverse his repeated proclamations of innocence and cooperate against Mr. Walters. On the record before this Court, there can be little doubt that, but for this illegal investigatory scheme, Mr. Walters never would have been indicted.

In these circumstances, we respectfully submit that the only adequate remedy is dismissal of the charges. And as we outline in detail below, under *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 259 (1988), this Court can dismiss an indictment for government misconduct in connection with the grand jury process under its supervisory powers where the record shows *either* (1) "'grave doubt' that the decision to indict was free from the substantial influence" of the misconduct *or* (2) "a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." This Court also has the power to dismiss the charges against Mr. Walters as a matter of due process because of the outrageousness of the government's misconduct, including the FBI's illegal and criminal acts, its decision not to investigate or put a stop to the leaks, and the USAO's complicity in and attempts to cover up the wrongful conduct.

Nearly a century ago, in his famous dissent in *Olmstead v. United States*, 277 U.S. 438, 485 (1928), Justice Brandeis warned: "To declare that in the administration of the criminal law the end justifies the means – to declare that the government may commit crimes in order to secure the conviction of a private criminal – would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

- 3 -

For all of these reasons, as more fully set forth below, we ask this Court to dismiss the indictment against Mr. Walters or, in the alternative, order an evidentiary hearing to uncover the full scope and details of the government's shocking misconduct.

## STATEMENT OF FACTS

Because knowledge of the key events has emerged haltingly and in a piecemeal fashion, we set forth below a detailed and comprehensive chronology in light of the more fulsome picture that has now come to light, incorporating both facts included in our earlier motion for a hearing on government misconduct, as well as the very significant and substantial new information.

Nevertheless, as the government itself concedes, "much about the scope and content of the information that [SSA] Chaves leaked to reporters remains unclear." *See* Letter from the United States Attorney's Office, *United States v. Walters*, S1 16 Cr. 338 (PKC) (Dec. 16, 2016), ECF No. 65-1 at 1, 3 [hereinafter "USAO Submission"].  More than that, all we know at this point about the scope and details of the government misconduct is only those selected facts that the USAO has decided to disclose after this Court declined to accept its blanket denials and ordered a hearing.  The USAO has a clear conflict of interest when it comes to investigating its closest law-enforcement partners, and that conflict is even more disqualifying when the circumstances require investigating, assessing and characterizing the conduct of the senior-most ranks of the USAO itself in connection with an investigation and grand jury presentation it supervised.  That is why, notwithstanding the extensive, outrageous and prejudicial government misconduct that has now come to light and is set out below, if the Court finds that the evidence on material issues is incomplete or in dispute, we ask Your Honor to hold a full adversarial fact-finding hearing and order further disclosure of evidence before deciding this motion.  *See* Point V, *infra.*

- 4 -

1.     **Pre-Indictment Misconduct**

(a)     *The Government Began its Campaign to Violate the Rights of Mr. Walters at Least as Early as April 2013.*

The investigation of Mr. Walters that eventually led to the current Indictment began at least as early as November 4, 2011, when the government obtained the first in a series of pen registers and "trap and trace" devices for Mr. Walters' phone.[2]  A year and a half or more after its inception, the investigation apparently had not yielded evidence to move forward with a criminal case, leading SSA Chaves to conclude it was "dormant."  (USAO Submission at 4); *see also* Matthew Goldstein & Ben Protess, *Investor, Bettor, Golfer: Insider Trading Inquiry Includes Mickelson, Icahn and William T. Walters*, N.Y. Times (May 30, 2014) (Schoeman Decl. Ex. B) (noting that the "investigation has dragged on for more than two years without yielding definitive evidence of insider trading"); Ben Protess & Matthew Goldstein, *Authorities Find Insider Trading Case Tied to Phil Mickelson Is Slow to Take Shape*, N.Y. Times (May 31, 2014) (Schoeman Decl. Ex. C) (explaining that "nearly three years after . . . signs of possible insider trading, a case has yet to materialize").  It was at this time in the spring of 2013 that SSA Chaves embarked on a calculated, deliberate, sustained campaign of illegal and criminal leaks to both *The New York Times* and *Wall Street Journal*, in an apparent attempt to resuscitate the moribund investigation.

Thus, in April 2013, "over dinner," SSA Chaves "told *Times* reporters [Matthew] Goldstein and [Ben] Protess about the [Walters] Investigation."  (USAO Submission at 4).  SSA Chaves then sat down for lunch a few months later with a different reporter, this time Susan Pulliam of the *Wall Street Journal*, and "told [her] that the FBI was investigating [redacted]

---

[2]  ████████████████████████████████████████████████████████
████████████████████████████████████████████████████

KL3 3109083.1

Walters." *Id.* at 5. The USAO Submission is silent as to whether this dinner and lunch were the first meals SSA Chaves ever had with these or other reporters (which seems highly unlikely), and whether on any prior occasions he had leaked to these or other reporters confidential law enforcement and secret grand jury information about this or any other investigations. The record is also silent as to the cost of the meals and who paid for them.

The USAO Submission clearly establishes that SSA Chaves used this secret and confidential grand jury and law enforcement information about the identity of the grand jury's target(s) to illegally obtain investigative leads, specifically asking the reporter "to let him know if she came across information regarding Walters." (USAO Submission at 5). Pulliam did just that, calling SSA Chaves "from time to time" to "describe what she was learning regarding Walters." *Id.* The government's submission is silent on what specific information Pulliam (or any other reporter) provided to SSA Chaves in exchange for his leaks of secret, confidential grand jury and law enforcement information. But we do know that there was a continuing *quid pro quo* exchange of information, as SSA Chaves not only illegally identified the target(s) and discussed confidential details of the investigation, but also would "at times tell Pulliam – *and the Times reporters* – to 'check your sources,' suggesting that something the reporter had learned was incorrect." *Id.* at 5 (emphasis added).

(b) 

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████

   We now know that ████████████████████ on or around April

17, 2014, SSA Chaves once again dined with three reporters from *The New York Times* and

leaked additional details about the investigation, telling "the *Times* reporters that the FBI was

investigating a number of different stocks in which Walters [redacted] had invested." (USAO

Submission at 5). We also know there are text messages and phone logs indicating "multiple

phone calls" between SSA Chaves and the *Times*' Protess "later in April 2014, including an

approximately 21-minute phone call with Protess on April 20," ██████████████████

████████ *Id.* at 5. The contents of the text messages have not been disclosed and are known

only to the government. The government asserts that around this time "the Investigation began

to gain momentum" (although how and the role of the reporters is not explained), and states that

for this purported reason SSA Chaves claimed that "he became uncomfortable with Pulliam's

questions and stopped responding to her phone calls." *Id.* But as the USAO Submission makes

clear, and as described below, the leaking continued unabated.

         (c)    *The FBI and USAO Were Aware of the Possibility of a Leak as Early as May 6 and May 8, 2014, Respectively.*

      The USAO Submission is silent as to precisely what others at the FBI knew or suspected about SSA Chaves' illegal leaking and when they knew or suspected it. However, it is clear that at least as of May 6, 2014, others at the FBI were put on notice as to the likelihood of a leak when, ███████████████████████, J. Peter Donald, the FBI's New York Field Office media representative, "met for coffee" with Susan Pulliam of the *Wall Street Journal*. Why such a meeting was agreed to by the FBI, and what if any legitimate purpose it was supposed to serve, are unknown. Donald invited SSA Chaves, who had been illegally leaking news of the Walters investigation to Pulliam and other reporters for many months. Donald apparently denies being aware that SSA Chaves was leaking at the time, but his decision to invite SSA Chaves, and only Chaves, to join him suggests otherwise. Donald recalls that Pulliam asked about the Walters investigation, about which she already "had a high level of detail." (USAO Submission at 5). SSA Chaves similarly recalled that Pulliam "had a good sense of the Investigation, the relationships of its subjects, and the stocks involved." *Id.* at 6.

      Donald and SSA Chaves disagree on whether they revealed anything to Pulliam at this meeting. Donald's claim is that "neither he nor [SSA] Chaves confirmed or commented on anything Pulliam said," whereas SSA Chaves admits that "he and Donald confirmed that the FBI was working on the investigation with the SEC." (USAO Submission at 5-6). SSA Chaves also recalls that "Pulliam [told] them that she planned to publish something and Donald ask[ed] her to wait to do so and to allow them to discuss it." *Id.* at 6.

      Following this meeting, the FBI alerted the USAO to the discussion with Pulliam. *See* Declaration of Telemachus P. Kasulis, Esq. (Oct. 21, 2016), ECF No. 44 ("Kasulis Decl.") at

KL3 3109083.1

¶ 11 ("On or about May 8, 2014, the USAO learned for the first time that the *Wall Street Journal* was considering publishing an article about our investigation . . . ."). The Kasulis Declaration and USAO Submission are both silent as to whether the meeting, Pulliam's detailed knowledge of their confidential investigation and the attendant concerns it should have raised as to the likelihood of a leak were then elevated to superiors at the FBI or the USAO; whether any actions were taken at the time to investigate the potential leak; and if not, why not.

      (d)    *The* Wall Street Journal *agreed to the FBI's Request that it Hold Publication of an Article about the Investigation* ███████████
████████████

On Tuesday, May 13, 2014, a week after the discussion with Pulliam over coffee, the FBI's Donald called the *Wall Street Journal* and – presumably in response to the FBI's request – "the paper agreed to hold publishing its story until May 22." (USAO Submission at 6). While the USAO Submission references emails evidencing this conversation, those emails have not been disclosed and further details are unknown. ████████████████
████████████████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████ What is also unclear is whether that reason ████████████████████ was improperly disclosed to the *Journal* at that point, or if there was some other reason they agreed to hold publication.

The FBI kept the USAO apprised of its ongoing communications with the *Journal*. The Kasulis Declaration states that on "May 13, 2014, the USAO learned . . . that the *Wall Street Journal would not be able to publish* a story about our investigation until May 22, 2014 at the earliest, and that it might well be later." (Kasulis Decl. ¶ 12) (emphasis added). Given that we now know the *Journal* agreed to hold off on publishing the story *after a request*

*and call from the FBI and the USAO was fully aware of that fact*, the use of the phrasing "would not be able to publish" is highly misleading, and raises a serious question as to whether it was an effort by the USAO to hide from Mr. Walters and this Court the true facts of the FBI's illegal dealings with the press.

On May 22 and 23, 2014, "the *Journal* asked to meet with the FBI to discuss continuing to hold the story. The FBI was inclined to meet with the paper, but first sought the USAO's opinion." (USAO Submission at 6). According to the USAO, it was "opposed to such a meeting and counseled against it." *Id.* Although contemporaneous emails apparently evidence this opposition, they have not been produced, nor have the USAO's reasons for opposing the meeting been stated. We are told "the USAO did not believe it could forbid the FBI from meeting with the *Journal*, and the FBI ultimately decided to proceed." *Id.* The USAO allegedly "warned the FBI not to comment on the Investigation, and simply to seek the paper's agreement to hold publication," *id.* – but again no evidence of those facts has been disclosed.

Contrary to the USAO's version of events, which has them opposing the meeting, three of the five FBI agents who eventually attended the meeting – Chaves, Donald, and Douglas Leff, then Assistant Special Agent in Charge and Chaves' direct supervisor – all "believed that, despite some initial reservations, by the time of the FBI's meeting with the *Journal*, the USAO concurred with the FBI's decision to meet with the paper." *Id.* at 6 n. 2. No emails or other evidence have been disclosed to support this claim, or to otherwise explain the significant factual dispute between the USAO and the FBI about what actually happened.

(e) ████████████████████████

████████████████████████

████████████████████████



    (f)    *The May 27, 2014 Meeting Between the FBI and* Wall Street Journal *Suggests that More than One FBI Agent was Responsible for Illegal Leaking.*

Five members of the FBI agreed to meet with Pulliam, Michael Rothfeld, and an editor from the *Wall Street Journal* on Tuesday, May 27, 2014. Those individuals included SSA Chaves, Donald, Leff, Richard Frankel, then Special Agent in Charge of the Criminal Division of the New York Field Office, and Christos Sinos, then Supervisory Special Agent who led the New York Field Office's media program. (USAO Submission at 4, 6). There are conflicting accounts as to what took place during the meeting, particularly as to the critical question of what secret and confidential grand jury and law enforcement information may have been leaked or discussed:

- SSA Chaves claims that "in preparing for the meeting, the FBI personnel had discussed their willingness to discuss some aspects of the investigation—though nothing related to the grand jury or wire intercepts—in exchange for the *Journal* agreeing to continue to hold publication. Specifically, [SSA] Chaves recalled that the FBI was prepared to discuss the subjects of the Investigation—including Walters [redacted]—the stocks and trades involved, and other investors and avenues of investigation." *Id.* at 6-7.



- 11 -

- SSA Chaves also indicated that at the meeting the FBI personnel "confirmed various aspects of the investigation, consistent with the strategy . . . . For example, [SSA] Chaves recalled one of the *Journal* reporters asking whether the FBI was employing wiretaps, and someone from the FBI (but not him) responding that they could not discuss that and were considering using all sophisticated surveillance techniques available." *Id.* at 7.

