UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

UNITED STATES OF AMERICA,                    :

                                             :        **ECF CASE**

        -v-                                  :

                                             :        S1 16 Cr. 338 (PKC)

WILLIAM T. WALTERS                           :
        a/k/a "Billy,"                       :

                                             :

                    *Defendant*.             :

                                             :

———————————————————————— x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT WILLIAM T. WALTERS' PRETRIAL MOTION TO DISMISS THE
INDICTMENT FOR GOVERNMENT MISCONDUCT AND FOR A HEARING**

Barry H. Berke
Paul H. Schoeman
Eric A. Tirschwell

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Counsel for Defendant William T. Walters*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 6

    I.      The Evidence Raises "Grave Doubts" About Whether the Misconduct
           Substantially Influenced the Grand Jury's Decision to Indict ................................. 6

    II.     Systematic and Pervasive Government Misconduct Spanning Several
           Cases Is a Valid Basis for Dismissal Without a Showing of Prejudice ................. 12

    III.    The Government's Conduct is Outrageous ............................................................ 15

    IV.    Other Remedies Are Insufficient to Eliminate the Prejudice to Mr.
           Walters, Punish the Government and Deter Future Misconduct ........................... 18

    V.     At a Minimum Mr. Walters is Entitled to an Evidentiary Hearing and
           Discovery .............................................................................................................. 19

CONCLUSION ............................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States,*
487 U.S. 250 (1988)................................................................................................. *passim*

*Gustafson v. Alloyd Co.,*
513 U.S. 561 (1995)................................................................................................13

*Kotteakos v. United States,*
328 U.S. 750 (1946)................................................................................................12

*O'Neal v. McAninch,*
513 U.S. 432 (1995)................................................................................................12

*In re United States,*
441 F.3d 44 (1st Cir. 2006)......................................................................................18

*United States v. Anderson,*
61 F.3d 1290 (7th Cir. 1995)...................................................................................14

*United States v. Brito,*
907 F.2d 392 (2d Cir. 1990)................................................................................13, 14

*United States v. Brown,*
602 F.2d 1073 (2d Cir. 1979)...................................................................................19

*United States v. Carlone,*
666 F.2d 1112 (7th Cir. 1981)..................................................................................18

*United States v. Carter,*
No. 04 Cr. 954 (NRB), 2005 WL 180914 (S.D.N.Y. Jan. 25, 2005).......................14

*United States v. Chin,*
934 F.2d 393 (2d Cir. 1991).....................................................................................15

*United States v. Cuervelo,*
949 F.2d 559 (2d Cir. 1991).....................................................................................20

*United States v. Friedman,*
635 F. Supp. 782 (S.D.N.Y. 1986)...........................................................................11

*United States v. Friedman,*
854 F.2d 535 (2d Cir. 1988).....................................................................................11

*United States v. Hasting,*
    461 U.S. 499 (1983) ..................................................................................................19

*United States v. Hatfield,*
    No. 06 Cr. 0550 (JS), 2010 WL 183522 (E.D.N.Y. Jan. 8, 2010) ............................18

*United States v. Howard,*
    Crim. No. 12-1, 2014 WL 2429315 (E.D. La. May 29, 2014) ..................................14

*United States v. Isgro,*
    974 F.2d 1091 (9th Cir. 1992) ..................................................................................18

*United States v. Myers,*
    510 F. Supp. 323 (E.D.N.Y. 1980) ...........................................................................18

*United States v. Restrepo,*
    547 F. App'x 34 (2d Cir. 2013) .................................................................................14

*United States v. Silver,*
    103 F. Supp. 3d 370 (S.D.N.Y. 2015) .......................................................................14

*United States v. Williams,*
    504 U.S. 36 (1992) ..............................................................................................14, 15

## Other Authorities

Fed. R. Crim. P. 6(e) ................................................................................................ *passim*

Fed. R. Crim. P. 52(a) ......................................................................................................12

Fed. R. Evid. 804(b)(3) ......................................................................................................3

## INTRODUCTION

The government responds to our motion to dismiss the indictment based on undisputed and extraordinary government misconduct by contending that "the *reality* is the leaks did not harm Walters." The only record on which the government draws for its version of events consists of (1) the government's original and now discredited sworn declaration denying any misconduct, (2) an unsworn letter characterizing the results of an investigation in a self-serving way, and now (3) a brief that adds additional layers of characterization but ignores facts previously disclosed and fails to address key questions that we have raised.

We respectfully submit that Supervisory Special Agent Chaves – until recently the government's most highly celebrated white collar agent and the USAO's most frequent partner in headline-grabbing cases – was not, as the government now contends, an unreliable lone wolf out to sabotage an investigation that was humming along. The only motive that SSA Chaves plausibly had was to further his squad's stalled investigation, not to hamper it. SSA Chaves' motivations are perfectly clear, not only from common sense, but also from re-reading the articles for which we now know he was the source, written by journalists who appear to have gotten to know him very well:

- "Federal authorities, whose investigation has dragged on for more than two years without yielding definitive evidence of insider trading . . . ." Matthew Goldstein & Ben Protess, *Investor, Bettor, Golfer: Insider Trading Inquiry Includes Mickelson, Icahn and William T. Walters*, N.Y. Times (May 30, 2014) (attached to Defendant's Memorandum of Law in Support of his Motion to Dismiss as Exhibit B to the Declaration of Paul H. Schoeman, Esq. ("Schoeman Decl.")).