- Likewise SSA Sinos "vaguely remembered the FBI confirming certain information the *Journal* reporters described, and also telling the *Journal* reporters that some of the information they had described was incorrect." *Id.*

- Contradicting these accounts, "Leff and Donald . . . stated that, at the meeting, the FBI asked the *Journal* to hold the story, but told the reporters *nothing* about the Investigation." The USAO's submission suggests that these two agents and perhaps others stated that "the FBI was not prepared and would not have been willing to provide the *Journal* with information related to the Investigation." *Id.* (emphasis added).[5]

Despite the contradictory accounts as to whether and what information was leaked at the meeting, the curious absence of any information about what the senior-most agent present (Frankel) says occurred, and the USAO's concession that "precisely what occurred at that meeting" is "not clear," *id.* at 6, the *Journal* apparently was given enough information and feedback about the investigation that it agreed to continue to hold publication. Further demonstrating the continuing *quid pro quo* relationship between the FBI and the *Journal*, the *Journal* also extracted an extraordinary promise from the government agents: "[a]ccording to multiple witnesses, the FBI . . . agree[d] to tell the *Journal* if the FBI learned that another news organization was looking at a similar story." *Id.* at 7. SSA Chaves already knew the *Times* was working on such a story, but according to the government did not disclose that to anyone else at this meeting. *Id.*

---

[5] Further muddling the record, according to Matthew Thoresen, the case agent primarily responsible for the investigation of Walters, SSA Chaves "told him that the FBI had not provided details of the Investigation to the *Journal* at that meeting." (USAO Submission at 7). However, "Thoresen [also] recalled that, in the days after the *Times* and *Journal* published their second articles, [SSA] Chaves apologized to him, saying, in sum, that he ([SSA] Chaves) felt partly responsible for the articles given what had been said at the FBI's May 27 meeting with the *Journal*." (USAO Submission at 9).

- 12 -

That very same evening, May 27, "the USAO learned from the SEC that the *Times* was looking into the Investigation." *Id.* There is an email from SSA Chaves to his supervisor (Leff), at 9:50pm EST, Subject: WSJ, in which he wrote:

> Just got off the phone with Anjan [the head of the USAO's Securities and Commodities Fraud Task Force]. We now have another media outlet (NY Times) inquiring on today's matter. A call was made to SEC SF by the Times earlier today asking about some aspects of this case. The SEC Regional Director contacted Anjan to report this. We'll have a conference call in morning to discuss but the prevailing thought would be to notify the WSJ of the inquiry as we promised. It will set in motion the need to make immediate approaches of some of the targets within the next few days. Let me know if you want to be on the call otherwise I'll brief you following.

(USAO Submission Ex. A, ECF No. 65-2). The USAO Submission states that the "USAO immediately notified the FBI, which in turn alerted the *Journal* the same day" (i.e., May 27). (USAO Submission at 7).

SSA Chaves forwarded the email chain to case agent Thoresen and another agent writing (deceptively, as he was the leaker): "Just can't win. Let's discuss in morning." (USAO Submission Ex. A, ECF No. 65-2). Thoresen replied, confirming that the existence of a leak was well understood at that point: "Whomever is leaking, apparently has a specific and aggressive agenda in that they are now going to other media outlets in an effort to derail this investigation." *Id.*

       (g)    *The FBI Approaches Target Subjects Immediately Following its Meeting with the* Wall Street Journal.

The next day, May 28, James Margolin, the Chief Public Information Officer at the U.S. Attorney's Office, emailed six AUSAs, including the highest officials in the office who reported directly to the U.S. Attorney (such as Deputy U.S. Attorney Zabel) as well as AUSA Kasulis, with an update on communications between the FBI and the press. Contrary to the

assertion in the USAO Submission on page 7 that the *Journal* was immediately told the *Times* was on to the story on May 27, Margolin indicated late in the evening on May 28 that the FBI had *not yet* reached out to the *Journal* as promised, "and was trying to wait till the approaches [of the targets/subjects] were done." (USAO Submission Ex. B, ECF No. 65-3).[6]

      The following day, May 29, 2014, the FBI approached Tom Davis at his home in Texas and Phil Mickelson at a golf tournament in Ohio. Mr. Davis denied any wrongdoing and "stated that he never gave insider information to [Mr.] Walters, and that he was '100 percent certain' of that fact." (Schoeman Decl. ¶ 3). Likewise, Mr. Mickelson denied any wrongdoing. (Schoeman Decl. ¶ 6).

      That same afternoon at 4:21pm EST, either after the approaches were completed or while they were still in progress, Margolin (from the USAO's press office) followed up on his earlier email explaining that Donald, from the FBI's press office, had called Pulliam at the *Journal* that afternoon because "SAC Rich Frankel . . . essentially ordered him to call. Frankel felt that, in light of the information about Ben Protess [of the *Times*] contacting the SEC, the FBI had an obligation to tell the Journal another journalist had contacted a different entity in the government about the same subject matter." (USAO Submission Ex. B, ECF No. 65-3). Highlighting the close and symbiotic relationship between the government and the press, Margolin candidly continued: "Peter's inclination had been to wait, at least until the approaches had been made, since logically, Ben Protess isn't going to run a story in the Times without contacting the FBI or us or both. Frankel apparently didn't see it that way." *Id.* Again, this email contradicts the assertion in the USAO Submission on page 7 that the *Journal* was told

---

[6] Curiously, the Subject line of the email chain – which the government appears to have produced in partial form, omitting the beginning of the chain – references the wiretap ("Re: Wire/WSJ"), even though the discussion is about the timing of the articles relative to the approach of witnesses. *Id.*

about the *Times'* interest in the investigation two days earlier, on May 27.

Roughly thirty minutes later, Zabel, the Deputy U.S. Attorney, responded that he had just spoken with Rothfeld (from the *Journal*) who was struggling with how to explain the insider trading theory, which Zabel "declined" to clarify. *Id.* Zabel's email, which is redacted in critical respects, indicates that he was aware at that point of at least the strong possibility, if not the fact, of a government leak. Zabel thus explained that the *Journal* reporter knew the USAO was "working on [redacted] with the FBI," "seem[ed] to feel they have all the essential elements correct of the story," "mentioned [redacted] Walters," and said "the 'whole thing began with [redacted]." *Id.* There is no indication that the USAO did anything at this point to explore the source of the leaks or otherwise address the illegal conduct.

        (h)    *As Expected, the* Wall Street Journal *and* The New York Times *Published Articles about the Walters Investigation on May 30, 2014.*



KL3 3109083.1



Mr. Rothfeld followed up yet again with two emails to Mr. Walters about the anticipated *Wall Street Journal* article, further detailing his extensive knowledge of the government's investigation, including knowledge that trading in Dean Foods was under review, and asking Mr. Walters to call or email him:

> Beyond its general scope, as I described to you, we also plan to report that the government investigation, including by the FBI and SEC, is examining trading in multiple stocks including that of Clorox around the time in 2011 that Mr. Icahn was active in it. Based on our reporting, the government has looked at large options

---

[7] Unofficial transcripts of the recordings cited herein are provided as an aid to the Court. If the Court would like to review the underlying audio files, they can be provided as well.

KL3 3109083.1

positions you held in Clorox at that time. Also, we plan to report that you struck up a friendship with Mr. Icahn through a mutual acquaintance when his company owned the Stratosphere. And, that you have a friendship with Mr. Mickelson surrounding your shared interest in golf. We will also include some general background about your life, and that you are 67 years old. If you would like to discuss or comment on any of these things, please call me at either of the numbers below or email me as soon as possible. This story is likely to be published today.

. . .

I wanted to let you know about one additional point we plan to include – that the investigation is also focusing on trading in Dean Foods.

Again, let me know if you'd like to comment on any aspect of this. I am here if you want to reach me.

Emails from Michael Rothfeld to William Walters (May 30, 2014) (WG 0053512) (Schoeman Decl. Ex. G).

That afternoon, Donald from the FBI Office of Public Affairs emailed Venizelos, then Assistant Director in Charge of the FBI's New York Office (the highest ranking FBI agent in New York), along with Frankel, Leff, SSA Chaves, Thoresen, the two agents who had approached Davis and Mickelson (Howard and Shea) as well as others at the FBI, and included on the email Margolin from the USAO. He indicated that the *Journal* would "likely publish a *front page* story tomorrow" on the Walters investigation. (USAO Submission Ex. C, ECF No. 65-4) (emphasis added).

Later that evening, the *Wall Street Journal* broke the story that "[f]ederal investigators are pursuing a major insider-trading probe involving finance, gambling and sports, examining the trading of investor Carl Icahn, golfer Phil Mickelson and Las Vegas bettor William 'Billy' Walters." *See* Susan Pulliam & Michael Rothfeld, *FBI, SEC Probe Trading of Carl Icahn, Billy Walters, Phil Mickelson – Insider-Trading Investigation Began in 2011 with*

- 17 -

*Unusual Trades in Clorox*, Wall St. J. (May 30, 2014) (Schoeman Decl. Ex. H).  The article

repeatedly referred to unidentified sources who were familiar with the investigation, and

provided detailed information concerning the investigations into trading in both Dean Foods and

Clorox:

- "Federal investigators are pursuing a major insider-trading probe involving finance, gambling and sports, examining the trading of investor Carl Icahn, golfer Phil Mickelson and Las Vegas bettor William "Billy" Walters. The Federal Bureau of Investigation and the Securities and Exchange Commission are examining whether Mr. Mickelson and Mr. Walters traded illicitly on nonpublic information from Mr. Icahn about his investments in public companies, *people briefed on the probe said*."

- "The FBI and SEC are examining whether Mr. Walters on at least one occasion passed a tip on to Mr. Mickelson, *these people said*, and are studying the two men's trading patterns."

- "The government investigation began three years ago after Mr. Icahn accumulated a 9.1% stake in Clorox Co. in February 2011, *said the people briefed on the probe*.  On July 15, 2011, he made a $10.2 billion offer for Clorox that caused the stock to jump. Well-timed trading around the time of his bid caught the attention of investigators, who began digging into the suspicious trading in Clorox stock, *the people familiar with the probe said*."

- "The investigators expanded their probe to look at trading patterns by Mr. Walters and Mr. Mickelson relating to Dean Foods Co., *said the people briefed on the probe*. The FBI, following its approach to Mr. Mickelson on Thursday, expressed an interest in his trading in Dean Foods, *a person familiar with the situation said*."

*Id.* at 1-2, 3, 6 (emphasis added).

 The article also attributes to these same "people briefed on the probe" the

following statement: "publicity of the probe could jeopardize the government's ability to put

together any potential case, they said, by limiting its ability to covertly gather evidence." *Id.* at 4-

5.  Since this statement of concern obviously came from the FBI agents, who had met with the

*Journal* reporters and editor for the express purpose of asking them to postpone publication of its

story to avoid just such interference, it follows that the source of the other leaked investigation

information in the article – attributed to the same "people briefed on the probe" – was the FBI as

KL3 3109083.1

well. Assuming that is true, it contradicts the claims of Leff and Donald, both of whom denied

any disclosures to the press were made at the meeting, and corroborates the contrary accounts of

SSA Chaves and Sinos. For the same reasons, the statements would have put everyone involved

at the USAO who read the article on notice that the FBI had been the article's source for both the

warning about interference with the investigation and some if not all of the leaked information

about the targets, focus and other details of their investigation.

Shortly after the *Wall Street Journal* article broke, Matthew Goldstein and Ben

Protess of *The New York Times* ran a story with substantially the same information, although this

time specifically crediting the United States Attorney's Office for the Southern District of New

York with playing a leading role in the investigation:

> • "The F.B.I. and Securities and Exchange Commission, which are leading the inquiry *along with federal prosecutors in Manhattan*, are examining whether Mr. Icahn leaked details of his Clorox bid to Mr. Walters, *the people briefed on the investigation said*. One initial theory, the people said, is that Mr. Walters might have passed that information to Mr. Mickelson."

*See Investor, Bettor, Golfer: Insider Trading Inquiry Includes Mickelson, Icahn and William T.*

*Walters*, N.Y. Times (May 30, 2014) (Schoeman Decl. Ex. B) (emphasis added). As with the

*Wall Street Journal, The New York Times* made multiple references to "people briefed on the

investigation." The *Times* also revealed the length of the investigation (which no one outside the

government would have known) and disclosed information from the telephone and trading

records that, ██████████████████████████ were obtained using grand jury subpoenas:

> • "Federal authorities, *whose investigation has dragged on for more than two years* without yielding definitive evidence of insider trading, *are also examining phone records* to see whether Mr. Walters spoke to Mr. Icahn shortly before the trades."

> • "In a separate strand of the investigation, federal authorities are looking into trading in Dean Foods that has no apparent connection to Mr. Icahn, the people briefed on the matter said. Mr. Walters and Mr. Mickelson *placed the trades around August 2012, according to the people*, just before the food and beverage company announced its quarterly earnings and a public offering of stock for one of its subsidiaries. The

> authorities are investigating whether Mr. Walters had a source inside the company
> itself – and whether others who know Mr. Walters may have traded on the
> information as well."

*Id.* at 2 (emphasis added).

When the *Journal* article was published, the FBI's Donald circulated it, including

to Assistant Director in Charge Venizelos.  Venizelos replied roughly an hour later to Donald,

Frankel, Sinos, and SSA Chaves, asking "[h]ow did [the reporter] find out about agent

approaching P[hil ]M[ickleson] on thursday. I don't buy that he [Mickelson] told them."  (USAO

Submission Ex. C, ECF No. 65-4).  Venizelos instructed his staff to "not speak to this reporter

again for now."  *Id.*  Donald followed up a few minutes later that the "WSJ told me that the

defense attorney told them that agents had approached his client," but as Venizelos pointed out in

his response, "[w]hy would he do that to his client."  *Id.*  Venizelos ordered all the involved FBI

agents to "stop talking to this reporter for now!"  He also suggested that if they continued to leak

"there [would] be reassignments immediately."  *Id.*

Perhaps most significantly, Venizelos told his subordinates:  "If we don't have

enough evidence by now its [sic] over."  (USAO Submission Ex. C, ECF No. 65- 4).  In other

words, the senior-most FBI official in New York confirmed his clear understanding of the truth

at the heart of this Motion:  one or more FBI agents within his office were illegally leaking to the

press as an investigative strategy to breathe life into a dead investigation.