- "...a case can wither without a smoking-gun email, a loose lipped cooperating witness or wiretapped conversations." Ben Protess & Matthew Goldstein, *Authorities Find Insider Trading Case Tied to Phil Mickelson is Slow to Take Shape*, N.Y. Times (May 31, 2014) (Schoeman Decl. Ex. C).

- "Even before the probe became public, investigators confronted roadblocks particular to the unusual nature of the people under scrutiny, according to the people briefed on the probe." Michael Rothfeld & Susan Pulliam, *Trade Probe Hits Snag as Surveillance is Derailed*, Wall St. J. (June 2, 2014) (Schoeman Decl. Ex. L).

- "After news reports, the subjects of investigations will often discuss the reports or take actions to avoid being caught, and those maneuvers can cause them to get caught, law-enforcement officials have said." *Id.*

Reading the articles today and knowing what we now know, it is uncanny how successfully SSA Chaves, possibly with the assistance of others, engineered exactly the results he wanted. As SSA Chaves indicated, the evidence that the government had before the leaks, including brokerage and telephone records and a report from FINRA, was not "definitive evidence of insider trading." The trading at issue in the indictment had all occurred by this point, the government's wiretap application included avowals that traditional investigative techniques (apart from a wiretap) were not likely to be successful, and the first thirty days of the wiretap were in fact devoid of incriminating conversations. It was at exactly this point that the first articles containing leaked information appeared. Just as SSA Chaves hoped, in the following days there were wiretapped conversations between Mr. Walters and Mr. Davis that the government and Mr. Davis believe are incriminating. The leaks also appear to have caused Mr. Davis to destroy his cell phone and it was only after the leaks that he began repaying a loan to Mr. Walters. Both of these are actions that the government now contends inculpate both Mr. Davis and Mr. Walters ███████████████████████████. Eventually, Mr. Davis, who had proclaimed his innocence to agents who interviewed him the day before the articles appeared, reversed his repeated and sworn protestations of innocence and began to cooperate.

Unlike the government, we believe that in critical respects Agent Chaves' confession – as grudgingly and disjointedly described by the government – was truthful. The

portions the government has referenced are mostly "statements against interest," and are therefore sufficiently reliable to be admissible in evidence even if SSA Chaves was not available to testify at a hearing. *See* Fed. R. Evid. 804(b)(3). According to what we know of what SSA Chaves has said, he began speaking to reporters about the grand jury's investigation of Mr. Walters in order to revive a "dormant investigation." Thereafter a reporter called SSA Chaves from time to time to feed him information to further the investigation (*see* Letter from the United States Attorney's Office, *United States v. Walters*, Sl 16 Cr. 338 (PKC) (Dec. 16, 2016), ECF No. 65-1 at 5 ("USAO Submission")) – a fact the government tellingly does not address or dispute. We also know that according to SSA Chaves, five very senior FBI agents met with reporters on May 27, 2014 with a plan to barter information about the investigation in exchange for the reporters' agreement to delay publishing a story, the USAO was informed of the decision to have the meeting, and at the meeting the FBI agents carried out the plan to provide the reporters with non-public information. (USAO Submission at 6-7). We also know that according to SSA Chaves he was not the source for certain leaked information that, according to the government, "facially appeared to be from a law enforcement source." (*Id.* at 10).

Rather than address these facts, or even admit that critical facts are in dispute, the government asks the Court to accept its counter-narrative. According to the government, although SSA Chaves had gone rogue, everyone else at the FBI and USAO was "outraged" and "appalled by the leaks." (Gov't Opp. at 3, 8). To support this version of events, the government relies on paraphrases of what witnesses have said and a slim selection of the "thousands of emails and text messages, and records of phone calls" the prosecution team reviewed. (USAO Submission at 2). Only six email chains have been produced and not a single witness statement of the 14 witnesses interviewed, including SSA Chaves, has been produced or even quoted at

- 3 -

length. Instead, the government continues to rely on the letter it had first hoped to submit *ex parte* and under seal and has not provided any additional *evidence* on these issues with its opposition brief. We simply do not know whether other emails or further details of witness interviews tell a different story or include additional relevant facts about any number of critical issues, including what information SSA Chaves received from reporters in exchange for leaking, what information about other potential leakers was gathered during the USAO's investigation, and why the FBI and the USAO did nothing at the time to investigate and shut down the leaks.