Meanwhile, Donald "spoke to the *Times* reporters on May 30, around the time the

*Times* published its story online [and learned that they were] incensed that the *Journal* had

scooped them, and asked Donald why the FBI had notified the *Journal*, since the *Times* reporters

had not made a formal inquiry of law enforcement.  Donald remembered being puzzled by that

question, because it sounded to him like the *Times* reporters knew of the agreement between the

FBI and the *Journal*. . . . Donald also remembered that the *Times* reporters had the entire story

- 20 -

KL3 3109083.1

and even more details about the Investigation than the *Journal*." (USAO Submission at 8).  If there was anybody in the government who at this point was somehow not yet convinced that the leaks were coming from within the FBI and continued unabated, this call surely must have settled the issue.

Although the USAO's Submission is vague on timing, it states that "[b]ased on emails and interviews, it also appears that on May 30 the *Times* reporters knew something about the Government's wiretap, though it is unclear what." (USAO Submission at 8).  No further details are provided on this critical point, nor has the government disclosed the emails or interview memos evidencing exactly what the *Times* had been illegally told about the sealed wiretap.  The USAO Submission continues: "Though [SSA] Chaves initially told us he did not remember providing information to the *Times* reporters about the FBI's agreement with the *Journal*, upon review of certain of his text messages and phone logs, he agreed that that may have been what occurred." *Id.* Again, the referenced text messages and phone logs have not been disclosed.  It is clear, however, that despite the unequivocal evidence that the most confidential aspects of its investigation had been illegally leaked to multiple reporters, neither the FBI nor the USAO took any steps at that time to investigate or review the communications of the relevant FBI agents, which would have revealed SSA Chaves (and perhaps others) as the source(s).

      (i)    *Davis Immediately Felt the FBI's Efforts to*
                *Pressure Him Through Illegal Leaks.*

Emails produced in discovery indicate that when the *Journal* and *Times* stories broke on May 30, 2014, replete with illegally leaked details of the investigation, Mr. Davis immediately began to feel the heat being turned up around him, as no doubt was SSA Chaves' intent.  From the limited evidence that has been produced, we know that one friend forwarded

KL3 3109083.1

the article to Mr. Davis writing "Uh oh" (DAVIS_0147334) (Schoeman Decl. Ex. I); a business

acquaintance wrote "Hope this is not correct" (DAVIS_0146575) (Schoeman Decl. Ex. J); and

Mr. Davis also was in immediate dialogue with the General Counsel of Dean Foods

(DAVIS_0144982) (Schoeman Decl. Ex. K). These emails also indicate Mr. Davis likely heard

from one or more of the reporters in advance of the stories' release, as he told his friend he had

"[h]eard this was coming out." (Schoeman Decl. Ex. I). We do not know what information Mr.

Davis may have provided to the reporters or whether that information was relayed back to SSA

Chaves. The USAO Submission is also silent as to any further details of how many additional

business and personal acquaintances may have contacted Mr. Davis as a result of this article.

We do know – from the *Times* article published the next day – that it was well

understood that one of the government's tactics was to try to "scare [targets] into cooperating"

through public exposure of the fact that they were under investigation. *See* Ben Protess &

Matthew Goldstein, *Authorities Find Insider Trading Case Tied to Phil Mickelson Is Slow to

Take Shape*, N.Y. Times (May 31, 2014) (Schoeman Decl. Ex. C) (explaining that at some point

the investigative "focus . . . turned to Mr. Mickelson, whom authorities *hoped to scare into

cooperating*. As one of America's most popular athletes, Mr. Mickelson had much to lose under

the glare of the government's spotlight.") (emphasis added). The evidence shows the same

tactics were applied to Mr. Davis, who, in the face of the unrelenting leaks, destroyed evidence

and later succumbed to government pressure and decided to make a deal to cooperate against Mr.

Walters.

      (j)    *The Media Blitz of Illegally Leaked Information Continued with
Articles on May 31, 2014 and June 1, 2014.*

The next day, Saturday, May 31, 2014, another *New York Times* article was

published that contained even more illegally leaked details. The continuing leaks demonstrate

- 22 -

the prior email directive from the senior-most FBI official in the New York Office – ADIC

Venizelos – to "stop talking to this reporter" either was viewed as insincere or was being

deliberately ignored by one or more agents so they could continue their aggressive and illegal

pursuit of Mr. Walters and others.  The article disclosed that Mr. Mickelson and Mr. Walters

earned "several million dollars" on a series of stock trades, "according to people briefed on the

matter *who spoke anonymously because they were not authorized to discuss the investigation*."

Ben Protess & Matthew Goldstein, *Authorities Find Insider Trading Case Tied to Phil Mickelson*

*Is Slow to Take Shape*, N.Y. Times (May 31, 2014) (Schoeman Decl. Ex. C) at 1 (emphasis

added).  The article also included more specifics on what Mr. Walters' and Mr. Mickelson's

trading records showed:

- "And trading records indicated that the bets came not just from Mr. Walters but also
  from at least one other investor connected to the golfing world, *one of the people
  briefed on the matter said.*"

*Id.* (emphasis added).

Beyond disclosing illegally leaked secret grand jury and confidential investigation

information, *The New York Times* article revealed what the prosecutors working on the case were

thinking and provided a justification about why the United States Attorney's Office had not yet

brought charges:

- "*The previously unreported details about the size and scope of the trading*, emerging
  a day after a federal insider trading investigation first came to light, might seem to
  stack up in the government's favor. As federal authorities examine whether Mr. Icahn
  leaked details of his Clorox bid to Mr. Walters, the people said, *they are exploring a
  theory* that Mr. Walters might have separately passed on other information to Mr.
  Mickelson."

- "A recounting of the government's tactics, described in interviews with people
  briefed on the matter, provides a case study in the hurdles of building an insider
  trading investigation. Even after the United States attorney's office in Manhattan
  racked up a perfect record under Preet Bharara – more than 80 insider trading
  convictions and no defeats – *a case can wither without a smoking-gun email, a loose-
  lipped cooperating witness or wiretapped conversations*."

- "In recent months, authorities have pored over phone records, *the people briefed on the matter said*, seeking to line up Mr. Icahn's calls to Mr. Walters with the trading in Clorox. But phone records provide *only circumstantial leads*."

*Id.* at 1, 2 (emphasis added).

The next evening, June 1, 2014, Pulliam and Rothfeld at the *Wall Street Journal*

ran another article disclosing even more about what the prosecutors were thinking (the story was

published in the June 2 print edition of the *Journal*). Michael Rothfeld & Susan Pulliam, *Trade*

*Probe Hits Snag as Surveillance is Derailed*, Wall St. J. (June 2, 2014) (Schoeman Decl. Ex. L).

The story makes clear that these reporters were briefed about the government's earlier use of pen

registers and other surveillance techniques, and specifically told the reason wiretaps could not be

used on Mr. Icahn's phone. The article stated:

- "Authorities *were considering the use of wiretaps in the investigation* of the financier, gambler and golfer, *people briefed on the probe said*. Meantime, investigators were using other types of electronic and human surveillance in the probe, the people said. *In recent weeks, potentially promising surveillance through such methods had picked up in activity, the people said*."

- "*Even before the probe became public, investigators confronted roadblocks particular to the unusual nature of the people under scrutiny, according to the people briefed on the probe*. As they considered whether they could wiretap Mr. Icahn, one of the people said, they learned that it could be hard to do so without him finding out—because he owned a stake in a telecommunications company through which surveillance might have to be conducted."

*Id.* at 2 (emphasis added). ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

KL3 3109083.1

████████████████████████████████████████████████ The

article further indicated that the *Journal* not only knew about the wiretaps but also that "an *agent*

*leading the case* was out of the country and couldn't help with the approach" of Mickelson.

Rothfeld & Pulliam, *Trade Probe Hits Snag as Surveillance is Derailed*, (Schoeman Decl. Ex. L)

at 2 (emphasis added).

      The *Wall Street Journal*'s June 2 article also suggests that the reporters asked

their government source(s) (at least one of whom we now know was SSA Chaves) why they

were leaking all of this non-public information and received a candid response:

- "While the publicity is likely to damage the government's ability to conduct covert surveillance, investigators can sometimes use publicity to their advantage. *After news reports, the subjects of investigations will often discuss the reports or take actions to avoid being caught, and those maneuvers can cause them to get caught, law-enforcement officials have said.* In the 2010 investigation, some hedge-fund traders, upon reading The Wall Street Journal's account of that insider-trading probe, moved to destroy evidence, according to a criminal complaint later filed in federal court charging traders with obstruction of justice."

*Id.* at 3 (emphasis added). The "2010 investigation" mentioned in the article is a reference to the

investigation of Level Global and related cases, an investigation overseen by SSA Chaves. *See,*

*e.g.*, Criminal Complaint in *United States v. Barai, et al.*, 11-MAG-332 (S.D.N.Y. Feb. 7, 2011).

      Immediately after the *Journal* article came on-line during the evening of June 1,

the FBI case agent (Thoresen) forwarded it to AUSA Kasulis, with the words "[d]eplorable and

reprehensible," presumably referencing the obvious and illegal leaks. (USAO Submission Ex. D,

ECF No. 65-5). That same evening, June 1, the USAO's Chief Public Information Officer

(Margolin) circulated a link to the *Journal* article to the U.S. Attorney Preet Bharara, Deputy

U.S. Attorney Zabel, AUSA Kasulis and others. Shortly thereafter, U.S. Attorney Bharara

forwarded it to FBI Assistant Director in Charge Venizelos, making clear the U.S. Attorney fully

█████████████████████████████████████████████████████████████

understood the source of the leaks was someone at the FBI: "I know you agree these leaks are outrageous and harmful. Let me know what action you want to take together." (USAO Submission Ex. E, ECF No.65-6). Venizelos then emailed Agents Frankel, Sinos, Donald, and SSA Chaves, acknowledging the same: "[this] is now an embarrassment to this office. . . . It [sic] funny how I get all the other articles sent to me but somehow this was missed." *Id.*

While Venizelos' email also stated that "[w]e have issues to deal with and they will be address [sic] appropriately," *id.*, the USAO Submission contains no information suggesting the FBI did anything at this point to investigate and/or stop the leaks, other than hold a meeting on June 2 in which Venizelos apparently did nothing more than "direct[] the agents not to speak to any of the reporters involved." (USAO Submission at 9). Nor is there any indication in the USAO Submission that the USAO itself took any "action" – as the U.S. Attorney's email indicated was warranted – to follow up on these clearly illegal and criminal leaks. Finally, no reasons are provided to explain why no action was taken to investigate the obvious and acknowledged illegal leaks.

(k)     *The Target Subjects Were Recorded on the Wiretap Discussing the News Articles Containing Leaked Information.*

The illegal leaks resulted in dozens of conversations with Mr. Walters that were recorded on the wiretap. There can be no doubt that this is precisely what SSA Chaves – and perhaps others on the government team – desired and expected.[9]

As we wrote in our earlier motion, the calls on the wiretap are not incriminating.

---

[9] Indeed, the strategy used here is an illegal and criminal variant on a well-known law enforcement tactic often referred to as "tickling the wire." Normally, it involves approaching a target/subject whose conversations are being recorded and letting them know the government is investigating, and then seeing what happens on the wiretap. Here, that law enforcement tactic was perverted into an unlawful and criminal strategy to "tickle the wire" by illegally leaking secret grand jury and confidential law enforcement information.

KL3 3109083.1



KL3 3109083.1



<sup>12</sup> Again, even though the calls are

<hr />

<sup>12</sup>                    Mr. Walters objected to this practice because the calls,
transcripts of which were redacted exhibits to the government's reply memorandum, are not

KL3 3109083.1

completely consistent with Mr. Walters' innocence, the government has clearly used the fruits of

its illegal and criminal conduct in debriefing sessions with Mr. Davis as part of its efforts to build

and fortify a case against Mr. Walters and intends to elicit that evidence at trial.

        (l)     *Despite the FBI and USAO's Purported "Outrage," SSA Chaves*
               *Continued to Leak by Means of a Personal Cellphone and at Some*
               *Point Spoliated a Private Email Account.*

        The decision of both the FBI and the USAO not to take action to investigate the

source of the illegal leaks and shut them down allowed SSA Chaves to continue to leak, now

utilizing a personal cellphone.  Specifically, SSA Chaves admitted that, "despite [ADIC]

Venizelos's explicit directive that no one speak to the *Journal* or *Times* reporters," he continued

to do so, telling the *Times* reporters "he could no longer speak to them on his work cellphone"

and giving them "his personal cellphone number."  (USAO Submission at 9).  He then spoke

with "the *Times* reporters on his personal cellphone sometime between on or about June 2 and

June 11." *Id.*  Chaves also "said that, around that same time, he deleted a personal email

account," and claims he did so "*in part* because he did not want Pulliam to be able to contact him

at that address." *Id.* (emphasis added).  The other reason(s) for deleting the personal email

account are not stated.

        On June 10, 2014, the FBI approached Mr. Walters for the first time.  Although

he reportedly "stated that the agent was a true gentleman," Mr. Walters made clear "he did not

wish to answer any questions without an attorney present . . . ."  (Schoeman Decl. ¶ 4).

        The next day, June 11, 2014, *The New York Times* ran another story that included,

for the first time, specific dollar figures that Mr. Walters and Mr. Mickelson purportedly earned

---

inculpatory (for example, Mr. Walters said "just as long as lawyers talk, you know we, you and I
can't discuss it, but uh, it's okay if our attorneys will do that"). *See* Letter from Barry H. Berke,
Esq., *SEC v. Walters*, No. 16 Civ. 3722 (LLS) (Aug 26, 2016), ECF No. 59 at 1.

in "trades they made in Dean Foods in 2012 just before the company's stock soared. Those

trades generated more than $15 million in proceeds for Mr. Walters and nearly $1 million for Mr.