Moreover, the government's insistence that all but SSA Chaves were outraged and appalled by the leaks is troublingly inconsistent with the declaration of AUSA Kasulis, which was submitted by the government in its initial effort to fend off the defendant's request for a hearing. Contrary to what the government argues, the declaration and accompanying brief were not limited to arguing that Mr. Walters "could not meet his burden of making a *prima facie* showing of a Rule 6(e) violation." (Gov't Opp. at 13). The declaration and brief contended that no leaking occurred, and did so even though the defense appended to the motion the same articles that had purportedly triggered a frenzy of opprobrium when they first appeared. To explain the jarring disconnect between the purported universal dismay in June 2014 and the blanket denials in September 2016, the government falls back on a massive memory failure. Apparently no one recalled (or looked for) the Deputy U.S. Attorney's email from June 12, 2014, in which he advised the U.S. Attorney and five other senior members of the USAO that a *New York Times* reporter identified an FBI agent as the leaker. The Deputy U.S. Attorney further stated, "I don't think this should be discussed generally right now for a number of reasons," which have never been revealed, "but obviously we need to discuss and will need to address this with the FBI." It seems that the still unexplained two-year long failure by the USAO to take any

- 4 -

action to investigate and shut down the leaks caused the entire incident to vanish from the collective memory.

We respectfully submit that the USAO's motivation to save this prosecution and limit the Court's scrutiny as much as possible has made the government far less reliable in these proceedings than it is in the ordinary case. While the government may believe that it can fairly investigate itself and the FBI, the government's mixed motives as a fact finder are no doubt what has led the Department of Justice's Public Integrity Section and Office of the Inspector General to take over the leak investigation.[1] The fact that those investigations have been active since December 8, 2016 clearly suggests that the Department's more independent investigators are not content to rely on the self-investigation conducted by the USAO. Yet the government continues to insist the Court and Mr. Walters should simply accept what the government has said thus far.

Finally, the government has not addressed in any way the enormous body of evidence that we cited in our brief (and which is all too well known to the defense bar) showing that leaks occurred in many of the high-profile investigations in which the USAO partnered with SSA Chaves' white collar squad. If, as the government claims, the leadership of the USAO and the FBI was "appalled" and "outraged" at the obvious leaks in the investigation of Mr. Walters, they must have spent much of the period between 2009 and 2016 in a similar state of agitation as leak after leak appeared in connection with investigations of Raj Rajaratnum (2009), David Ganek (2010), Michael Steinberg (2013) and Sanjay Valvani (2016), among others. Until this

---

[1] The government notes that there are cases in which the USAO has prosecuted New York-based law enforcement agents, but seems to miss the real point. (Gov't Opp. at 18 n.13). This is a case in which the same USAO that is partnering with FBI agents to prosecute the defendant was also investigating that defendant's claims that those agents' colleagues and bosses, as well as current and former members of the USAO itself, engaged in, tolerated or failed to prevent egregious and obstructive conduct.

Court issued its order requiring a hearing, the USAO and the FBI took no action to find the sources of these leaks or punish the leakers.

Despite the government's efforts to exercise complete control over the facts accessible to the Court and the defense, we submit that three things are now perfectly clear. First, there is at least "grave doubt" as to whether the decision to indict was "substantially influenced" by the government's use of illegal means to resuscitate a dormant investigation. Second, this illegal and criminal investigative approach was deployed by the government not just in this case but in multiple other insider trading investigations. And third, the totality of the government's misconduct here – the intentional and calculated bartering of grand jury information, the decision not to investigate and stop the leaks, the submission of papers that hid the truth – is outrageous and shock the conscience. Each of these provides an independent basis to dismiss the indictment. The government's arguments to the contrary are just that – arguments based on factual contentions with no evidentiary support. To the extent the Court finds material facts are in dispute or insufficiently developed, we respectfully submit a hearing is required, after full disclosure of the government's investigation, so that the Court will have an evidentiary record upon which to assess the full scope of the government's misconduct.

## ARGUMENT

I.    **The Evidence Raises "Grave Doubts" About Whether the Misconduct Substantially Influenced the Grand Jury's Decision to Indict**

The government agrees that the relevant legal test from *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256 (1988), is whether "there is 'grave doubt' that the decision to indict was free from the substantial influence of" the government misconduct, but argues that no court has ever held that "a Rule 6(e) violation" met this standard of prejudice. (Gov't Opp. at 20-21). That narrow proposition may be true, but the misconduct here goes well beyond mere

Rule 6(e) violations to include obstruction of justice and violations of other federal statutes undertaken for the purpose of generating inculpatory evidence during a grand jury investigation that to our knowledge no other court has ever uncovered before. In addition, as our moving papers make clear (Walters Br. at 49-50 & n.16), multiple courts have found *Bank of Nova Scotia* prejudice and have dismissed indictments for government misconduct, including illegal or improper investigative techniques. And there have been numerous instances, not memorialized in reported cases, where the prosecution – upon learning of serious investigative misconduct by government agents – dismissed on its own, in the interests of justice and/or to avoid an adverse dismissal ruling. *Cf.* Transcript at 7, *United States v. Goncalves*, CR 09-335 (RJL) (D.D.C. Feb. 21, 2012), ECF No. 631 (granting the government's motion to dismiss, stating "I for one hope this very long, and I'm sure very expensive, ordeal will be a true learning experience for both the Department and the FBI").