Mickelson, *one of the four people briefed on the matter said.*" Matthew Goldstein & Ben

Protess, *Golfer Mickelson's Role Said to Be Overstated in Insider Inquiry*, N.Y. Times (June 11,

2014) (Schoeman Decl. Ex. Q) at 1 (emphasis added).

      The timing of the article – one day after Mr. Walters declined to speak to FBI

agents – strongly suggests it was triggered by the government to continue to put pressure on a

target who had invoked his right to counsel and to not speak to the government without his

attorney present. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Given the timeline of events, it is highly likely

that it was SSA Chaves who prompted the call, as part of his ongoing and illegal *quid pro quo*

relationship with the press, and as yet another tactical move to try to get Mr. Walters to speak

and potentially incriminate himself, this time even after he had invoked his right to counsel. We

assume that similar calls were made to the other targets of the investigation and possibly other

witnesses who were not yet willing to cooperate with the FBI, but at this point we do not know

what information others may have provided to reporters and to what extent that information was

funneled back to SSA Chaves and the FBI.

      In addition, the specific reference in the June 11 article to "four people briefed on

the matter" should have raised serious questions as to whether SSA Chaves was the sole leaker

or there were other FBI or USAO sources as well. While the USAO Submission attempts to

paint a picture that the illegal and criminal government misconduct was limited to SSA Chaves

- 30 -

KL3 3109083.1

alone, SSA Chaves has expressly indicated otherwise – denying that he was the source of multiple specific pieces of secret and confidential grand jury investigation information that ended up in news articles, including trading records, phone records, trading profits, and the issuance of a grand jury subpoena to Dean Foods. (USAO Submission at 11); *see also id.* at 4 (SSA Chaves "denied having provided all the confidential information regarding the Investigation that appeared in those newspapers during the relevant time period"). Whether SSA Chaves was the only leaker of grand jury information thus remains unclear. Regardless, the evidence is overwhelming that the illegal leaks represent far-reaching government misconduct since the most senior officials at the FBI and USAO were fully aware of the illegal leaking in the investigation, made the decision to conduct no investigation or inquiry, and allowed it to continue unabated.

<div align="center">

(m)      *The USAO Continued to Engage with the Press and Received Further Confirmation as to the Source of the Leaks.*

</div>

On June 12, 2014, Deputy U.S. Attorney Zabel – the USAO's second in command – once again had a conversation with the press, this time Ben Protess of *The New York Times*, the co-author of the article from the prior day. That day, the *New York Times* ran corrections to its prior articles on May 31, June 1, and June 2, which had "us[ed] information from people briefed on the inquiry," clarifying that "While investigators are looking at [Mr. Mickelson's] trading in some stocks, Clorox is not among them." Corrections, N.Y. Times (June 12, 2014) available at https://www.nytimes.com/2014/06/12/pageoneplus/corrections-june-12-2014.html. Zabel characterized the conversation with the *Times* as "good but astonishing." As the USAO Submission concedes, Protess expressly told Zabel during this call "that Protess' sources (whom he did not name) on the Investigation included *a man at the FBI* and someone at the U.S. Securities and Exchange Commission." (USAO Submission at 4) (emphasis added). Zabel's email thus states that Protess "was quite upset to have to walk back his story and blames

<div align="center">

- 31 -

</div>

an FBI person (*and it sounds like an agent*) whom he sa[]ys they have confirmed *lied to the NYT* and some other news orgs." (USAO Submission Ex. F, ECF No. 65-7) (emphasis added). Zabel added that Protess "thinks the FBI person [redacted] did not like being called out for lying or the story being walked back and was a bit threatening saying Ben [Protess] and the NYT are 'on the radar.'" *Id.* Zabel concluded the email by reiterating concerns about the leak, but seemed to think there was some impediment to addressing it at that time: "I don't think this should be discussed generally *right now* for a *number of reasons* but obviously we need to discuss and will *need to address this with the FBI.*" *Id.* (emphasis added). The USAO submission does not explain these reasons for not discussing the issue "right now."

The USAO Submission contains no indication that the obvious, egregious, and continuing series of FBI leaks was ever addressed by the USAO with the FBI, at least not until this Court's Order of November 17, 2016, granting Mr. Walters a hearing on these issues.

(n)     *The Leaks Continued into Late June.*

In the absence of any action by the FBI or USAO to investigate or stop the leaks, they continued unabated, as part of the apparent FBI strategy to increase the pressure on the targets of the investigation, and specifically Mr. Davis. On June 23, 2014, *The New York Times* ran another article with more details about the grand jury investigation, entitled "Dean Foods Receives a Subpoena in an Investigation into Mickelson's Trades." *See* Matthew Goldstein & Ben Protess, N.Y. Times (June 23, 2014) (Schoeman Decl. Ex. S). According to the article, "[p]rosecutors working for Preet Bharara, the United States attorney [sic] in Manhattan, recently subpoenaed the food and beverage company for documents, according to people briefed on the matter." *Id.* at 1. While the article cited unnamed sources – "people briefed on the matter" – it made clear that this leak did not come from Dean Foods, the subpoena recipient: "Jamaison Schuler, a *Dean Foods spokesman, declined to comment* on whether federal authorities had made

- 32 -

any requests for documents." *Id.* (emphasis added).  And in addition to discussing the grand jury subpoenas, the article disclosed the government's theory of the case: "One theory the authorities are pursuing is that a person inside Dean Foods provided Mr. Walters advance notice of the WhiteWave deal, prompting him to share that information with Mr. Mickelson." *Id.*  Pulliam and Rothfeld ran a similar article in the *Journal* the same day, announcing that Dean Foods recently "received a subpoena from criminal authorities ordering the company to produce information, said a person familiar with the matter." *See* Susan Pulliam & Michael Rothfeld, *U.S. Seeks Records in Inquiry Tied to Dean Foods, Clorox*, Wall St. J. (June 23, 2014) (Schoeman Decl. Ex. T).

<div style="margin-left:2em">

(o)   *The Government's Illegal Leaking Strategy Yields Fruit: Mr. Davis Destroys Evidence.*

</div>

In the midst of this onslaught of illegally leaked accusatory information in press reports, Mr. Davis did exactly what the government expected and hoped he would – he spoliated evidence.  As part of his cooperation deal, Mr. Davis has pleaded guilty to obstruction of justice in connection with the destruction of a phone.  As Mr. Davis allocuted to the Court: "[i]n or around May or June 2014, *after the FBI visited my home*, I knowingly destroyed the prepaid cellular phone that Billy Walters had previously provided me with and in order to covertly provide Billy Walters with material, nonpublic information described above.  Specifically I attempted to dispose of the cellular phone by throwing it into a creek near my home in Dallas.  I did so with the intent both to impair the integrity of the cellular phone and to make it unavailable for any subsequent criminal proceeding." Transcript of the Plea Hearing, *United States v. Davis*, No. 16 Cr. 338 (PKC) (S.D.N.Y. May 16, 2016) at 23 (emphasis added).  Because the pre-paid phone has not been recovered, the only evidence connecting it to the alleged insider trading scheme is Mr. Davis' word, and Mr. Walters is unable to use the data on the phone to challenge

that account. According to a government filing, Mr. Davis "is no longer in possession of the Cellphone and cannot recall the exact number." (Schoeman Decl. at ¶ 5). In other words, it appears that Mr. Davis spoliated potentially relevant evidence in response to conduct by the government – illegal and criminal leaks that resulted in an onslaught of accusatory news stories and FBI agents showing up to interview him. This is precisely what the government predicted ▮ ▮▮▮▮▮▮▮▮▮▮ Mr. Davis would do, and exactly what targets of the earlier Level Global investigation had done when leaked information appeared in a *Wall Street Journal* article written by Pulliam.

> (p)    *The Leaks Continue Until Davis Agrees*
> *to Cooperate Sometime in 2016*

In May 2015, Tom Davis testified before the SEC. As the transcript of his testimony reflects, Mr. Davis repeatedly and emphatically denied ever disclosing any material nonpublic information to Mr. Walters. Testimony of Thomas C. Davis, *In the Matter of The Clorox Company*, (May 18, 2015) (Schoeman Decl. Ex. U)

Not long after those denials, the leaks and the use of the press to put pressure on Mr. Davis continued, with the *Wall Street Journal* running another article publicly naming Tom Davis for the first time. Like the articles from May and June 2014, this one also contained similar vagaries as to its sources:

- "Criminal and civil authorities are investigating whether the former chairman of Dean Foods Co. leaked inside information about a corporate spinoff to a professional gambler who in turn is suspected of tipping off golfer Phil Mickelson, *according to people familiar with the probe*. The scrutiny of Dean Foods ex-Chairman *Thomas Davis* brings a high-profile investigation first reported by The Wall Street Journal last year into the boardroom of a major company."

- "The Securities and Exchange Commission and the Manhattan U.S. attorney's office are examining whether Mr. Davis leaked information on his company's 2012 announcement of a spinoff of its WhiteWave Foods division to Las Vegas bettor William "Billy" Walters, *the people familiar with the investigation said*."

- "The portion of the investigation related to Mr. Icahn – which involved potential trading in Clorox, in which Mr. Icahn once held a stake – is now largely dormant, *the people familiar with the matter said*."

- "Mr. Davis and Mr. Walters were acquaintances, and Mr. Walters had a social relationship with Mr. Mickelson, *according to people familiar with the probe*."

- "[Mickelson] was approached by FBI agents in September 2013, at an airport in Bedford, Mass., after playing in the Deutsche Bank Championship golf tournament, the Journal previously reported. The FBI, aware that the investigation was about to be reported on by the Journal, approached him again on May 29, 2014, after he finished a round at an Ohio golf tournament. Mr. Mickelson referred the two agents to his lawyer, *a person familiar with the matter told the Journal*, which reported on the investigation the following day."

*See* Michael Rothfeld, Jean Eaglesham & Christopher M. Matthews, *Trading Investigation Eyes Ex-Chairman of Dean Foods and Golfer Phil Mickelson*, Wall St. J. (Aug. 12, 2015) (Schoeman Decl. Ex. V) (emphasis added).

Mr. Davis continued to maintain his own and Mr. Walters' innocence: "The lawyer representing [Mr. Davis] . . . said in a statement that Mr. Davis has 'fully and without reservation cooperated with the SEC in their investigation of alleged insider trading in Dean Foods Company stock from day one. He has no knowledge of any material non-public information about Dean Foods Company being conveyed to Mr. Walters by him or anyone else.'" *Id.*

At some point in early 2016, after almost two years of repeated, blatant and detailed FBI leaks, which FBI management and the USAO ignored and failed to investigate and shut down, Mr. Davis reversed course and began cooperating and claiming he had illegally tipped Mr. Walters.

- 35 -

KL3 3109083.1

2. <u>**Evidence of Similar Misconduct in Other Cases**</u>

As noted above and as discussed in detail below, under *Bank of Nova Scotia*, this Court may exercise its supervisory power to dismiss an indictment for government misconduct in the grand jury process if there is a "history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." 487 U.S. at 259.

It is a matter of public record that SSA Chaves has been involved over many years in numerous high-profile white collar cases in the Southern District of New York, either directly or in a supervisory capacity, where there have been credible and well-documented claims of improper press leaks in violation of grand jury secrecy. The undersigned counsel has represented clients in several of these matters. In many of the cases, the fact of leaking was raised as a concern such that the USAO and FBI have been on notice for years.

Additionally, SSA Chaves' level of comfort with the *Wall Street Journal* and *New York Times* reporters in Mr. Walters' case – sharing repeated meals with them, and exchanging messages over a personal email account and cellphone – suggests it is highly unlikely that his illegal and criminal leaking of secret grand jury and confidential law enforcement information in Mr. Walters' case was the first time he engaged in this criminal and reprehensible behavior.

In sum, even without a hearing and further investigation and discovery, which may be warranted here, particularly to the extent the government disputes that the illegal leaks were "systematic and pervasive" across multiple cases (*see* Point V, *infra.*), there is a very strong factual record to support a finding that using illegal leaks to the press to pressure individuals into incriminating themselves or others and/or cooperating has become part of the government's investigative playbook, "spanning many cases," and indeed has become "systematic and pervasive" so as to raise "a substantial and serious question about the fundamental fairness of the

- 36 -

process which resulted in the indictment." The following are a few examples relating to insider

trading investigations out of the FBI's New York Field Office, where during the relevant years

SSA Chaves was a white-collar supervisor:

- Raj Rajaratnam (2009): In May 2010, internal oversight bodies in the Justice
  Department and SEC "opened inquiries into allegations that government officials
  improperly disclosed nonpublic information tied to the government's insider-trading
  case against Galleon Group founder Raj Rajaratnam, ...[allegations that included]
  leaking the names of unindicted co-conspirators to the news media, including [by]
  The Wall Street Journal" in 2009. *See* Kara Scannell, *Lawyer Says DOJ, SEC to
  Probe Leaks in Rajaratnam Case*, Wall St. J. (May 26, 2010) (Schoeman Decl. Ex.
  W).[13]

  - *See, e.g.,* **Gregory Zuckerman**, Don Clark, and **Susan Pulliam**, *Colleagues
    Finger Billionaire — Galleon Founder Pushed Hard for Stock-Trading Tips; 'Get
    an Edge or You're Gone'*, Wall St. J. (Oct. 19, 2009) (Schoeman Decl. Ex. Y)

    - "Three former colleagues of Mr. Rajaratnam secretly are bolstering the
      government's probe, say people familiar with the criminal investigation. They
      include California hedge-fund managers Ali Far and Choo Beng Lee, who are
      cooperating witnesses in the case, the people say."

  - *See also* **Susan Pulliam**, *The Galleon Case: Probe Widening in Galleon Case ---
    Prosecutors Subpoena Hedge-Fund Manager Grodin; Ties to a Witness*, Wall St.
    J. (Oct. 24, 2010) (Schoeman Decl. Ex. Z).