The government's citations to cases denying dismissal of the indictment that predated *Bank of Nova Scotia* and/or found no showing of prejudice (Gov't Opp. at 21-22) miss the critical difference that here, the prejudice to Mr. Walters is clear and takes multiple forms, as we laid out on pages 51-53 in our moving papers.[2] Apparently recognizing that if the leaks were designed to, and in fact did, breathe life into a dormant investigation, that would establish a "but for" and thus "substantial" influence on the grand jury's decision to indict, the government argues that when the leaks began the investigation was active, not in any way dormant, and that

---

[2] The government's suggestion that counsel for Mr. Walters was "unable to articulate prejudice" at the December 21, 2016 court appearance (Gov't Opp. at 17) is absurd. We spent our time at that conference laying out for the Court the extensive government misconduct that had been disclosed the previous night. There was no argument then about prejudice; instead, after hearing the defense's views on the government's misconduct and all of the issues it raised, the Court allowed Mr. Walters to file a written motion to dismiss – which we have now done, and in which we have laid out the clear prejudice that he suffered.

the misconduct "brought it to a halt." (Gov't Opp. at 23-24). But no actual evidence to support the government's alternative factual assertion – such as a declaration from the case agent, or even from a prosecutor – backs up this contention.[3]

On the other hand, the actual record – including SSA Chaves' statements and the contemporaneous press accounts of the status of the investigation – overwhelmingly suggest otherwise: that the investigation had stalled prior to the leaks and it was precisely for that reason that SSA Chaves started to engage and barter with the press to try to give it new life, which is exactly what happened. All that the government has done in opposing this motion is make factual assertions to dispute questions that are central to the *Bank of Nova Scotia* prejudice analysis, without producing the trove of emails and interview memos of all the key players on which it is relying or allowing its claims to be tested in an adversary proceeding.[4]

One thing that is not disputed is that in exchange for his illegal leaks, SSA Chaves received information back from at least one reporter – who "would from time to time call Chaves to describe what she was learning regarding Walters." (USAO Submission at 5). Although the full scope of what SSA Chaves received and its precise impact on the investigation are not yet

---

[3] The government claims that the investigation went "dormant" for months after the press articles came out (even though it issued two grand jury subpoenas shortly after the articles were published), implying that the leaks somehow hindered the investigation. (Gov't Opp. at 9). But in a footnote, *id.* at n.6, the government discloses that the much more likely explanation for any temporary lull in the investigation was that the case agent was transferred to another office. Curiously, the government's footnote is silent as to why the case agent (who complained about the leaks) was transferred at the same time that SSA Chaves (the leaker) was promoted to oversee all white collar cases in New York.

[4] The government asserts that the "true meaning" of the email from ADIC Venizelos – "if we don't have enough evidence by now its [sic] over" – is that he feared the leaks would cripple the investigation. (Gov't Opp. at 24 n.19). But no declaration from Venizelos is presented to support that interpretation, which makes much less sense than that he was saying that if the FBI did not have a case at that point, it should stop trying to build one through illegal leaks and move on. Even if the government's interpretation is deemed plausible, which we submit it is not, there is a dispute about what the email means that would require further fact-finding.

fully known, the government makes no argument and submits no evidence to refute the commonsense inference that SSA Chaves continued to barter for such improperly obtained leads because he believed it was helpful to the investigation of Mr. Walters. Indeed, we know that SSA Chaves continued to speak with a number of these reporters on his personal cell phone even after being instructed in early June 2014 not to have such communications. While the USAO Submission states that SSA Chaves spoke to these reporters between June 2 and June 11, 2014 (USAO Submission at 9), it is silent as to what additional communications he may have had after that date. In fact, the USAO Submission's timeline of misconduct abruptly ends with the publication of *New York Times* and *Wall Street Journal* articles on June 23, 2014. The USAO is silent about any evidence of SSA Chaves' improper conduct after that date, and fails to address what additional information was improperly leaked and received by SSA Chaves between June 2014 and Mr. Davis' decision to cooperate in early 2016.

With respect to Mr. Davis destroying the cellphone that Mr. Walters allegedly gave him, it is undisputed that Mr. Davis spoliated that evidence just *one week* after the articles surfaced with leaks about the investigation (which leaks also led the FBI to approach Mr. Davis at that same time). The government misses the mark in arguing it did not make "deliberate efforts" to cause Mr. Davis to spoliate this evidence. (Gov't Opp. at 26). The issue is not limited to the government's intent, but whether – as the record now makes clear – there is a causal connection between the government's misconduct and Mr. Davis destroying the phone. Significantly, we now know that this highly inflammatory piece of evidence – the destruction of a cell phone allegedly given to Mr. Davis by Mr. Walters to secretly pass along illegal inside information – was not only causally linked to the illegal leaks but also ████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ These two facts – the destruction of the phone and the repayment of the loan – are thus closely tied in a causal way to the illegal leaks and provide strong evidence of a direct and substantial link between the government's misconduct and the grand jury's decision to indict Mr. Walters. To be clear, the defense's contention is that any information on the cell phone would not have inculpated Mr. Walters (although Mr. Davis had his own reasons for destroying a cell phone) and Mr. Davis had always intended to repay the loans. But for the leaks, Mr. Walters would have been able to demonstrate these facts incontestably. But the leaks, as SSA Chaves intended, have changed the facts on the ground in a way that created arguments for the government ████████████ ████████ and cannot be undone.