    - "Federal investigators in the Galleon Group case have requested trading
      records from a hedge-fund manager who once worked for Steven A. Cohen's
      SAC Capital Advisors and who employed a cooperating witness in the
      insider-trading case announced last week, people familiar with the matter
      say."

    - "The subpoena, sent in the past week, is the first indication that the circle of
      trading being examined in the case is broadening."

---

[13] *See also* Walter Pavlo, *Rajaratnam Camp Offended By Inside Information Leaks To Media*,
Forbes (Mar. 22, 2011) (Schoeman Decl. Ex. X) describing a website – RajDefense.org – that
provided information on what it viewed to be the prosecution's leaks to the media, in order "to
call out the Wall Street Journal's Susan Pulliam." As the article describes: "[i]t seems Ms.
Pulliam is gaining inside information from the government in its prosecution of Rajaratnam.
They have even started a 'LeakCounter' that keeps track of Pulliam's articles that will 'chronicle
Ms. Pulliam's ongoing collaboration with concealed sources'. The LeakCounter was at 29 of 36
stories that Pulliam has written...but the day is still young."

KL3 3109083.1

- "Another individual who worked as a low-level assistant for Mr. Grodin and with Mr. Lee at Stratix was an individual whom <u>prosecutors now allege passed along inside information regarding Google</u>. That individual, <u>identified by people familiar with the matter as Shammara Hussain</u>, left Stratix in May 2007 to briefly work for Market Street, a small San Francisco investor-relations firm. A lawyer for Ms. Hussain, 23, <u>who hasn't been named or charged by prosecutors</u>, said her client intends to cooperate ..."

- <u>David Ganek/Level Global (2010)</u>: On February 26, 2015 David Ganek filed a complaint alleging that individuals from the U.S. Attorney's Office of the Southern District of New York and FBI (including SSA Chaves) leaked information to the press and fabricated evidence in late 2010, resulting in the destruction of his hedge fund. More specifically, Ganek alleged that the government sought a warrant based on the false assertion that a cooperating witness had informed the government that he provided inside information to Ganek, an assertion that the complaint alleges the cooperating witness never made. Additionally, the complaint alleges that the government leaked news of its impending raid of his business to the press, which then photographed the FBI removing boxes from his office. Ganek was never charged with a crime but his business was destroyed. *See Ganek v. Leibowitz*, No. 15 Civ. 1446 (S.D.N.Y. Feb. 26, 2015).

- *See, e.g.*, **Susan Pulliam, Michael Rothfeld, Jenny Strasburg & Gregory Zuckerman**, *U.S. in Vast Insider Trading Probe*, Wall St. J. (Nov. 20, 2010) (Schoeman Decl. Ex. AA).[14]

  - "Federal authorities, <u>capping a three-year investigation, are preparing insider-trading charges</u> that could ensnare consultants, investment bankers, hedge-fund and mutual-fund traders and analysts across the nation, according to people familiar with the matter."

  - "Among the expert networks whose consultants are being examined, <u>the people say</u>, is Primary Global Research LLC, a Mountain View, Calif., firm that connects experts with investors seeking information in the technology, health-care and other industries."

  - "Another aspect of the probe is an examination of whether traders at a number of hedge funds and trading firms, including First New York Securities LLC, improperly gained nonpublic information about pending health-care, technology and other merger deals, <u>according to the people familiar with the matter</u>."

  - "Key parts of the probes are at a late stage. <u>A federal grand jury</u> in New York has heard evidence, <u>say people familiar with the matter</u>. But as with all

---

[14] This is the article that, as noted above, *supra* at 25, caused targets of the investigation to destroy evidence, which in turn led to obstruction of justice charges similar to the one to which Davis has now pleaded guilty.

- 38 -

investigations that aren't completed, it's unclear what specific charges, if any, might be brought."

- *See also Preet Bharara's Methods - Did the U.S. Attorney's office fabricate evidence to smear a Wall Street target?*, Wall St. J. (Mar. 29, 2015) (Schoeman Decl. Ex. BB). The article, which has no attribution, describes the lawsuit and notes that:

  - "Even the search itself was extraordinary, if in keeping with Mr. Bharara's M.O. He has exploited tools once reserved for the mafia or terrorists to go after white-collar crime, such as wiretaps and raids. The November 2010 bust of Level Global seized records and computers; prosecutors would normally obtain such material with a subpoena. They made no arrests. Someone also leaked advance notice to the press, and the raid was conducted in coordination with others on hedge funds in Boston and Connecticut. The dramatic crackdown—featuring B-roll of FBI agents wheeling boxes of documents out of office buildings—became a media circus."

  - "A Level Global trader named Sam Adondakis was working at the time as a confidential informant, and the U.S. Attorney's office asserted in the warrant application that he told FBI agents that Mr. Ganek participated in an insider-trading scheme involving Dell. . . . We now know Mr. Adondakis never said this to the FBI. To his knowledge, he said, his boss had never engaged in insider trading . . . An FBI agent also disavowed 'confusion' to explain the warrant application, noting that 'I was certain that Mr. Adondakis was not saying that he specifically told Mr. Ganek that the information was coming from someone at Dell.' Asked again for emphasis, the FBI agent repeated his statement."

  - "So the question is how the false accusation made it into the warrant. . . . The history of the Level Global case—the raid, the media tip-offs, the legal inventiveness—suggests a false allegation wasn't an accident. The goal was to arraign hedge-fund managers and CEOs, not merely their minions, and then to try these unpopular defendants on the evening news."

- Fayad Abbassi (2011): In 2011, Susan Pulliam, Michael Rothfeld and Jenny Strasburg of the *Wall Street Journal* revealed that a young analyst named Fayad Abbassi, "of Neuberger Berman [was] among those against whom investigators [were] pursuing charges, *according to people familiar with the matter*" and provided details of those purported forthcoming charges. Mr. Abbassi was never charged but he was immediately placed on leave from his job following the leak.

  - *See* **Michael Rothfeld, Jenny Strasburg, & Susan Pulliam,** *More Charges Set for Insider Probe*, Wall St. J. (Dec. 1, 2011) (Schoeman Decl. Ex. CC).

    - "Federal authorities are pursuing charges against individuals at three prominent investment firms, including a large mutual-fund company, in a new

phase of a high-profile insider-trading case that has shaken Wall Street, <u>according to people familiar with the matter</u>."

- "Investigators are focusing on an <u>analyst</u> at mutual-fund firm <u>Neuberger Berman</u> Group LLC and <u>traders</u> who worked at hedge funds <u>Diamondback</u> Capital Management LLC and <u>Level Global</u> Investors LP, <u>the people say.</u> <u>Law-enforcement officials expect charges against the individuals to be filed by mid-December, the people say</u>."

- "The expected charges come at a time when two former research analysts at Level Global and Diamondback—Spyridon 'Sam' Adondakis and Jesse Tortora, respectively—have been <u>cooperating with the federal investigation, according to people familiar with the matter</u>."

- <u>Michael Steinberg (2013)</u>: In 2013, Michael Rothfeld and Jenny Strasburg of the *Wall Street Journal* publicized details of the government's investigation of Mr. Steinberg, including that "[a]uthorities [were] currently [] preparing to present evidence to a grand jury …, *according to a person familiar with the investigation.*" *See* Michael Rothfeld and Jenny Strasburg, *Ex-Analyst at SAC Felt Pressured for Tips*, Wall St. J. (Feb. 14, 2013) (Schoeman Decl. Ex. DD) (emphasis added). Later, Jenny Strasburg was tipped off regarding the return of the grand jury indictment and was outside Mr. Steinberg's apartment when he was arrested at 6am, which she captured on film. *See* Jenny Strasburg, *SAC Capital Trader Michael Steinberg Arrested*, Wall St. J. Video (March 29, 2013). The government ultimately dismissed all charges against Mr. Steinberg but not until it had dragged him through a lengthy trial.

  - *See* **Michael Rothfeld & Jenny Strasburg**, *Ex-Analyst at SAC Felt Pressured for Tips*, Wall St. J. (Feb. 14, 2013) (Schoeman Decl. Ex. DD).

    - "A former analyst at SAC Capital Advisors <u>told federal criminal investigators</u> that he was pressured by his manager to gather inside information on technology stocks, <u>according to people familiar with the briefing</u>. The Federal Bureau of Investigation and the Manhattan U.S. Attorney's office now are using the statements from the analyst to try to build a case against the SAC portfolio manager, Michael Steinberg, and others that <u>could result in charges in the coming months, these people said. Authorities currently are preparing to present evidence to a grand jury against Mr. Steinberg, according to a person familiar with the investigation</u>."

    - "Mr. Horvath was interviewed again on Jan. 23 by a federal prosecutor and the FBI at the office of the Manhattan U.S. Attorney in preparation for possible criminal charges against Mr. Steinberg and others, <u>the people familiar with the meeting said. That meeting, the pending grand jury presentation and Mr. Horvath's statements to investigators that he was encouraged to develop inside information, haven't previously been reported</u>."

- "Investigators continue to examine the actions of several people involved or mentioned in email exchanges in August 2008 between Messrs. Steinberg and Horvath about a coming earnings announcement for Dell, <u>the people familiar with the matter said</u>."

- <u>Sanjay Valvani (2016)</u>: In April 2016, the *Wall Street Journal* revealed that Sanjay Valvani was the target of an insider-trading investigation. Following publication of the article, Mr. Valvani was placed on paid administrative leave – not because his employer believed he did anything wrong (indeed, it told its investors it did *not* so believe), but because the article identifying him as the target of the criminal investigation made it too difficult for him to do his job – instantly decimating his reputation and ending his theretofore unblemished and highly successful 15+ year career in the securities industry. Following the article, counsel to Mr. Valvani raised concerns about the leak with the government. (Letter to USAO from Berke, April 25, 2016) (Schoeman Decl. Ex. EE). Even though the USAO and the FBI were well aware of the prior leaks in Mr. Walters' case, the USAO brushed off the concerns in a response that stated: "[t]he Government understands its obligations when conducting a grand jury investigation, takes all practicable measures to ensure that grand jury information is not made public, and takes seriously any publication of information regarding an ongoing investigation." (Letter to Berke, April 28, 2016) (Schoeman Decl. Ex. FF). As this Court no doubt is aware, Mr. Valvani was subsequently indicted, and days later tragically took his own life, never wavering from the assertion of his innocence.

  - *See* Christopher M. Matthews & **Gregory Zuckerman**, *Insider Trading Is Focus of Probe Into Visium*, Wall St. J. (April 8, 2016) (Schoeman Decl. Ex. GG).

    - "Federal prosecutors have zeroed in on one current and several former employees of hedge fund Visium Asset Management LP as they determine whether to file criminal insider-trading charges, <u>according to people familiar with the matter</u>. <u>Prosecutors</u> are focused on the trading of several pharmaceutical stocks at the $8 billion firm, <u>the people said</u>. <u>They have indicated in meetings with defense lawyers</u> that they believe insider trading may have occurred."

    - "As part of the investigation into Visium, the <u>U.S. attorney's office has targeted Sanjay Valvani</u>, a current partner and portfolio manager who focuses on pharmaceutical shares, <u>the people familiar with the matter said</u>. The identities of the former employees under investigation couldn't be determined. <u>The probe is at an advanced stage, the people said</u>."

    - "<u>Defense lawyers have argued privately to prosecutors</u> that the trades under investigation weren't illegal, <u>said one of the people familiar with the matter</u>.

- 41 -

As noted above, these examples are drawn only from cases where individuals were being investigated for insider trading out of the FBI's New York Office, where we believe SSA Chaves supervised the squad responsible for these investigations.

### 3.    Post-Indictment:  The USAO Falsely Denies the Prior Misconduct

After Mr. Walters raised the possibility of illegal leaking by the government in his initial motion papers, the USAO submitted an opposition memorandum and a declaration that repeatedly denied what the USAO knew to be true as early as May, and no later than June, 2014: that one or more government agents were the source of the illegal leaks.  The USAO's papers also contain a number of highly misleading statements.

In his Pretrial Motion, Mr. Walters alleged that "the government engaged in a pattern of improper conduct, including . . . leaking grand jury information to the press, as part of a concerted effort to breathe life into a flagging investigation."  Defendant's Memorandum of Law in Support of Defendant William T. Walters's Pretrial Motion for a Bill of Particulars, *Brady* Material, and a Hearing to Address Government Misconduct, *United States v. Walters*, S1 16 Cr. 338 (PKC) (Sep. 23, 2016), ECF No. 42 at 2.  He further alleged that this "appears to have been an attempt to prod Mr. Walters and other targets of the investigation to engage in incriminating conduct."  *Id.*

We now know that both of these statements are absolutely true, and that what Mr. Walters alleged occurred is in fact exactly what happened.  More importantly, we now know that the USAO knew about the illegal leaking as early as mid-2014, when the *Journal* and *Times* articles first appeared, and certainly no later than June 12, 2014, when the number two person in the USAO was expressly told by a *New York Times* reporter that at least one source of the leaks was someone at the FBI.  (USAO Submission Ex. F, ECF No. 65-7).

- 42 -

And yet, in its opposition to Mr. Walters' Pretrial Motion, filed on October 21, 2016, the USAO repeatedly, emphatically and without any qualification falsely denied that the source of the leaks was an "agent" or "attorney" for the government:

- Walters cannot "demonstrate that the source of the information was a member of the prosecution team" and the record "cannot support a finding that the source of the information was an attorney or agent for the Government." Government's Memorandum of Law in Opposition to Defendant's Motion for a Bill of Particulars, *Brady* Material, and a Hearing, *United States v. Walters*, S1 16 Cr. 338 (PKC) (Oct. 21, 2016), ECF No. 43 ("Opp. Mem.") at 32-33.