The government also argues that the leaks did not lead to Mr. Davis' cooperation. While it is true that Mr. Davis did not agree to cooperate until approximately 18 months after the first round of leaks appeared in press articles, the government's claim that it was the SEC and USAO's "renewed focus on Davis" in early 2015 and his "demonstrably false SEC testimony" in May 2015 that drove his decision to cooperate in February 2016 is again mere unsupported assertion. It also essentially ignores the August 2015 *Wall Street Journal* story that was the first to name Mr. Davis publicly as a target of the investigation – and that certainly reads as if it reflects continuing government leaks (a fact the government does not dispute). And again, the government reflexively assumes that Mr. Davis is telling the truth now (after at least fifteen pre-plea proffers ████████████████████████████), and that his

- 10 -

decision to cooperate with the government was made in a vacuum, free from the pressure and humiliation of the leaks and without any concern that his post-leak conduct was known to the government and could be used against him. The government's story that Mr. Davis' decision was "driven by his and his counsel's assessment of his exposure," (Gov't Opp. at 11), is unsubstantiated and, in its ambiguity, is not actually contrary to what we are contending.

Going one step further, the government suggests that even assuming the leaks did prompt Mr. Davis' cooperation, that would not rise to the level of required prejudice, citing *United States v. Friedman,* 854 F.2d 535, 583-84 (2d Cir. 1988). *Friedman* makes no mention of *Bank of Nova Scotia,* presumably because it was originally decided a week before the *Bank of Nova Scotia* decision was handed down (although it was amended shortly thereafter). Moreover, *Friedman* involved the very different question of a motion to dismiss *post-trial,* where the district court had denied the *pre-trial* motion to dismiss, and where the defendants "make no claim that the . . . petit jury was affected by the government's misconduct." *Id.* at 583-84. *Friedman* does not control or state the applicable standard here and the clearly controlling test for dismissal under *Bank of Nova Scotia* – *i.e.,* whether there is "grave doubt" that the grand jury's decision to indict was "substantially influenced" by the government's misconduct.[5]

To be clear, the government's attempt to create factual disputes poses no barrier to this Court dismissing now, on the current record, based on a finding that there is "grave doubt" that the misconduct "substantially influenced" the grand jury's decision to indict. The Supreme Court has explained that "grave doubt" in a closely analogous context means "that, in

---

[5] In *Friedman,* the district court denied the pretrial motion based on Rule 6(e) violations principally because the defendants "concede[d] that there is no authority suggesting that dismissal of an otherwise valid indictment would be appropriate." *United States v. Friedman,* 635 F. Supp. 782, 785 (S.D.N.Y. 1986). Whether or not that was an accurate statement of the law at the time, the Supreme Court's decision in *Bank of Nova Scotia* two years later provides that authority. .

the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 434 (1995). Here, at the very least, the current record provides as much reason to believe the government's conduct "substantially influenced" the grand jury's decision to indict as it does to believe it did not. Records of stock trades and phone calls are one thing, but we submit there can be no credible argument that the additional evidence generated by or traceable to the misconduct – a destroyed cell phone, an allegedly phony loan suddenly being repaid, a cooperating witness' testimony, and unknown information from reporters about what they were learning regarding Mr. Walters – raises "grave doubt" as to whether the grand jury's decision to indict was "substantially influenced" by the government's misdeeds. Under such circumstances, the conscientious "uncertain judge" is directed to "treat the error, not as if it was harmless," but instead as if it affected the decision being challenged. *Id.*[6]

## II. Systematic and Pervasive Government Misconduct Spanning Several Cases Is a Valid Basis for Dismissal Without a Showing of Prejudice

In our moving papers, we presented the Court with evidence from five additional insider trading cases supervised by SSA Chaves showing "a very high likelihood – if not near certainty – that SSA Chaves and perhaps others at the FBI followed a similar illegal and criminal investigative approach of leaking information in order to build their cases in these other matters as well." (Walters Br. at 54-55; 36-42). The government's opposition brief contains not a single word denying or disputing that this is true, effectively conceding the point.

---

[6] *O'Neal* draws on the "grave doubt" language from *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946), applying the harmless error standard of Fed. R. Crim. P. 52(a). That is the same case and standard that the *Bank of Nova Scotia* case adopted and applied in the context of grand jury misconduct. 487 U.S. at 256-57. *Kotteakos* also makes clear the "grave doubt" inquiry "cannot be merely whether there was enough to support the result, apart from the phase affected by the error." 328 U.S. at 765.