- "Walters cannot demonstrate that the source of the information was an attorney or agent of the Government" and "a sworn declaration submitted by the prosecutor responsible for this investigation at the time of the published reports persuasively rebuts this argument." *Id.* at 44-45.

- Walters "cannot demonstrate that the source of the information was 'likely' an agent or attorney for the Government" and "the natural and logical inferences lead to the conclusion that the source was not a Government official." *Id.* at 47, 55; *id.* at 52-53 (Walters "cannot show that the source of the information contained in the articles was an agent or attorney for the Government").

- "[T]he declaration submitted under oath by the prosecutor principally responsible for the investigation in May and June 2014 rebuts any notion that a Government attorney or agent provided grand jury materials to the press." *Id.* at 55-56.

More generally, the USAO misleadingly disparaged Mr. Walters' claims as "a fishing expedition" and "nothing more than unfounded speculation," Opp. Mem. at 2, falsely claimed that his "baseless accusations are undermined by the facts," *id.* at 32-33, and stated unequivocally that the allegations of misconduct "are not" true, *id.* at 58. The USAO's papers also denied there were "leaks of grand jury material," *id.* at 2, and denied that the *Journal* or *Times* articles "include[d] any information related to a grand jury investigation," *id.* at 32-33.

Now that the truth has begun to emerge, the USAO has conceded that the reality was something very different, i.e., (a) the articles "contained a significant amount of confidential information about the Investigation, including its subjects, particular stock trades and tipping

- 43 -

chains under investigation, potential illegal trading profits, and the consideration of the use of particular investigative techniques" (USAO Submission at 10), (b) "some of the confidential information disclosed might have come from grand jury subpoenas," and (c) the Court should "assume that a Rule 6(e) violation occurred," *id.* at 2, 11.

As indicated above, the USAO opposition brief also was supported by a Declaration from AUSA Kasulis, who supervised the investigation back in 2014. As described previously, paragraph 12 of his Declaration, which as the government emphasized was submitted "under oath" (Opp. Mem. at 55), contains the highly problematic statement that "[o]n or about May 13, 2014, the USAO learned from the FBI press office that the *Wall Street Journal would not be able to publish* a story about our investigation until May 22, 2014 at the earliest, and that it might well be later." (Kasulis Decl. ¶ 12) (emphasis added). *See also* Opp. Mem. at 34 (stating that "the Government came to understand that the *Journal would not be prepared to publish* the article until at least May 22") (emphasis added). We now know that the truth is not that the *Journal* "would not be able" or "would not be prepared" to publish their story until May 22, 2014, but instead that the *Journal* had agreed not to do so based on a meeting, request and phone call from the FBI, facts that the senior leadership of the USAO, including AUSA Kasulis, appear to have been aware of back in 2014. The email updates that Kasulis and others received from Margolin on May 29, 2014 under the subject line Re: Wire/WSJ (which the USAO has produced only in a truncated form) clearly indicate knowledge of the FBI's deal with the *Wall Street Journal.* (USAO Submission Ex. B, ECF No. 65-3).

Similarly, in paragraph 14, the Kasulis Declaration goes on to say:

> On or about May 27, 2014, however, I learned that the SEC had just received a call from a reporter at the *New York Times*, which was also considering publishing an article about our investigation into potential insider trading by Walters and others. Realizing that

> there was virtually no chance that both papers would hold off on
> their stories for a significant period of time, on or about May 27,
> 2014, the USAO and the FBI made plans to conduct approaches of
> Phil Mickelson and Thomas Davis.

(Kasulis Decl. ¶ 14).  This too is highly misleading, since we now know that the reason the

*Journal* published is that the FBI told the *Journal* that the *Times* was working on an article –

which is clear from the email that AUSA Kasulis and his supervisors received from Margolin.

(USAO Submission Ex. B, ECF No. 65-3).  If the FBI had not tipped the *Journal* about the

*Times*, neither one likely would have published at that point.

> In addition, the declaration submitted by the USAO states:

> I am aware of the additional media stories about this investigation
> published in 2014.  At no time did I disclose any information
> presented in this case to the grand jury (or any information related
> to the investigation at all) to any member of the press. I also spoke
> with Special Agent Thoresen, who confirmed that at no time did he
> disclose any information presented in this case to the grand jury (or
> any information related to the investigation at all) to any member
> of the press.

(Kasulis Decl. ¶ 17).  Again, as we now know, as of June 2014 at the very latest, the U.S.

Attorney and his entire senior team were aware and had been expressly told that someone at the

FBI was a source of the leaks.  (USAO Submission Ex. E, ECF No.65-6 & Ex. F, ECF No. 65-7;

*id.* at 4 ("In June 2014, *Times* reporter Protess told Zabel (then the Deputy U.S. Attorney) that

Protess's sources (whom he did not name) on the Investigation included *a man at the FBI* and

someone at the" SEC) (emphasis added).  In addition, SA Thoresen had emailed AUSA Kasulis

about the leaks on June 1, calling them "[d]eplorable and reprehensible."  (USAO Submission

Ex. D, ECF No. 65-5).  In the face of all of this knowledge of the leaks, the USAO's submission

of a Declaration stating that one particular FBI agent was not the source of the leaks – when it

knew another agent (and perhaps more than one) was – is at best a highly misleading half-truth.

KL3 3109083.1

It is also deeply troubling that in preparing the Kasulis Declaration for submission to this Court, the USAO apparently spoke to and included a denial from the one FBI agent who *did not* attend the May 27, 2014 meeting with the *Journal* – case agent Thoresen – even though the USAO knew that five other FBI agents, including SSA Chaves, had met with the *Journal*, and at least one of those five (Sinos) – if asked – presumably would have disclosed (as he later did) that in fact the FBI did "confirm[] certain information the *Journal* reporters described" at the meeting. (USAO Submission at 6-7). Moreover, as we now know, SSA Chaves apologized to case agent Thoresen shortly after the May 27 meeting, because "he (Chaves) felt partly responsible for the [*Journal* and *Times*] articles given what had been said at the FBI's May 27 meeting with the *Journal*," thereby indicating to Thoresen that information had been leaked at the meeting. *Id.* at 9. Finally, even after the truth began to be disclosed with the filing of the USAO Submission, the government "reaffirmed the accuracy of the affidavit [Kasulis] previously had submitted to the Court." (USAO Submission at 2).

## ARGUMENT

I.      **Legal Background: Grand Jury Secrecy and the Illegal Conduct of SSA Chaves**

The Supreme Court has "consistently . . . recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," *Douglas Oil Co. of Cal. v. Petrol Stops NW.*, 441 U.S. 211, 218 (1979) (citation omitted), and has "consistently stood ready to defend it against unwarranted intrusion." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983). Rule 6(e) of the Federal Rules of Criminal Procedure codifies the "strong historic policy of preserving grand jury secrecy" by providing that the government is "forbidden to disclose matters occurring before the grand jury." *Id.* at 425, 428; *see also* Fed. R. Crim. P. 6(e)(2)(B)(iv). "Both the direct and indirect disclosure of information are proscribed." *In re Grand Jury Matter*, 682 F.2d 61, 63 (3d Cir. 1982).

Disclosing who received a grand jury subpoena, the focus and direction of a grand jury investigation, or records obtained via grand jury subpoena violates Rule 6(e). *See, e.g.*, *Hodge v. FBI*, 703 F.3d 575 (D.C. Cir. 2013); *Germosen v. Cox*, No. 98-cv-1294 (BSJ), 1999 WL 1021559 (S.D.N.Y. Nov. 9, 1999). So does identifying an individual as the target of a grand jury investigation. *See, e.g.*, *Martin v. Consultants & Admins., Inc.*, 966 F.2d 1078, 1097 (7th Cir. 1992) (explaining that Rule 6(e) can cover an FBI report closely related to a grand jury investigation where disclosure "would reveal the identities of targets and other witnesses"); 1 Wright & Miller, *Federal Practice & Procedure Criminal* § 106 (4th ed. Apr. 2016 Update) ("[T]he identity of the target and subjects of the investigation, the names of the witnesses, the names of jurors, and the documents, testimony and other evidence being presented [to the grand jury] are all covered by the secrecy rule.") (citations omitted). And here, of course, the government does not deny and has asked the Court to "assume that a Rule 6(e) violation occurred" (USAO Submission at 2) and has conceded that it "treats all information obtained pursuant to grand jury subpoena, including the contents of documents, as material subject to the secrecy protections of Rule 6(e)(2)." (Opp. Mem. at 40-41 n.10).

In addition, as Your Honor pointed out at the December 21, 2016 appearance, Transcript of Hearing at 8-9, *United States v. Walters*, S1 16 Cr. 338 (PKC) (S.D.N.Y. Dec. 21, 2016), leaking secret grand jury and confidential law enforcement information for an improper purpose can constitute the crime of obstruction of justice under 18 U.S.C. § 1503. *See The New York Times Co. v. Gonzales*, 459 F.3d 160, 163 (2d Cir. 2006) (unauthorized disclosures of "impending law enforcement actions by a government agent can constitute a violation of federal criminal law, . . . including the felony of obstruction of justice, 18 U.S.C. § 1503(a)"); *United States v. Brenson*, 104 F.3d 1267, 1276 (11th Cir. 1997) ("[A] person who improperly reveals

- 47 -

grand jury information in violation of Rule 6(e)(2) can be convicted for obstruction of justice...."); *United States v. Saget*, 991 F.2d 702, 713 (11th Cir. 1993) ("Any person who knowingly violates Rule 6(e)(2) . . . or induces or attempts to induce another person to violate the Rule may be convicted for obstruction of justice under § 1503." (internal quotation marks omitted)); *United States v. Forman*, 71 F.3d 1214, 1220 (6th Cir. 1995) (even "one who divulges grand jury materials but is not subject to Rule 6(e)(2) is still liable to prosecution under 18 U.S.C. § 1503 for obstruction of justice"); *United States v. Nobrega*, No. 1:10-cr-00186 (JAW), 2015 WL 8082455, at *3 (D. Me. Dec. 7, 2015) ("Individuals who violate the secrecy of grand jury proceedings may be subject to criminal prosecution under 18 U.S.C. § 1503."); *In re Grand Jury Proceedings, Special Grand Jury 89-2*, 813 F. Supp. 1451, 1465 n. 10 (D. Colo. 1992) ("Courts have held that a prosecution for obstruction of justice under 18 U.S.C.A. § 1503 is appropriate when an individual has violated Rule 6 during the pendency of a proceeding.").

Finally, improperly disclosing the existence of a sealed wiretap or the contents of that application, or the substance of calls recorded pursuant to such a wiretap, are illegal under 18 U.S.C. §§ 2518(8)(a)-(c), 2517(2) and 2520(g).

## II.   The Indictment Should be Dismissed Because there are "Grave Doubts" about whether the Government's Illegal, Criminal Conduct Influenced the Grand Jury's Decision to Indict

The Supreme Court has made clear that a district court may invoke its supervisory power to dismiss an indictment where it can be shown that government misconduct during the grand jury process "substantially influenced the grand jury's decision to indict, or if there is a *grave doubt* that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (citation and quotations omitted, emphasis added). *Accord United States v. Williams*, 504 U.S. 36, 46 (1992) ("the supervisory power can be used to dismiss an indictment because of misconduct before the grand jury");

- 48 -

*United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990) (noting the court's power to "dismiss an

indictment for prosecutorial misconduct" before the grand jury pursuant to "our supervisory

power," and citing the *Bank of Nova Scotia* standard as one basis for doing so).[15]

   Courts have invoked their supervisory powers to dismiss indictments under *Bank*

*of Nova Scotia* for a wide range of government misconduct, including improper and/or illegal

investigative techniques by law enforcement agents – as here. *See, e.g., United States v. Castro-*

*Gonzalez*, No. 13-cr-0693 (AJB), 2014 WL 3490506, at *2-3 (S.D. Cal. July 11, 2014)

(dismissing indictment with prejudice based on "bad faith and misconduct of case agent," who

concealed from grand jury, prosecutor and court that the evidence against defendant in narcotics

case was obtained while defendant was working as a confidential informant); *United States v.*

*Sabri*, 973 F. Supp. 134, 148 (W.D.N.Y. 1996) (dismissing count of indictment under

"supervisory power" where, at the direction of the FBI, the government manipulated the

attorney-client relationship in order to obtain evidence against the defendant, noting that this law

enforcement technique threatens "the integrity of the judicial process"); *United States v.*

*Marshank*, 777 F. Supp. 1507, 1521, 1528-29 (N.D. Cal. 1991) (dismissing indictment where

government agents and the prosecutor "collaborated with [the defendant's] attorney to build a

---

[15]*Williams* clarifies that supervisory dismissal power is available "at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" and specifically cites Fed. R. Crim. P. 6(e) – which was repeatedly and deliberately violated here – as one such rule. 504 U.S. at 46 & n.6 (citation omitted). The obstruction of justice statute, 18 U.S.C. § 1503(a), which as explained above reaches willful violations of grand jury secrecy, surely is another such rule. So too is 18 U.S.C. §§ 2518(8)(a)-(c), which make it unlawful and contemptuous to disclose the contents of any sealed wiretap application or communication. *Williams* in fact cites a number of similar criminal provisions in Title 18 setting "standards of behavior for prosecutors (and others)." 504 U.S. at 46 n.6.