Instead, in apparent acknowledgment of how devastating the facts are now that SSA Chaves has confessed to leaking in this case, the government pivots and argues the law – claiming "systematic and pervasive misconduct" "spanning several cases" is not an independent basis for dismissing an indictment and does not dispense with the need for a showing of prejudice to the defendant. (Gov't Opp. at 27-30). The problem for the government is that the overwhelming weight of case law, as well as the most logical reading of the key sentence in *Bank of Nova Scotia*, all contradict the government's wishful but unpersuasive legal contentions.

The Second Circuit's decision in *United States v. Brito,* 907 F.2d 392, 394 (2d Cir. 1990), could not be more clear in reading *Bank of Nova Scotia* as creating two different bases for dismissal under the Court's supervisory powers – (1) "grave doubt that the decision to indict was free from the substantial influence of" the misconduct (quoting *Bank of Nova Scotia*, 487 U.S. at 256) "*or* [(2)] possibly if there is a 'history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process'" (quoting *Bank of Nova Scotia*, 487 U.S. at 259). If the latter test required a showing of prejudice just like the former test, it would add nothing and would not reach any additional cases not already covered by the first test – thus rendering the Supreme Court's "systematic and pervasive" sentence meaningless. *Cf. Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant.")

Not surprisingly, the overwhelming majority of courts have rejected the government's nonsensical interpretation, and read *Bank of Nova Scotia* to state two separate tests for dismissing an indictment, with the latter "systematic and pervasive" misconduct test differing from the core test applied in *Bank of Nova Scotia* in not requiring a showing of prejudice. *See*

Walters Br. at 53-54 (citing cases); *United States v. Restrepo*, 547 F. App'x 34, 44 (2d Cir. 2013) (quoting *Brito* for proposition that dismissal of an indictment may be warranted where there is "systematic and pervasive prosecutorial misconduct as would undermine fundamental fairness"); *United States v. Anderson*, 61 F.3d 1290, 1296 n.4 (7th Cir. 1995) ("[T]here is no allegation of systemic and pervasive prosecutorial misconduct before the grand jury that might allow a presumption of prejudice."); *United States v. Silver*, 103 F. Supp. 3d 370, 380 (S.D.N.Y. 2015) (noting that "dismissal might be appropriate in instances where the defendant can show 'a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive . . . .'"); *United States v. Howard*, Crim. No. 12-1, 2014 WL 2429315, at *2 (E.D. La. May 29, 2014) ("A presumption of prejudice may be appropriate where, for example, there exists 'a history of prosecutorial misconduct, spanning several cases, that is so systematic and so pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment.'").

Judge Buchwald's discussion in *United States v. Carter*, No. 04 Cr. 954 (NRB), 2005 WL 180914, at *2 (S.D.N.Y. Jan. 25, 2005), that the independent "systematic and pervasive" test in *Bank of Nova Scotia* and *Brito* was somehow overruled by *United States v. Williams*, 504 U.S. 36 (1992), is, we respectfully submit, incorrect. All of the additional cases cited above reaffirming the "systematic and pervasive" test post-date *Williams. Williams* cut back on the availability of supervisory power to dismiss an indictment in cases alleging violations of only judge-made standards of prosecutorial conduct (which was all that was at issue in *Williams*, involving whether "substantial exculpatory evidence" had to be presented to the grand jury, and in *Carter*, involving whether it was proper for the government to rely on a single hearsay witness in the grand jury). But *Williams* expressly reaffirmed the district court's

- 14 -

authority to exercise that supervisory dismissal power in cases – like this one – alleging violations of specific legal rules (such as Rule 6(e)) or statutes (such as the obstruction of justice statute and the statutes governing wiretap secrecy) designed "to ensure the integrity of the grand jury's functions." 504 U.S. at 46 & n.6.

In sum, as a matter of logic and as supported by the overwhelming weight of precedent interpreting *Bank of Nova Scotia*, a "systematic and pervasive" pattern of misconduct across multiple cases involving repeated criminal violations of Rule 6(e), the obstruction of justice statute, and other federal statutes provides a basis to dismiss even after *Williams*, and without a showing of specific prejudice. Here, the Court has before it clear *and undisputed* evidence of precisely such a "systematic and pervasive" pattern of misconduct. That makes this case unlike all the prior cases that, while acknowledging the possibility of such a claim as a matter of law, rejected it in the absence of proof. And that is what provides this Court right now with an independent and sufficient basis to dismiss.

### III. The Government's Conduct is Outrageous

The government cites mostly the same cases we cited that empower the Court to dismiss an indictment for outrageous government conduct, in the rare case where the conduct is "so offensive that it 'shocks the conscience.'" *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). The government's central argument seems to be that while SSA Chaves' conduct was "wrong," it was not "outrageous," including the repeated misleading suggestion that what SSA Chaves did amounted to nothing more than "a violation of grand jury secrecy rules." (Gov't Opp. at 31-32.)