KL3 3109083.1

case against him," noting that it was invoking its supervisory power, among other reasons, "to preserve judicial integrity, and to deter future government misconduct").[16]

The prejudice inquiry under *Bank of Nova Scotia* "must focus on whether any violations had an effect on the grand jury's decision to indict," 487 U.S. at 263, *not* on whether the "grand jury's independence was infringed" *Id.* at 259. For example, one allegation at issue in *Bank of Nova Scotia* centered on the government's conduct outside the grand jury, granting "pocket immunity" to multiple witnesses. The Supreme Court explained that *if* "the Government had threatened to withdraw immunity from a witness in order to manipulate that witness' testimony, this might have given rise to a finding of prejudice." *Id.* at 262 (finding that any such threat in this case "cannot be ascribed to governmental misconduct"). Another allegation in *Bank of Nova Scotia* was that "a prosecutor was abusive to an expert defense witness during a recess and in the hearing of some grand jurors." *Id.* at 261. The Supreme Court found no prejudice because the expert "himself testified that his testimony was unaffected by this misconduct" and the prosecutor told the grand jurors to disregard the conversation. *Id.* In *Bank of Nova Scotia,* the Supreme Court's ultimate conclusion that the alleged misconduct did not have an effect on the grand jury's decision was based on a factual record that the district court developed over 10 days of evidentiary hearings. *Id.* at 253.

---

[16] Numerous courts have also dismissed under *Bank of Nova Scotia* based on government misconduct that occurs in the grand jury room. *See, e.g., United States v. Bowling*, 108 F. Supp. 3d 343, 352-53 (E.D.N.C. 2015) (dismissing several counts because the indictment was based on an erroneous legal instruction to the grand jury); *United States v. Stevens*, 771 F. Supp. 2d 556, 566-68 (D. Md. 2011) (dismissing indictment because prosecutor gave the grand jury erroneous legal instruction); *United States v. Cerullo*, No.05-cr-1190 (BEN), 2007 WL 2683799, at *1-4 (S.D. Cal. Sept. 7, 2007) (dismissing indictment where prosecutor and government agent repeatedly misled the grand jury); *United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (dismissing indictment because of misleading statement of law and inaccurate testimony before the grand jury).

- 50 -

KL3 3109083.1

Here, unlike in *Bank of Nova Scotia*, the record, even without further development with the participation of defense counsel, raises "grave doubts" as to whether the government misconduct "had a substantial effect on the grand jury's decision to indict."  As to the misconduct, the record clearly demonstrates that at least one supervisory FBI agent, and likely others, deliberately and systematically misused and abused the grand jury process, leaking secret and confidential grand jury investigative information to the press as part of an investigative strategy to revive a "dormant" or moribund investigation.  The leaks violated the secrecy provision of Rule 6(e) and were criminal acts of obstruction of justice under 18 U.S.C. 1503(a); they also appear to have included one or more violations of the wiretap non-disclosure provisions, 18 U.S.C. §§ 2518(8)(a)-(c), 2517(2) and 2520(g).  The evidence further establishes that the most senior supervisory personnel at the FBI, as well as the USAO, were aware of the leaks shortly after they began, but decided not to undertake any investigation to determine the source of the leaks or to stop them, thus allowing the misconduct to continue and reaping its ill-gotten rewards.

But for the illegal and criminal leaks to the press, and the FBI and USAO decisions not to stop them, there is at the least "grave doubt" that Mr. Walters ever would have been indicted.  The evidence now revealed makes perfectly clear that the investigation had become "dormant"; that is why SSA Chaves began the leaks; and the illegal use of the leaks to try to revive and build the case against Mr. Walters was well understood by the Assistant Director in Charge of the New York Office of the FBI, who wrote on May 30 – in response to the leaks in the *Journal* – that "[i]f we don't have enough evidence by now its [sic] over." (USAO Submission Ex. C, ECF No. 65-4).

We also know that the leaks were successful, and the "dormant" investigation was in fact revived. In part, the government agent(s) traded the secret and confidential grand jury investigation information in exchange for a promise from at least one reporter to share information she learned about Mr. Walters and others, which she did (although we do not know, and may never know, the details of that information).[17] In part, the illegal and criminal leaks were intended to generate press coverage that might cause the targets to make statements that the government was recording on a wiretap and could later argue were incriminating, which is exactly what happened (although as noted above, Mr. Walters contends the conversations are not inculpatory). And in part, the illegal and criminal leaks were intended to scare and pressure the targets into committing other incriminating acts or even cooperating, and both of those things happened as well when Mr. Davis first spoliated a cellphone allegedly provided by Mr. Walters, and later decided to reverse his repeated claims of innocence and cooperate against Mr. Walters. The FBI and USAO's decisions not to investigate to determine the source of the leaks and put an immediate stop to them allowed these criminal perversions of the grand jury investigative process to continue for more than a year, as the government continued to reap the benefits of its agents' unlawful conduct.

In sum, on the record now before this Court, there is more than sufficient proof, both direct and circumstantial, to find that some or all of the evidence obtained through the

---

[17] To the extent SSA Chaves continues to assert his Fifth Amendment privilege as to questions such as what information he obtained from Ms. Pulliam in exchange for his illegal leaks, Mr. Walters is entitled to an adverse inference that those leaks in fact generated material information that substantially impacted the investigative process and the grand jury decision to indict. *See Orena v. United States*, 956 F. Supp. 1071, 1093-94 (E.D.N.Y. 1997) (explaining basis for drawing adverse inference against government based on FBI agent's invocation of Fifth Amendment privilege); *United States v. Colasuonno*, No. 05-cr-1110 (AKH), 2006 WL 3025880 (S.D.N.Y. Oct. 24, 2006) (allowing adverse inference against witness called by the government who invoked Fifth Amendment privilege).

KL3 3109083.1

illegal and criminal misuse and abuse of the grand jury's investigative powers, the multiple

violations of Rule 6(e), 18 U.S.C. § 1503(a), 18 U.S.C. §§ 2518(8)(a)-(c), 2517(2) and 2520(g),

and the FBI and USAO's failures to put an end to them, "substantially impacted" the grand

jury's decision to indict.  At the very least, and in the absence of any evidence whatsoever in the

USAO submission refuting the overwhelming likelihood of "substantial impact," there is "grave

doubt" that the grand jury's decision to indict Mr. Walters was free from the "substantial

influence" of the shocking, repeated, illegal and criminal government misconduct in this case.

Either is sufficient under *Bank of Nova Scotia* to require dismissal.

III.     **The Indictment Should be Dismissed Based on Systematic and Pervasive**
         **Government Misconduct Spanning Several Cases**

         *Bank of Nova Scotia* provides a second, independent basis for dismissing the

indictment where – as here – the record demonstrates "a history of prosecutorial misconduct,

spanning several cases, that is so systematic and pervasive as to raise a substantial and serious

question about the fundamental fairness of the process which resulted in the indictment."  487

U.S. at 259.  *See also United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990) (citing *Bank of

Nova Scotia* and the "systematic and pervasive" "history of prosecutorial misconduct" as a

"possible[]" basis for dismissal under the court's supervisory power).

         As Judge Edelstein explained in *United States v. Felton*, "[t]his standard

articulated in *Bank of Nova Scotia* and examined in *Brito* makes it possible for a court to exercise

its supervisory powers to dismiss an indictment for prosecutorial misconduct *that does not itself

rise to the level of prejudicing the defendant* if the court finds that the prosecutor's misconduct

was nevertheless part of history that is so systematic and pervasive as to undermine fundamental

fairness." 755 F. Supp. 72, 76 (S.D.N.Y. 1991) (emphasis added). *See also United States v.

Mendez-Hernandez*, No. S-89-cr-323 (SWK), 1990 WL 64600, at *2 n.2 (S.D.N.Y. May 7,

1990) ("The *Bank of Nova Scotia* Court distinguished the case before it, to which the prejudice standard applied, from a case involving 'a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment.'") (citation omitted), *aff'd sub nom. United States v. Almonte*, 948 F.2d 1276 (2d Cir. 1991); *United States v. Fisher*, 692 F. Supp. 495, 502-03 (E.D. Pa. 1988) (same).

When Justice Kennedy wrote about "systematic and pervasive" misconduct in *Bank of Nova Scotia,* he probably could not have imagined a federal court would one day be presented with a factual record showing that over the course of multiple cases spanning several years, the FBI – with at least the tacit approval of the USAO – had used illegal and criminal leaks of secret and confidential grand jury information, including as part of a *quid pro quo* exchange of information with the press, as one of its core investigative practices to build white-collar cases. And even after the brazen leaking in Mr. Walters' case, which both the FBI and USAO knew about in mid-2014, similar leaking took place and was ignored in subsequent cases, and defense complaints about the leaks continued to be brushed aside, including as late as 2016. Shockingly, that is the record that is now before this Court.

We submit that one cannot read the recitation of news articles cited above concerning Mr. Walters' case, and compare them to the recitation of news articles about the five examples of additional insider trading cases, and not come to the conclusion that there is a very high likelihood – if not near certainty – that SSA Chaves and perhaps others at the FBI, with at least tacit approval from the USAO, followed a similar illegal and criminal investigative approach of leaking information in order to build their cases in these other matters as well. In each of the five other cases, one or more of the same reporters to whom SSA Chaves leaked in

- 54 -

KL3 3109083.1

Mr. Walters' case wrote stories that similarly attributed what is obviously secret and confidential grand jury investigation information to "people familiar with" the investigation or the matter – just as the reporters did in the articles about Mr. Walters. In several of the cases, attorneys for the targets complained to the USAO, but there is no indication that anything was ever done to investigate, much less stop, this clear pattern of illegal leaks.

In addition, given the evidence in the USAO Submission about SSA Chaves' comfort level and familiarity with the reporters, with whom he dined repeatedly and shared exchanges on a personal phone and personal email, logic and common sense suggest it is highly unlikely, if not implausible, that this was the first case in which he leaked information to and made a deal with these (or other) reporters. As the government itself is often heard to ask rhetorically, is it reasonable to believe SSA Chaves got caught the very first time he engaged in this illegal and criminal behavior? We think not, especially given the strong evidence to the contrary. Nor is it reasonable to believe that Chaves, a squad supervisor who has since been promoted, engaged in a sustained pattern of leaking that brought incredible publicity to the highest profile white-collar cases without the approval or tacit acquiescence of certain of his own supervisors at the FBI and his law enforcement partners at the USAO.

We would expect that in conducting its belated investigation, the USAO asked SSA Chaves whether he had leaked similar information in any of his prior cases. But as of right now, we do not the answer to that question, or even if it was posed. We would also expect that the USAO and the FBI reviewed SSA Chaves' emails in connection with the many other cases in which he was involved, either as an active case agent or a supervisor, to see if there were similar communications with members of the press. But again, we do not know if that review was done and, if so, the results it yielded.

- 55 -

In the face of the record we do have, we respectfully submit that unless the government submits persuasive evidence to refute the apparent pattern of illegal FBI leaks in these other cases, Your Honor already has a more than sufficient basis to dismiss the indictment under *Bank of Nova Scotia*'s "systematic and pervasive" test. At the very least, as we argue in Point V, below, Mr. Walters is entitled to discovery and a hearing to challenge any evidence the government may come forward with on this issue, and to further develop the evidence of misconduct in this and other cases, and thereby to demonstrate Mr. Walters' entitlement to dismissal of the indictment on this additional basis under *Bank of Nova Scotia.*

IV.     **The Indictment Should Also be Dismissed for Outrageous Government Misconduct**

The illegal government misconduct vis-à-vis Mr. Walters was not limited to the leaking and bartering of secret and confidential grand jury information. As detailed above, it also involved misconduct by both the FBI and the USAO, both of which decided not to investigate and put a stop to these illegal and criminal acts, even though both agencies knew about the leaks at the time they were occurring. And when Mr. Walters raised these issues in a motion to this Court, the government responded with highly misleading papers and a declaration under oath that both hid and misstated the truth. Considered as a whole, we respectfully submit that the totality of this unprecedented government misconduct is so outrageous that it provides an additional basis for this Court to dismiss the indictment as a matter of due process.

"A Court may dismiss an indictment when 'the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction[.]'" *Sabri*, 973 F. Supp. at 146 (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)); *see also United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) ("[I]f the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a

- 56 -

conviction, if the government's conduct reached a demonstrable level of outrageousness."). The Second Circuit has emphasized that "the existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience,' regardless of the extent to which it led the defendant to commit his crime." *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (citation omitted). The central question is whether the conduct is so outrageous that "common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction." *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011). And while the "burden of establishing outrageous investigatory conduct is very heavy," *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999), it is not insurmountable, *see, e.g.*, *Sabri*, 973 F. Supp. at 147 (dismissing a charge for outrageous government conduct based on "manipulation of the attorney-client relationship"); *Marshank*, 777 F. Supp. at 1523–24 (finding outrageous government conduct under *Russell* and dismissing indictment where agents and prosecutors cooperated with defense counsel, and hid this cooperation from the court).

      *Cuervelo* is instructive. That case involved a claim of outrageous government misconduct in the form of sexual relations between the defendant and a federal undercover agent. The Second Circuit framed as a central issue whether "sex was used deliberately by [a government agent] as a law enforcement tool in the investigative campaign." 949 F.2d at 568. So too here, we submit a central question of whether the government conduct was sufficiently "outrageous" to warrant dismissal is whether the Special Agent's illegal, criminal leaking and bartering of secret grand jury information was used deliberately as a law enforcement tool in the investigation of Mr. Walters. Clearly it was, as is fully supported by the record now before this Court. Indeed, we would submit that the combination of government misconduct here is even more "outrageous" than the sexual relations that the Second Circuit suggested could rise to the

- 57 -

level of "outrageous government conduct" sufficient to warrant dismissal of an indictment. Using sex to further a criminal investigation may be immoral (and it may even implicate a constitutional right to privacy, as the defendant in *Cuervelo* argued); but leaking and bartering secret grand jury information to further a criminal investigation both violates a specific Federal Rule of Criminal Procedure 6(e) and constitutes the felonious criminal act of obstruction of justice under 18 U.S.C. § 1503(a).