The government's dismissive tone about whether the misconduct rises to the level of "outrageous" is particularly ironic in light of the contemporaneous statement from the U.S. Attorney himself, who in a more candid moment when he purportedly knew just the tip of the

iceberg of criminal misconduct that we now know occurred, wrote to the FBI's Assistant Director that the leaks were "outrageous." The leaks certainly offended and shocked the conscience of the case agent, who called them "deplorable and reprehensible." We can only imagine what the U.S. Attorney and the case agent might have said in these excited utterances had they known that SSA Chaves was not just violating grand jury secrecy, but committing crimes in order to try to build a case against Mr. Walters. We do know that when the parties were last before this Court, the government continued to claim that back in 2014 the FBI was "outraged." Transcript of Hearing at 11, *United States v. Walters*, S1 16 Cr. 338 (PKC) (S.D.N.Y. Dec. 21, 2016).

Nor does the government have anything persuasive to say about the fact that – despite their claimed outrage as far back as May 2014 – both the USAO and FBI made a decision not to stop the leaks or investigate (even after receiving confirmation from a reporter that an FBI agent was leaking), and the USAO subsequently made false and misleading statements to the Court as part of an effort to prevent the government's misconduct from coming to light. The government offers no explanation for why the FBI – if it was truly outraged and really wanted to stop the leaks – did *no investigation whatsoever* at the time to figure out their source (whose identity we now know would have been quickly revealed by a simple review of the relevant agents' emails and phone records). The government's Opposition Brief also makes clear the USAO *did absolutely nothing* about the leaks back in 2014, other than ask the FBI what action they could take together, despite claiming that it too was outraged and despite the senior-most officials in the USAO having been expressly told in June 2014 that it was an FBI agent who was illegally leaking the secret grand jury and confidential law enforcement information.[7]

_____

[7] The government handpicked certain emails to support its contention that there was outrage over

- 16 -

As for misleading and hiding the truth from this Court, the government offers no coherent defense for the clearly false and inaccurate papers it submitted, saying weakly that it made unspecified "errors" that it does "not take pride in or excuse." (Gov't Opp. at 33). And yet, the government does exactly that, trying to excuse what it did by claiming the sworn Kasulis Declaration – which as outlined in our moving papers contains multiple false and misleading statements – was "modeled on a similar, recently submitted declaration cited with approval in *United States v. Skelos*." (Gov't Opp. at 14 n.10). The declaration in *Skelos* responsibly included representations from five AUSAs, two investigators and four FBI agents. (A copy is attached hereto as Ex. 1, *see* ¶¶ 13-16.) Here, the USAO chose to submit a sworn declaration from one AUSA who spoke to one agent, and they both denied their own personal culpability for the misconduct, knowing full well that at least at least one FBI agent was responsible for that misconduct and at least four other agents were involved in direct discussions with the media about the case during the investigation. No explanation is offered for why the USAO did not interview the many individuals it knew had contact with the press. Far from justifying or mitigating the false and misleading statements in the Kasulis Declaration, the comparison with the *Skelos* submission – which canvassed eleven different government lawyers, investigators and agents – heightens the outrageousness of the government's submissions here.

The government also argues that the misconduct in this case post-dated and was not "inextricably intertwined with" the insider trading charged in the indictment. (Gov't Opp. at 33-34). Even if true, that does not preclude a finding of outrageous government conduct, where

the leaks, but it has not said how many other emails exist that address the leaks and have not been produced. Nor has the government attempted to explain the Deputy United States Attorney's statement upon learning from a reporter about an FBI agent leaking: "I don't think this should be discussed generally *right now* for a *number of reasons*." (USAO Submission Ex. F, ECF No. 65-7) (emphasis added).

- 17 -

the test is whether the government's behavior is "so offensive that it shocks the conscience." We respectfully submit that the combination of a government agent systematically, deliberately and criminally leaking secret grand jury and wiretap information to unlawfully further an investigation; the FBI and USAO deciding to do absolutely nothing to investigate the source of the leaks and other criminal misconduct and put a stop to it; and the USAO's false and misleading submissions to this Court, considered as a whole, most certainly do rise to the level of government misconduct that is "so offensive that it shocks the conscience." That the government itself called the leaking, standing alone, "outrageous," "deplorable," and "reprehensible" only underscores the point (and undermines the government's litigation position). Dismissal is therefore warranted.