In addition, here, unlike in *Cuervelo*, the record shows not just "outrageous conduct" by a government investigating agent, but also a decision not to investigate or stop the illegal misconduct once it became known to both supervisory FBI officials and the USAO, which has now admitted that it was told and knew as of June 2014 that someone at the FBI was illegally leaking information to the press. And, when Mr. Walters put the evidence of government misconduct in a motion to this Court, the government responded with papers that denied and misrepresented the true facts. Finally, it is highly significant that the U.S. Attorney himself called the illegal leaks "outrageous" and the non-leaking FBI case agent described them as "[d]eplorable and reprehensible." (USAO Submission Exs. D, ECF No. 65-5, & E, 65-6)[18]

Forty-three years ago, in the *Russell* case, the Supreme Court anticipated precisely the kind of outrageous government conduct that is now before this Court – "a situation in which

---

[18] In *Cuervelo*, the Second Circuit wrote that "to obtain dismissal of an indictment based upon a claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous behavior in connection with the alleged criminal events and that due process considerations bar the government from prosecuting her." 949 F.2d at 565. While the "in connection with the alleged criminal events" language made sense in the factual context of that case, where the allegation was that the government's outrageous conduct was intertwined with the criminal conduct for which it sought to prosecute the defendant, there is no logical reason why it would be a strict requirement for dismissal in different factual circumstances where – as here – the outrageous government conduct comes during the investigation and prosecution of the crime and includes a pattern of illegal and criminal acts by law enforcement to further the investigation, the complicity of FBI superiors and the prosecutor's office, and submissions to the Court that contain false and misleading denials of the outrageous conduct.

KL3 3109083.1

the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." 411 U.S. at 431-32. In explaining why the case before it was "distinctly not of that breed," the *Russell* court emphasized that the government "violated no independent constitutional right of the respondent" and also did not "violate any federal statute or rule or commit any crime in infiltrating the respondent's drug enterprise." *Id.* at 430. Here, the same cannot be said. Here, the Special Agent deliberately, repeatedly violated a Federal Rule of Criminal Procedure designed to protect the integrity of grand jury process and those under investigation, and in so doing he also committed obstruction of justice and violated the wiretap laws. He committed these plainly illegal acts to further an investigation. His use of illegal leaks to pressure and communicate with Mr. Walters continued even after Mr. Walters invoked his right to counsel. The agent's superiors decided not to do anything meaningful to investigate or stop the illegal conduct of one (or more) of its own. The prosecutor's office also decided to do nothing, and then attempted to hide the truth from this Court.

We respectfully submit that this is one of those rare cases where the outrageous conduct at issue – considered in its entirety – is the kind of situation the *Russell* court had in mind when it penned the sentence that gave rise to the outrageous governmental conduct doctrine. The indictment should be dismissed for violating due process.

## V.    Mr. Walters is Entitled to an Evidentiary Hearing and Discovery to Further Develop the Record

We believe the record is more than sufficient to support dismissal of the indictment now, and without further factual development, for the reasons set out above. But if the Court does not find the current record sufficient to dismiss the indictment, at the very least Mr. Walters is entitled to a hearing to further develop the facts to support this motion.

- 59 -

First, Mr. Walters should not be required to simply accept the government's version of what happened here. The USAO has an obvious conflict of interest here in investigating the agents and agency it worked and continues to work so closely with in this and other investigations, especially where, as the Court observed, the FBI has the discretion to bring its best and highest profile cases to a number of different prosecutorial offices. (Tr. 38-39). The USAO has even more of a conflict of interest in investigating its own involvement and complicity in the illegal and criminal conduct here, particularly where there are clear conflicts between its own version and the FBI's version of what occurred. And yet all Mr. Walters and the Court have at this time is the USAO's version of what happened, set forth in a summary letter and supported by a small handpicked set of redacted and incomplete exhibits.

We also do not know what each witness who was interviewed as part of the USAO investigation said – most especially SSA Chaves. Instead, we know only what the USAO has chosen to tell us. We don't know what all the emails, texts and other contemporaneous evidence show about what happened; instead, we have only the *six* emails the government chose to disclose out of the *thousands* of emails, text messages and records of phone calls it states that it collected and reviewed. (USAO Submission at 2). We don't know precisely what information was illegally leaked, or what information was obtained in exchange for those improper leaks. Nor do we know if more than one agent was involved, or the details of who knew what and when amongst the higher ups at the FBI. From the record presented to the Court thus far, it appears as though the USAO never even asked the Special Agent if he committed similar misconduct in other cases, although as set out above, we believe it is clear that he did.

In addition, we do not know the extent of knowledge or involvement of other agents or supervisors at the FBI, in this case or other white collar cases – even though we do

know from prior cases of our own, and others, that there is strong reason to believe this illegal and criminal strategy was pursued in multiple other cases as well. Nor do we know exactly what else the USAO may have known or done, or failed to do, in the face of the known leaks in this case, as well as the many other cases cited above.

We also don't know exactly what evidence was presented to the grand jury, or what the grand jurors were told about that evidence and how it was obtained. We don't know all the circumstances of Mr. Davis' spoliation of evidence or his decision to cooperate, or all the details around how the government's misconduct and leaks impacted those critical events.

Under these circumstances, further fact-finding through an evidentiary hearing and related discovery is warranted, and we believe it is Mr. Walters' right, particularly if the Court determines that there are material issues as to our arguments for dismissal where the record is in dispute or incomplete. The government can hardly object to such a hearing given that it has already told this Court, "Given the seriousness of this matter, we want the Court to have the relevant facts surrounding the leak as we currently understand them. We stand ready to supply the Court with any additional information and answer any questions the Court may have." (USAO Submission at 2). We respectfully ask the Court to accept the government's offer and order a hearing to develop a complete factual record.

Not surprisingly, courts presented with motions for dismissal under *Bank of Nova Scotia* have ordered discovery and evidentiary hearings where the factual record was contested and/or incomplete. *See, e.g.*, *United States v. Pimental*, 199 F.R.D. 28, 31 & n.6 (D. Mass. 2001) (finding that government violated Rule 6(e) by disclosing grand jury materials, and ordering discovery before reaching the issue of *Bank of Nova Scotia* prejudice); *United States v. Busch*, 795 F. Supp. 866, 868 (N.D. Ill. 1992) (ordering evidentiary hearing on question of *Bank of Nova*

- 61 -

*Scotia* prejudice when there was an alternate juror present during grand jury proceedings);
*Marshank*, 777 F. Supp. at 1511-12 (holding evidentiary hearing and ordering discovery,
including "internal agency memoranda, agents' notes of meetings . . . , and notes of telephone
conversations between various agents," before dismissing under *Bank of Nova Scotia* and for
outrageous government conduct).

      The same is true for claims of outrageous government conduct.  For example, in
*Cuervelo*, the Second Circuit reversed the District Court's denial of a motion to dismiss the
defendant's claim of outrageous government misconduct, remanding for a "hearing to be held
and findings of fact and conclusions of law to be made vis-à-vis [the defendant's] contentions
and the role of the government, if any, in connection with this matter." 949 F.2d at 561.

> A hearing allows for a searching inquiry into the particulars of the
> investigative process employed by the government, as the court
> undertakes to sort through the various conflicting claims, and
> permits factual determinations to be made by the district judge. A
> hearing also provides the district judge with an opportunity to
> observe the demeanor and assess the credibility of various
> witnesses. Most often, conducting a hearing is the preferred course
> of action in cases where disputed factual issues exist.

*Id.* at 567.

      In connection with any hearing to further develop the factual record in this case,
Mr. Walters respectfully requests that the following documents be ordered by the Court to be
produced prior to the hearing:

- All notes, memoranda or other records of interviews of SSA Chaves concerning the leaks in this case or whether he or any other FBI or government employee leaked information in other investigations.

- All documents collected or reviewed in connection with the USAO Submission, including but not limited to emails, text messages, phone records and voicemails.

- All grand jury minutes concerning the indictment of Mr. Walters.

- 62 -

- All FBI 302s and other memoranda or notes relating to securing the cooperation of Mr. Davis.

- All certifications to the Court concerning the investigation of Mr. Walters, as required by Fed. R. Crim. P. 6(e)(3)(B), with the names of agents to whom disclosures of grand jury materials have been made and certifying that those agents were advised of their grand jury secrecy obligations.

- All USAO and FBI documents (including but not limited to internal emails and communications between the two offices) concerning the leaks in this investigation.

- All communications between SSA Chaves and any other agent concerning contacts with the press relating to the investigation of Mr. Walters.

- All communications about pending investigations between (a) SSA Chaves and/or any member of the group he supervised and (b) the press (including but not limited to *The New York Times* and the *Wall Street Journal*), from January 1, 2009 to the present.

The outcome of the hearing would also inform any open issues about remedy. To be clear, Mr. Walters submits that he is entitled to dismissal, and that lesser remedies are plainly insufficient. Here, the misconduct was willful, flagrant, repetitive and spanned an extended time period; it implicates not just one agent but a significant portion of the entire FBI New York Field Office as well as the USAO; it spans multiple cases, not just this one; and the prejudice in this case could not be more clear, as there is "grave doubt" the government ever could have obtained an indictment but for its own illegal misconduct. Under this combination of egregious and outrageous circumstances, we respectfully submit that dismissal is the only adequate remedy. *See United States v. Chapman,* 524 F.3d 1073, 1084-90 (9th Cir. 2008) (affirming dismissal of indictment under supervisory powers based on willfulness and flagrancy of government's misconduct); *Gov't of the V.I. v. Fahie,* 419 F.3d 249, 253-55 (3d Cir. 2005) (explaining that the "intentional character of the government's misconduct affects the appropriate remedy," that the "harshest penalt[y]" of dismissal under supervisory powers should be reserved for cases of willful misconduct, and that "[d]eliberate misconduct is targeted for extra deterrence because we

- 63 -

expect willful misbehavior to be the most effectively deterred by enhanced penalties"); *United States v. Broward,* 594 F.2d 345, 351 (2d Cir. 1979) (explaining that the Second Circuit has upheld the dismissal of an indictment only where "there was a need either to eliminate prejudice to a defendant in a criminal prosecution, where it was impossible to do so by imposition of lesser sanctions, or to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct").

Nevertheless, there is ample authority that would support this Court's power to address government misconduct by imposing other sanctions if the indictment is not dismissed. *See United States v. Ross,* 372 F.3d 1097, 1107 (9th Cir. 2004) ("The supervisory powers provide a wider range of remedial options than would otherwise exist . . . ."), *on reh'g in part,* 138 F. App'x 902 (9th Cir. 2005); *United States v. Toscanino,* 500 F.2d 267, 276 (2d Cir. 1974) ("[T]he supervisory power is not limited to the admission or exclusion of evidence, but may be exercised in any manner necessary to remedy abuses of a district court's process."), *abrogated on other grounds as recognized by In re Terrorist Bombings of U.S. Embassies in E. Afr.,* 552 F.3d 157 (2d Cir. 2008); *United States v. Omni Int'l Corp.,* 634 F. Supp. 1414, 1438-39 (D. Md. 1986) ("A common thread underlying many decisions is that the magnitude of the misconduct affects the use of the supervisory power, whether or not actual prejudice is shown. . . . In determining the proper remedy pursuant to the supervisory power, the relief chosen should be directly related to the seriousness of the misconduct.") (citations omitted).[19]

---

[19] The Second Circuit has affirmed that "[a] federal court, 'guided by considerations of justice,' may exercise its supervisory powers to formulate procedural rules not mandated by the Constitution" and exercise "general supervisory authority over members of the bar of this Court, lawyers who are at the same time United States attorneys." *United States v. Ming He,* 94 F.3d 782, 792 (2d Cir. 1996) (citations omitted). In *United States v. Hammad,* 858 F.2d 834, 839, 840-42 (2d Cir. 1988), the Second Circuit held that the supervisory authority could be used to suppress evidence that the government obtained by violating a disciplinary rule. The *Hammad*

As to the specific application of any remedies short of dismissal, Mr. Walters respectfully requests that the Court defer decision until after a hearing. Following the development of a more complete factual record, Mr. Walters would be in a position to argue which particular evidence that may be a product of or tainted by the government misconduct should be subject to a range of possible remedies, including but not limited to: suppression, preclusion of government arguments relying on the tainted evidence, instructions to the jury, and/or permitting the defense to elicit relevant evidence of the government's misconduct.

## CONCLUSION

For all of the foregoing reasons, Mr. Walters respectfully requests that the Court dismiss the indictment with prejudice. In the alternative, to the extent the Court finds there are any material issues of disputed fact or that the record is insufficiently developed to grant this motion to dismiss, Mr. Walters requests an evidentiary hearing and production of all relevant information as outlined above.

Dated: New York, New York
      January 13, 2017

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:  /s/ Barry H. Berke           
Barry H. Berke
Paul H. Schoeman
Eric A. Tirschwell

1177 Avenue of the Americas

---

court discussed the policy behind the exclusionary rule – to "deter improper conduct by law enforcement officials," *id.* at 839 – and used the supervisory power to apply that rationale "to governmental misconduct which falls short of a constitutional transgression." *Id.* at 840-41. *See also United States v. Miceli*, 774 F. Supp. 760, 773-75 (W.D.N.Y. 1991) (R&R adopted) ("the suppression remedy fashioned by the [*Hammad*] court in its supervisory power concerned only what was necessary to remedy the prejudice to the defendant directly caused by the government's misconduct. . . . [T]he *Hammad* decision shows the Second Circuit's willingness to fashion an exclusionary remedy if no other constitutional or statutory remedy is available").

New York, New York 10036
(212) 715-9100  (Phone)
(212) 715-8000  (Fax)
bberke@kramerlevin.com
pschoeman@kramerlevin.com
etirschwell@kramerlevin.com

*Counsel for Defendant William T. Walters*

KL3 3109083.1