## IV.   Other Remedies Are Insufficient to Eliminate the Prejudice to Mr. Walters, Punish the Government and Deter Future Misconduct

When the *Bank of Nova Scotia* court wrote that "[e]rrors of the kind alleged in these cases can be remedied adequately by means other than dismissal," 487 U.S. at 263, it was clearly talking about cases where there was no prejudice to the defendant and where there was not evidence of "systematic and pervasive" misconduct spanning multiple cases. The cases cited by the government on pages 35-36 of its brief are of the same ilk.[8] Those cases are not this case. In this case, there is clear evidence of both prejudice impacting the grand jury process and a systematic and widespread pattern of misconduct across multiple cases over many years. Under

---

[8] *See In re United States,* 441 F.3d 44, 60 (1st Cir. 2006) (finding no "showing that there was any impropriety that 'substantially influenced' the decision of the third grand jury to indict"); *United States v. Isgro,* 974 F.2d 1091, 1098 (9th Cir. 1992) (finding the "defendants have suffered no prejudice" under *Bank of Nova Scotia*); *United States v. Carlone,* 666 F.2d 1112, 1116 (7th Cir. 1981) (finding "no suggestion either that the government made deliberate misrepresentations . . . or that the defendants were in the least bit prejudiced"); *United States v. Hatfield,* No. 06 Cr. 0550 (JS), 2010 WL 183522, at *10 (E.D.N.Y. Jan. 8, 2010) (noting the "lack of substantive prejudice"); *United States v. Myers,* 510 F. Supp. 323, 327 (E.D.N.Y. 1980) ("[T]he defendants have failed to show that they suffered actual prejudice . . . .").

these circumstances, the remedy of dismissal is warranted, as even one of the government's own citations supports. *See United States v. Brown*, 602 F.2d 1073, 1076-78 (2d Cir. 1979) (dismissal is warranted in "extreme cases" such as where "it is impossible to restore a criminal defendant to the position he would have occupied" or "the pattern of misconduct is widespread or continuous") (quoting *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979) and *United States v. Fields,* 592 F.2d 638, 648 (2d Cir. 1978)).

Here, we submit that the investigation and possible criminal prosecution of SSA Chaves, and belated efforts by the USAO and FBI to instruct their employees to follow the law, are not a sufficient remedy. Mr. Walters was unquestionably prejudiced by the pattern of calculated and criminal misconduct during the grand jury process. The FBI and USAO decided to do nothing to stop that misconduct, and instead were more than happy to reap its ill-gotten rewards. Later, the government attempted to hide the misconduct from this Court. The record further shows the criminal leaking of secret grand jury information went well beyond this one case and had become part of the government's investigative playbook. No remedy short of dismissal can restore Mr. Walters to the position he would have been in but for the misconduct. In other words, this is one of those rare "extreme cases" where the only sanction that will adequately redress the wrongs to Mr. Walters and deter such misconduct in the future is dismissal. *See United States v. Hasting,* 461 U.S. 499, 505 (1983) (recognizing that one of the purposes of exercising supervisory powers is "as a remedy designed to deter illegal conduct").

## V.    At a Minimum Mr. Walters is Entitled to an Evidentiary Hearing and Discovery

The government misstates our argument about a hearing, claiming we seek one "in the event the Court determines . . . that Walters was not prejudiced by the leaks and the Indictment should not be dismissed." (Gov't Opp. at 37). Instead, we pointed out, as the Second Circuit has explained in the context of a claim of outrageous government conduct, that to the

- 19 -

extent the Court finds that "disputed factual issues exist," "a hearing is the preferred course." (Walters Br. at 61-62) (quoting *United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991) (reversing and remanding where District Court rejected claim of outrageous government conduct without conducting a hearing)). The government offers no response to the teaching of *Cuervelo*, the three other cases we cited in which the courts held hearings before deciding whether there was prejudice under *Bank of Nova Scotia* (Walters Br. at 61-62), or *Bank of Nova Scotia* itself, where the district court held ten days of evidentiary hearings before deciding the motion to dismiss. 487 U.S. at 253.

The government's assertion that "a further hearing will serve no purpose" because it has stipulated that a Rule 6(e) violation occurred (Gov't Opp. at 37) also makes no sense. The government has chosen what it wants to admit, and tailored the admitted facts as narrowly as possible. But the issue on this motion is not simply whether the government in this case violated grand jury secrecy. This Court must look at the full sweep of the misconduct, which also includes obstruction of justice and violations of other federal statutes as part of a deliberate plan to bolster an investigation, and determine (1) whether there is "grave doubt" that this admitted misconduct "substantially influenced" the grand jury, (2) whether the misconduct was systematic and pervasive across multiple cases, and (3) whether it rises to the level of outrageous conduct that shocks the conscience. To the extent the Court has any uncertainty as to any one of these issues, or believes the record is either incomplete or in material dispute, Mr. Walters respectfully submits he is entitled to an evidentiary hearing and discovery.

## CONCLUSION

For all of the foregoing reasons and those set out in our moving papers, Mr. Walters respectfully requests that the Court dismiss the indictment with prejudice or, in the alternative, grant an evidentiary hearing.

- 20 -

Dated: New York, New York
       February 6, 2017

                                    Respectfully submitted,

                                    KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                    By:  /s/ Barry H. Berke
                                    Barry H. Berke
                                    Paul H. Schoeman
                                    Eric A. Tirschwell

                                    1177 Avenue of the Americas
                                    New York, New York 10036
                                    (212) 715-9100  (Phone)
                                    (212) 715-8000  (Fax)
                                    bberke@kramerlevin.com
                                    pschoeman@kramerlevin.com
                                    etirschwell@kramerlevin.com

                                    *Counsel for Defendant William T. Walters*